## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-483-DLF** |
| **EDWARD FRANCISCO RODRIGUEZ,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Edward Francisco Rodriguez to 88 months' incarceration, at the middle of the applicable Sentencing Guidelines range, three years of supervised release, $2,000 in restitution, and a $100 special assessment.

## I.       INTRODUCTION

The defendant, Edward Rodriguez, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Rodriguez, a 28-year-old real estate agent from Brooklyn, New York, joined other rioters storming the police line on the West Plaza. During the riot, Rodriguez obtained a can of bear spray and used it to spray police officers who were attempting to keep the crowd from advancing toward the Capitol building. In a subsequent interview posted on social media, Rodriguez told the interviewer, "I was there, and I just want to let you know that we in America, we fight back!"

The government recommends that the Court sentence Rodriguez to 88 months' incarceration for his conviction of violating 18 U.S.C. §§ 111(a)(1) and (b), at the midpoint of the advisory Guidelines' range of 78-97 months, which the government submits is the correct Guidelines calculation. An 88-month sentence reflects the gravity of Rodriguez's conduct, but also acknowledges his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts supporting the Complaint filed in this case (ECF No. 1-1) for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Rodriguez's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

On January 5, 2021, Rodriguez travelled by train from New York City to Harrisburg, Pennsylvania, where he then boarded a charter bus organized by a local "Stop the Steal" group. The bus arrived in Washington, D.C., either late in the night on January 5 or early in the morning on January 6.

On the morning January 6, Rodriguez attended the "Stop the Steal" rally and then marched with other protestors to the Capitol, as shown in Image 1. Rodriguez was wearing a navy suit, white dress shirt, a plaid necktie, a red hat with lettering, "Trump, Keep America Great, and a red face covering with lettering, "Trump 2020." At times, Rodriguez wore a navy overcoat and carried a sign reading, "Stop the Steal."



*Image 1 – Rodriguez marching towards the Capitol*

On the West Lawn of the Capitol grounds, Rodriguez gave an interview that was posted to Twitter, as shown in Exhibit A. Rodriguez stated, "Here in America, we fight back! We will never

surrender to dictatorship, corruption, communism, or socialism! We the people will never put up with their bullshit! Here in America, we fight back!"



*Image 2, a screenshot from Exhibit A, Timecode 01:08 – Rodriguez being interviewed*

By at least 1:53 p.m., Rodriguez was standing on the restricted grounds of the Capitol on the West Plaza. Rodriguez made his way to the front of the barricade line.



*Image 3, screenshot from Exhibit B, Timecode 00:38 – Rodriguez making his way through the crowd to the front*

Rodriguez was standing at the front of a large crowd, just behind a line of barriers that had been erected to keep the crowd back and away from the Capitol building. At that time, he was holding the sign that read, "Stop the Steal." As shown in Exhibit C, Timecode 02:26, Rodriguez held the sign above his head and led the crowd in a chant from the front of the barricade line, yelling, "Fight for Trump!"



*Image 4, a screenshot from Exhibit C, Timecode 00:00 – Rodriguez at West Plaza police line*

The crowd made multiple attempts to push forward past the barriers and police officers forced the crowd back. Rioters around Rodriguez began throwing various objects at police officers. At approximately 2:09 p.m., as shown in Exhibit C, Timecode 15:20, a group of rioters pushed forward and attempted to breach the barricade line, toppling a large wrought iron lamppost onto police officers. At that time, Rodriguez is shown in Exhibit D, Timecode 02:20, joining the group of rioters attempting to breach the barricade line, holding his "Stop the Steal" sign, and aiming a cannister of Frontiersman Bear Attack Deterrent (bear spray)[2] at police officers. Rodriguez appears

---

[2] As detailed below, Frontiersman is a brand of bear spray manufactured by SABRE. Bear spray is a specific aerosol spray whose active ingredients are highly irritant capsaicin and related capsaicinoids that are used to deter aggressive or charging bears. Frontiersman bear spray is made

to struggle to deploy the bear spray, which the government believes resulted from the device not being armed yet, as further detailed below.



*Image 5, a screenshot from Exhibit D, Timecode 02:23 – Rodriguez aiming cannister of bear spray at police officers during breach attempt*

In response to the rioters' attack, a police officer deployed pepper spray towards rioters and yelled, "Move back!" As shown in Exhibit D, Timecode 02:31, Rodriguez held his sign in front of his face to deflect the officer's pepper spray.

Less than one minute after police officers wrestled the wrought iron lamp post away from the rioters and resecured the barricade line, at approximately 2:10 p.m., Rodriguez returned to the front of the crowd. On this occasion, Rodriguez deployed the Frontiersman bear spray at the law enforcement officers who were attempting to keep the crowd from advancing toward the Capitol building, as shown in Exhibits C, D, E, F, and G. Based on video evidence and officer interviews, Rodriguez was approximately three to five feet away from police at the time of the assault.

---

with 2.0% major capsaicinoids, which is the maximum strength allowed for commercial sale. Frontiersman bear spray is 50% stronger than the maximum strength police pepper spray, which is the highest strength spray intended for use against humans. *See* https://www.sabrered.com/bear-spray/frontiersman-9-2-ounce-bear-spray, *last visited* October 16, 2023.



*Image 6, a screenshot from Exhibit D, Timecode 03:44 – Rodriguez deploying bear spray towards police officers from the perspective of police officers*



*Image 7, a screenshot from Exhibit E, Timecode 08:40 –Rodriguez deploying bear spray towards police officers from the perspective of police officers*



*Image 8, still from Exhibit F, Timecode 00:08 – Rodriguez deploying bear spray towards police officers from perspective of the crowd*



*Image 9, still from Exhibit G, Timecode 00:24 – Rodriguez deploying bear spray towards police officers from perspective of the barricade line*

As shown in Exhibit F, Rodriguez directly hit at least three police officers with the bear spray at an approximate distance of three to five feet. At least five additional police officers were in the immediate proximity and also suffered from the effects of the spray. Many of the officers whom Rodriguez attacked were forced to retreat from the barricade line and undergo decontamination.

Rodriguez directly hit at least one of the officers, Metropolitan Police Officer N.D., in the eyes and face with bear spray. When interviewed, Officer N.D. remembered Rodriguez as having sprayed him in the eyes and face because of Rodriguez's distinctive red hat and red face mask. Officer N.D. remembered Rodriguez being in front of the crowd for most of the time that Officer N.D. was at the barricade line. The spray's effects on Officer N.D. and other officers are described further below.

After deploying the bear spray at police officers, Rodriguez retreated to the rear of the crowd, and he then left the Capitol grounds.

Later that day, Rodriguez gave another interview that was posted on YouTube, as shown in Exhibit H. Rodriguez said, "I was there and I just want to let you know that we in America, we fight back! … They [police officers] were pepper spraying people – but the police got it back… Just know that we were here today because we stand for freedom."



*Image 10, a screenshot from Exhibit H, Timecode 00:00 – Rodriguez being interviewed*

Rodriguez gave another interview that was later posted on YouTube, as shown in Exhibit I. His interviewer asked, "So, what'd you think about the festivities today out here at the Capitol center?" Rodriguez replied, "I am totally for it, because I believe us, Americans, we the people, we are tired. We can see the corruption, the dictatorship from very far away. A lot of people are scared, but what they need to understand, what they need to know, we fight back!" Later in the interview, Rodriguez commented, "The most important thing is that we all remember why we were here today—it was not to cause problems—it's to make sure that the people know that the government works for the people and the people does not work for the government. Therefore, I'm very happy I was here today. We made it all the way, um, through. And, they need to definitely consider the reason of why we're here and I know they will because we will never give up." At the end of the interview, Rodriguez declined to give his name to the interviewer, stating, "I'd rather keep that confidential."



*Image 11, a screenshot from Exhibit I, Timecode 00:00 – Rodriguez being interviewed*

*Interview with FBI*

On July 9, 2021, Rodriguez was arrested, and he agreed to an FBI interview.[3] Rodriguez explained that he traveled to Washington D.C. for the "Stop the Steal" rally. He remarked that he wanted to "fight for my freedom, my rights, for America." After the rally, he marched from the rally to the Capitol, where he was "not too far from the front yard." Rodriguez described the protest developing into a riot: "It was terrible… It was very confusing… It went from a peaceful rally to… people trying to cause violence and confusion… It got very twisted… It just turned." He observed others in the crowd throwing objects at the police. Rodriguez remarked, "I saw someone throw a smoke bomb, from our side," referring to another rioter. He stated, "It looked very normal, but looking at it after… they [referring to others in the crowd] were inciting violence." Rodriguez heard others around him yelling, "Move forward!"

Rodriguez admitted that he made his way to the front of the barricade line. He stated, "There was a line of police officers and I wanted to see what was happening… I was at the front chanting, 'Freedom.'" At one point, Rodriguez saw "either pepper spray or bear spray" on the ground and he picked it up. Rodriguez claimed he did not recall what, if any, markings were on the cannister. He asked others around him, "How do I use this? How do I use this?" referring to the spray. An unknown male in the crowd "helped [Rodriguez] open it [the spray] up." Rodriguez admitted to deploying the spray at police officers. Rodriguez remarked, "When I saw that [spray], I picked it up, and I sprayed the police."

When asked by agents who Rodriguez was aiming to hit with the spray, Rodriguez admitted, "I was trying to aim at that person who was spraying the people." Agents asked

---

[3] Video of Rodriguez's FBI interview is included as Exhibit J.

Rodriguez to describe that person, and he stated, "He was in a police officer uniform." Rodriguez admitted that he intended to hit the uniformed officer with the spray but claimed that he did not observe the effect that his attack had on police officers, because, "It happened so fast." Rodriguez initially denied knowing what effect the spray he deployed would have on officers, but when asked again, he stated, "Yes, because I just got blinded [myself with OC spray.]" Rodriguez described getting OC spray in his eyes during the attack. He claimed that he did not know whether the spray in his eyes came from the spray that he deployed or from OC spray the police officers deployed. Rodriguez claimed that he did not know what he did with the spray cannister after he sprayed police officers. Rodriguez told agents that he retreated from the barricade line after the attack and others in the crowd helped him decontaminate his eyes with water.

Agents asked Rodriguez why he decided to spray police officers and he replied, "I felt like I needed to do something to stop it." In retrospect, Rodriguez realized, "Spraying a police officer… that's a crime."

### *Internet Search History*

Several days after the riot, Rodriguez's Google search history showed a query, "What does bear spray to do humans?" which led agents to believe Rodriguez knew that the spray that he deployed against police was bear spray.

### *Spray Identified as Frontiersman Bear Attack Deterrent*

A subsequent review of video and photographic evidence showed the spray Rodriguez used against the officers was labeled: "Frontiersman Bear Attack Deterrent."



*Image 12 – High resolution photograph of Rodriquez
deploying bear spray at police officers*



*Image 13 (left) – Close-up of bear spray deployed by Rodriguez*

*Image 14 (right) – Frontiersman Bear Attack Deterrent Spray in black belt holster[4]*

---

[4]   Image   source:   https://www.campingsurvival.com/products/bear-attack-deterrent-spray,   *last visited* August 17, 2023.

Frontiersman Bear Attack Deterrent is a brand of bear spray that is manufactured by SABRE.[5] Bear spray sold by SABRE comes in two sizes: 7.9-ounce and 9.2-ounce, and both sizes are sold with the black belt holster shown above in Image 14.[6]

The front of the cannister specifies that active ingredients in bear spray include capsaicin and related capsaicinoids (OC), which make up 2.0 percent of the product's ingredients. *Id.* According to SABRE's website, OC spray formulas that include 2.0 percent major capsaicinoids are the "Maximum strength . . . allowed by the [U.S. Environmental Protection Agency]"[7] and, therefore, deployment of the spray results in "Maximum stopping power."[8] SABRE's website claims that the bear spray contains the "Strongest formula allowed by law" and that it is "50% stronger than SABRE's maximum strength police pepper spray."[9] Notably, SABRE's maximum strength police pepper spray contains the highest level of major capsaicinoids intended for use on humans. SABRE asserts that the bear spray is among the hottest varieties of OC sprays commercially available. SABRE's website includes a graphic that shows a heat spectrum of OC sprays by levels of major capsaicinoids (MC):[10]

---

[5] https://www.sabrered.com/bear-spray, *last visited* August 17, 2023.

[6] *Id.*

[7] Bear spray manufacturers, including SABRE, must register their products and receive approval for labeling and product formulation from the EPA prior to distributing or selling bear spray. *See, e.g.,* Exhibit K, EPA Labeling Letter regarding Frontiersman Bear Attack Deterrent.

[8] https://www.sabrered.com/bear-spray, *last visited* October 16, 2023.

[9] https://www.sabrered.com/bear-spray/frontiersman-9-2-ounce-bear-spray, *last visited* October 16, 2023.

[10] *Id.*



*Image 15 –Marketing graphic showing OC sprays by levels of major capsaicinoids*

Commercially available pepper spray for use on humans contains concentrations of MC ranging from 0.18 to 1.33 percent. *See United States v. Worrell,* 21-cr-292 (RCL), Trial Tr. at 106 (attached as Exhibit L); *see also* Image 15 above (quantifying sprays containing 1.33 percent MC as "Level III" sprays). A pepper spray with MC concentration of 1.33 percent corresponds to a Scoville Heat Unit rating (SHU) of 2 million, which is many times more potent than the hottest peppers humans ever come into contact with or eat. Exhibit L at 108-09. As noted above, the spray used by Rodriguez—Frontiersman: Bear Attack Deterrent Spray—contains 2.0 percent MC concentration, which is 50% stronger than a spray containing 1.33 percent MC concentration, since bear spray is designed for use against wild bears and other dangerous animals. *See* Exhibit K, EPA Letter Approving Cannister Labeling and Marketing Materials.

The front of the Frontiersman bear spray aerosol canister[11] reads, "Bear Attack Deterrent Spray" and includes a warning label: "Keep Out of Reach of Children… DANGER…." Exhibit K

---

[11] Labeling of Frontiersman Bear Attack Deterrent Spray does not explicitly describe the spray as an aerosol product but does note that the canister can be recycled in communities where "(steel) aerosol can recycling is available." Exhibit K at 6. Retailers of SABRE products describe the product as an aerosol spray. *See, e.g.*, https://www.midwayusa.com/product/1007746676, *last visited*, August 17, 2023.

at 3. The back of the Frontiersman bear spray cannister contains a litany of additional precautionary statements and warnings. *Id.* at 3-5. There is a section labeled "Hazards to Humans & Domestic Animals," which reads, "DANGER: May cause irreversible eye damage if sprayed in the eyes at close range. Contact through touching or rubbing eyes may result in substantial but temporary eye injury. Strongly irritating to nose. Do not get in eyes, on skin or on clothing. Thoroughly wash with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove contaminated clothing and wash clothing before reuse." *Id.* The back of the cannister also displays a first aid statements' grid:

| If in Eyes: | • Hold eye open and rinse slowly and gently with water for 15-20 minutes.<br>• Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye.<br>• Call a poison control center or doctor for treatment advice. |
|---|---|
| Have the product container or label with you when calling a poison control center or doctor or going for treatment. For medical emergencies call the poison control center at 1-800-222-1222. For general information on this product contact the National Pesticides Information Center (NPIC) at 1-800-858-7378, Monday through Friday, 8 am to 12 pm Pacific time or at http://npic.orst.edu. | |

*Image 16 – Bear spray first aid instructions*

Exhibit K at 3.

The back of the bear spray cannister also describes the product's effective range. For both the 7.2-ounce and the 9.2-ounce cannisters, "This product has an effective range of 25 to 40 feet at 32ºF and 68ºF, respectively." Exhibit K at 6. As described below, several officers who were attacked with bear spray by Rodriguez and others were attacked at a much closer range than the labeled effective range. Officer M.B. was approximately three to five feet away from Rodriguez when he sprayed her. Officer B.R., who was wearing a gas mask, was sprayed directly in the face by Rodriguez from approximately three feet away.

The back of the Frontiersman bear spray cannister also describes the speed with which the spray is deployed. The 7.2-ounce cannister "delivers approximately five to six 1-second bursts"

and "empties in approximately six to seven seconds at 68ºF and 32ºF, respectively." Exhibit K at 6. The 9.2-ounce cannister "delivers approximately seven to eight 1-second bursts" and "empties in approximately seven to eight seconds at 68ºF and 32ºF, respectively." *Id.* During his post-arrest interview, Rodriguez remarked that the spray attack "happened so fast." As shown in Exhibit F, Rodriguez's attack lasted for approximately seven seconds, long enough (or nearly so) to empty the cannister of bear spray.

On the back of the Frontiersman bear spray cannister, there labeled instructions to "To Arm and Apply," which read, "This product is designed for one-handed operation. Place forefinger through hole in handle with thumb on safety clip curl. Pull safety clip straight back and off using thumb… Depress actuator tab for burst of spray... Aim at face and eyes of bear. Press trigger for 3 seconds to create a barrier of spray between you and the bear. Stop to evaluate the impact of wind and other factors and adjust your aim if needed before spraying again." Exhibit K at 6. Marketing materials also include images of how to arm and disarm the bear spray:



*Image 17 – Arming instructions for bear spray*

Exhibit K at 8. During his post-arrest interview, Rodriguez admitted to receiving help with the bear spray from an unknown male in the crowd. Consistent with the cannister's instructions and Rodriguez's apparent first unsuccessful attempt to deploy the bear spray at police officers,

Rodriguez described the need to arm the cannister before deploying the spray and having received assistance from an unidentified male in the crowd because Rodriguez did not know how to do so.

EPA approved marketing materials for Frontiersman bear spray state that the product is designed "To Deter Bears from Attacking Humans… Also deters [human] attacks from mountain lions, cougars, pumas, bobcats, lynxes and all other large cats." Exhibit K at 7. Approved marketing materials for the bear spray depict a grizzly bear:



*Image 18 – Bear spray marketing image of grizzly bear*

Exhibit K at 7.

According to the U.S. National Park Service, "The grizzly bear is typically larger than the black bear and has a large muscle mass above its shoulders; a concave, rather than straight or convex, facial profile; and much more aggressive behavior… Males weigh 200–700 pounds, females weigh 200–400 pounds; adults stand about 3½ feet at the shoulder… Grizzly bears are generally 1.5 to 2 times larger than black bears of the same sex and age class within the same geographic region, and they have longer, more curved claws… [Grizzly bears are] [a]gile; can run

up to 40 mph… Can climb trees... [and] Can also swim and run up and downhill."[12] Based on EPA approved labeling and marketing materials, Frontiersman bear spray is a product designed to deter an attack by dangerous, massive wild animals that could seriously injure humans, such as grizzly bears. Bear spray is clearly not designed for use on humans.

### OC Spray

As described above, the active ingredient in bear spray is OC. A toxicologist testifying recently in the trial of *United States v. Worrell,* 21-cr-292 (RCL), a case involving the use of pepper gel, in which the defendant was convicted of assault with a deadly or dangerous weapon under 18 U.S.C. § 111(b), described the effects of OC spray.[13] When the human body comes into contact with OC, certain physiological responses are triggered regardless of concentration or delivery mechanism and regardless of a person's perceived sensitivity to the substance. In other words, what matters is simply "whether the body comes into contact with capsaicinoids." Exhibit L at 109. At that point, the neurons that can detect capsaicin will release other substances and neurotransmitters, including substance P, which is one of the main neurotransmitters for pain. *Id.*

For example, when OC comes into contact with the eyes, neurotransmitters trigger a "very strong reflex" causing the eyes to shut "very tightly … in some respects, violently," to protect the body from additional exposure. *Id.* at 110. The eyes and the skin on a person's face are particularly sensitive due to the large number of pain receptors present there in contrast to, for example, the skin on a person's arm. *Id.* at 111. Once OC enters the nasal passageway, a person's respiratory

---

[12] https://www.nps.gov/yell/learn/nature/grizzlybear.htm, *last visited* August 17, 2023.

[13] A transcript from *Worrell* that includes testimony from a toxicology expert regarding OC spray is included as Exhibit L. Page numbers used for identification in this memorandum correspond to the page numbers marked on the transcript itself, not the page number in the exhibit.

tract also clinches shut to prevent the chemical from entering the lungs, causing a person to have difficulty breathing, sometimes leading to bronchospasm, extreme tightening of the respiratory tract. *Id.* at 112. A person experiencing bronchospasm will wheeze heavily and may lose the ability to breathe altogether. *Id.*

In addition to the impairment of the lungs, OC also triggers dial aged blood vessels which, in turn, may cause bradycardia or tachycardia (unsafe high or low heart rate) the risks of which increase if a person is already engaged in strenuous physical activity. *Id.* at 113-14, 118. Rapid changes in blood pressure can cause a person to lose consciousness. *Id.* at 123. OC exposure to the eyes may cause corneal abrasions due to extreme dryness, which may take days or weeks to heal. *Id.* at 116. The risk of corneal abrasion and permanent eye damage increases if a person is not able to decontaminate right after being exposed. *Id.* at 117. The cornea is also vulnerable to infection; a secondary infection due to capsaicin-induced corneal damage may cause long-term eye problems. *Id.* at 121. In addition, following exposure to pepper spray, some individuals will develop reactive airway dysfunction syndrome, or RADS (which makes their lungs vulnerable to future chemical exposures), and long-term asthma, each of which may require individuals to go on long-term medication to ensure that their lungs are functioning properly. *Id.* at 114-15.

Approximately 15 percent of people exposed to OC will experience severe medical problems requiring emergency medical treatment. *Id.* at 117-18. In rare cases, persons exposed to pepper spray have died of heart attack or heart failure, or severe heart or respiratory failure. *Id.* at 124, 133. Individuals with asthma are particularly vulnerable; a capsaicin exposure is more likely to cause an individual with asthma to not be able to breathe, which could trigger other serious medical complications. *Id.* at 123.

### *Injuries*

The government has identified at least eight Metropolitan Police Department (MPD) officers whom Rodriguez injured with his spray attack: Sergeant O.A., Officer M.B., Officer N.D. (the victim named in the Superseding Indictment), Officer P.N., Officer B.R., former Officer J.R., Sergeant A.W., and Officer A.Z.

Police officers form a unique class of victims. As the Court heard in *United States v. Ramey*, officers are trained to be assaulted, experience pain, and "fight through it." 22-CR-184-DLF, Trial Tr. at 117 (D.D.C. Feb. 21, 2023). All of the officers whom Rodriguez sprayed felt pain from his attack. However, as detailed below, not all these officers experienced pain in the same way. Their pain varied by the initial pain level experienced, whether the pain later reactivated, and whether the pain was sustained for hours or even days. Some officers were affected immediately, while others were not affected until hours later, when they touched an article of clothing or gas mask that was covered in the chemical irritant Rodriguez used. Several officers were sprayed with bear spray and other chemical irritants by different rioters after Rodriguez's attack and experienced more extreme levels of pain than when Rodriguez initially assaulted them. Many officers described chemical irritants reactivating over the course of the day, sometimes multiple times, causing them recurrent pain. Some officers developed painful reactions to chemical irritants in the days following January 6, including a diagnosis of chemical burns to one officer's hands by an emergency room doctor.

Officers reacted to being sprayed with bear spray in different ways. A few officers who were sprayed were forced to retreat and decontaminate, and they were unable return to the police line due to the extreme levels of pain they experienced. Other officers retreated briefly,

decontaminated, and returned to the police line to protect the Capitol and their fellow officers—on some occasions, fighting through extreme pain. A few officers who experienced less pain did not retreat at all.

Officers sought treatment for their injuries in different ways. Some officers went to hospitals, clinics, or specialists where they received medical treatment. For some officers, medical treatment took place in the days following January 6. For others, medical treatment and rehabilitation lasted for months. Some officers treated their injuries themselves at home. Several officers received, and continue to receive, ongoing mental health counseling and psychiatric treatment for the lasting psychological effects of their experience on January 6, and others did not.

### a. Sergeant O.A.

Sergeant O.A. was sprayed by Rodriguez in the face, eyes, and forehead with bear spray.[14] After he was sprayed, Sergeant O.A., who was not wearing a gas mask on January 6, backed away from the police line and used water to rinse out his eyes. He experienced a "burning" sensation that he felt when he was sprayed with OC spray at the police academy; however, the sensation the bear spray caused was worse and felt like "little needles" pinching him and going into his skin. Sergeant O.A. felt as though he could not breathe. Although Sergeant O.A. struggled to open his eyes, he returned to the police line after approximately two-and-a-half minutes. He felt like it was his duty to prevent rioters from breaking through the barricade line, so he fought through the pain.

Sergeant O.A. was hit with multiple other chemical sprays after being sprayed by Rodriguez. The cumulative effect of being sprayed so many times caused Sergeant O.A. to

---

[14] A 302 report documenting an interview with Sergeant O.A. is included as Exhibit M-1. Sergeant O.A.'s body worn camera video of Rodriguez's spray attack is included as Exhibit M-2.

experience "a lot of pain." The chemical irritants reactivated approximately two to three hours after he was initially sprayed by Rodriguez, while Sergeant O.A. was still defending the Capitol. When Sergeant O.A. returned home from duty and took a shower, the chemical irritants reactivated again, which was approximately 12 hours after Rodriguez first sprayed him. On both occasions when the chemical irritants on his skin reactivated, Sergeant O.A. felt like "needles" were going into his face. Approximately five to six days after January 6, the skin on Sergeant O.A.'s hands and face began to peel off, and the skin underneath appeared red and dry. He believed the skin reaction was a result of exposure to multiple chemical irritants on January 6, including Rodriguez's bear spray. Sergeant O.A. did not seek medical attention for his hands and face but treated his injuries at home.

### b.  Officer M.B.

Prior to Rodriguez's attack, Officer M.B. had already been assaulted with bear spray by another rioter on the West Plaza. She retreated to the Upper West Terrace and decontaminated from the first attack. Officer M.B. then returned to the barricade line on the West Plaza even though she was only able to open one of her eyes. When asked why she returned to the line so quickly, she remarked, "I'm a fighter."[15]

Less than three minutes after Officer M.B. returned to the barricade line on the West Plaza, she was sprayed by Rodriguez in the face and hands with bear spray. Officer M.B. was approximately three to five feet away from Rodriguez when he sprayed her. She was wearing a bicycle helmet, but she did not have a riot helmet with a visor or gas mask. Officer M.B. knew that

---

[15]  A 302 report documenting an interview with Office M.B. is included as Exhibit N-1. Officer M.B.'s body worn camera video of Rodriguez's spray attack is included as Exhibit N-2, Timecode 07:00-10:00.

she had been assaulted with bear spray because it "burns worse" (than OC spray intended for use on humans). She also thought it was bear spray because it was orange in color and left a residue on her clothing that was more difficult to decontaminate. To Officer M.B., bear spray felt twice as powerful as regular pepper spray. On a pain scale of one to ten, she rated a bear spray attack as a 15. Even though she was wearing heavy mechanical gloves, her hands burned from Rodriguez's spray attack. She equated the pain to what Officer M.B. felt as a child when she but her hand directly on a hot stove top. Officer M.B. detailed her medical history, which included 18 prior surgeries. She commented that she had a high pain tolerance and the bear spray felt "as bad as tearing an ACL." Officer M.B. was forced to retreat from the police line once again and decontaminate as result of Rodriguez's attack.

Officer M.B. was assaulted multiple other times on January 6, including by being hit in the face and head with fists and objects, dragged down a flight of stairs and suffering a concussion, and sprayed with chemical irritants as many as 20 times. By the end of the day, Officer M.B. could not stop coughing and had difficulty breathing, which she described as most similar to an asthma attack. Both of her eyes were swollen shut and she could not see. Officer M.B. threw up from the cumulative effect of being hit multiple times with bear spray, other chemical sprays, and exposure to gas. At that point, Officer M.B. thought she might die.

In the months following January 6, Officer M.B. sought medical attention for her injuries, including consultation with various specialists for a concussion, back pain, knee pain, and swollen eyes, which she attributed to exposure to multiple chemical irritants. Officer M.B. replays the events of January 6 in her head often and experienced nightmares. She remarked that she "would not wish bear spray on my worst enemy" and that "the bear spray still haunts me."

### c.  Officer N.D.

Officer N.D. was sprayed by Rodriguez in the eyes and face with bear spray.[16] As detailed above, Officer N.D. remembered Rodriguez as his attacker because of Rodriguez's distinctive red hat and red face mask. Officer N.D. was wearing a Plexiglass shield, which partially covered his face but did not prevent the bear spray from striking his eyes. Officer N.D. experienced "immense pain" to his eyes and face after the attack. Officer N.D. was wearing contact lenses on January 6, which made chemical irritants like bear spray cling to and cause further pain to his eyes. On a pain scale of one to ten, Officer N.D. rated the attack as seven-and-a-half. Officer N.D. was forced to leave the barricade line to flush his eyes out with water, and he was assisted in decontamination by his superior officer because Officer N.D. could not see. Officer N.D. stated that under different circumstances, he would have stayed off the line for longer to recover from the attack, but he felt he had a duty to get back on the line despite experiencing "immense pain." Officer N.D. stated that he does not normally encounter death, but he thought that he and/or other officers could die that day, so he returned to the line as soon as possible to protect his fellow officers.

### d.  Officer P.N.

Officer P.N. was also sprayed by Rodriguez in the face with bear spray.[17] Officer P.N. was wearing his rioter helmet with a visor, which he believed deflected some of the spray. Nonetheless, spray particles traveled under Officer P.N.'s visor and into his mouth. He described the bear spray

---

[16] A 302 report documenting an interview with Officer N.D. is included as Exhibit O-1. Officer N.D.'s body worn camera video of Rodriguez's spray attack is included as Exhibit O-2. A victim impact statement written by Officer N.D. is included as Exhibit O-3.

[17] A 302 report documenting an interview with Officer P.N. is included as Exhibit P-1. Officer P.N.'s body worn camera video of Rodriguez's spray attack is included as Exhibit P-2. A victim impact statement written by Officer P.N. is included as Exhibit P-3.

as "burning" and "irritating." When the attack occurred, Officer P.N. remembered thinking he had "caught a mouthful" of "super soaker" OC spray. He was forced to step back from the line.

Less than 20 minutes after Rodriguez's attack, the police line on the West Plaza collapsed and rioters breached the barricades. At that time, Officer P.N. was assaulted several more times, including by being struck in the head with a blunt object, having his visor ripped from his helmet, and being sprayed directly in the face with bear spray by another rioter. On this occasion, Officer P.N. did not have a visor to deflect any of the bear spray. He described the bear spray as red in color and smelling like alcohol. This bear spray attack was much worse than other OC sprays that he had experienced before. He felt as though the skin on his face was "peeling off" or like acid had been thrown in his face. His vision became blurry, and he could barely see. On a pain scale of one to ten, Officer P.N. rated the direct attack with bear spray to his face as a 13.

Officer P.N. was able to get into the tunnel on the Lower West Terrace and then inside the Capitol building, where he attempted to decontaminate with water. He then returned to the tunnel, fought through the pain, and attempted to prevent rioters from entering the building. In the tunnel, Officer P.N. was subjected to additional OC spray attacks, CS gas, and fire extinguisher discharge. At that time, his body started tingling and he began having trouble breathing. Officer P.N. broke away and was able to exit the tunnel. He felt like something was not right with his body and his breathing difficulty became more serious. Officer P.N. then had a seizure. He believes that the episode was caused by the cumulative effect of being hit in the head and sprayed with multiple chemical irritants, including Rodriguez's initial attack and the more direct bear spray attack to Officer P.N.'s face that followed. When Officer P.N. stopped convulsing, he was unable to talk, and his fingertips changed color. USCP medics used CPR equipment to get oxygen into his lungs

and administered albuterol. Medics removed Officer P.N.'s vest and belt and cut through his shirt and clothing to treat him appropriately. Once it was safe to move Officer P.N., medics carried him to an ambulance. Officer P.N. was transported by ambulance from the Capitol to a hospital, where he received treatment for his injuries and was ultimately discharged.

Officer P.N., who has been with MPD for 10 years, was unable to work as a police officer for approximately 8 months after January 6. He received ongoing medical treatments for his injuries, including physical therapy for vestibular balance, consultation with an eye specialist for blurred vision, and speech therapy for a stutter that he developed. Officer P.N. stated that he seriously considered suicide after his experience on January 6. Officer P.N. sought mental health counseling and he was diagnosed with post-traumatic stress disorder (PTSD) from his experience on January 6. He continues to receive mental health treatment and takes prescribed medications.

### e.   Officer B.R.

Rodriguez sprayed Officer B.R. directly in the face with bear spray from approximately three feet away.[18] Officer B.R. was one of the few officers who was wearing both a helmet with a visor and a gas mask, so he did not immediately feel the effects of the spray. Officer B.R. remembered Rodriguez's attack because of the large cannister of bear spray that was used.

After the police line at the West Plaza collapsed, Officer B.R. retreated into the tunnel on the Lower West Terrace. The tunnel was packed with rioters and other police officers. Officer B.R. was pushed against a wall and thought he might "collapse." At that time, he felt like he could not breathe, so Officer B.R. removed his gas mask and, in doing so, touched his face. Officer B.R.

---

[18] A 302 report documenting an interview with Officer B.R. is included as Exhibit Q.

immediately felt the effects of the bear spray that covered his gas mask. Officer B.R. said the pain was "extreme." He could not open his eyes and had to be assisted by another officer to make it from the crowded tunnel to a wash station to decontaminate. The chemical irritant affected Officer B.R. for several hours after he returned home from duty.

###### f.   Former Officer J.R.

Former Officer J.R. was sprayed by Rodriguez in the face with bear spray, and he vividly remembered the attack.[19] Former Officer J.R. was wearing his helmet, which deflected some but not all the spray particles. The spray attack forced Officer J.R. to step back from the barricade line. At that moment, former Officer J.R. felt surrounded, outnumbered, and like there was no way out.

Approximately 20 minutes after Rodriguez's spray attack, the police line on the West Plaza collapsed. Many officers, including former Officer J.R., retreated into the tunnel on the Lower West Terrace. At the entrance to the tunnel, former Officer J.R. was sprayed directly with bear spray by an unidentified rioter at a distance of three to four feet. Former Officer J.R. advised that the spray was brown in color and came from bottle that was the same approximate size and appearance as the bear spray Rodriguez that used. On this occasion, the bear spray covered former Officer J.R.'s entire body.

Former Officer J.R. remarked that the bear spray immediately "took [him] out." It felt as though he was "in a fire" or "on fire." Former Officer J.R. felt as though he could not breathe, "like [his] lungs weren't working," and "like [he] was suffocating." Former Officer J.R. had been

---

[19] A 302 report documenting an interview with former Officer J.R. is included as Exhibit R-1. Former Officer J.R.'s body worn camera video of Rodriguez's spray attack is included as Exhibit R-2. A victim impact statement written by Officer J.R. is included as Exhibit R-3.

sprayed with pepper spray before January 6 during training at the police academy, as well as during other crowd control incidents he encountered while on the job with the MPD, but there was a distinct difference between the effects of bear spray and pepper spray. Former Officer J.R. quantified a direct bear spray as a "ten out of ten" on a pain scale and he felt "extreme pain." As result of the second bear spray attack in the tunnel, former Officer J.R. retreated. He was unable to return to the police line for the rest of the day. Nothing former Officer J.R. did to decontaminate helped with the pain, and the effects of the bear spray "lasted and lasted." At some point, the pain eventually subsided and former Officer J.R. was able to return home. There, the bear spray residue reactivated, and he experienced pain all over again.

On January 7, former Officer J.R.'s hands blistered, which he attributed to the multiple chemical spray attacks that he endured on January 6, including Rodriguez's attack. Former Officer J.R. remembered a "burning" sensation that lasted days after his initial exposure to chemical irritants. He compared the pain to placing one's hands on a hot stove and leaving them there. Former Officer J.R. sent pictures of his blistered hands to his MPD supervisor. Late in the night on January 7, former Officer J.R. was transported by ambulance from his residence to the hospital burn center for injuries to his blistered hands. Former Officer J.R. told medical personnel that he had been exposed to unknown chemical irritants at the Capitol on January 6, which he believed had caused the blistering, swelling, and pain to his hands. Medical records from MedStar Washington Hospital Center, which have been provided to defense counsel, show that former Officer J.R. was diagnosed with chemical burns to his hands that a doctor concluded was caused by exposure to chemical irritants on January 6. A doctor prescribed lotion and oxycodone for the pain. On January 8, former Officer J.R. received medical treatment again at the Police and Fire

Clinic for injuries to his hands. There, former Officer J.R. also told medical personnel about being attacked with chemical irritants at the Capitol on January 6. Another doctor diagnosed chemical burns to former Officer J.R.'s hands and prescribed him oxycodone and prednisone for the pain and swelling in his hands.

As a result of the overall impact of January 6, former Officer J.R. sought mental health counseling for six to eight months afterwards. He was hospitalized for panic attacks and prescribed anti-anxiety medication. Former Officer J.R. ultimately resigned from MPD due to the impact of January 6. Former Officer J.R. previously served for nine years in the U.S. Army and deployed twice to Iraq. Even through former Officer J.R.'s deployments and MPD career, he advised that he never felt closer to death than he did on January 6. Of all the assaults that former Officer J.R. endured on January 6, the bear spray attack at the entrance to the tunnel by an unidentified rioter stood out as the most traumatizing event.

### g.  Sergeant A.W.

Prior to Rodriguez's spray attack, Sergeant A.W. recalled that an unknown rioter was throwing full soda cans at police officers on the barricade line. Sergeant A.W., who was holding a MK-30 cannister of OC spray, deployed his OC spray towards the rioter who was throwing cans and instructed the crowd to move back. Shortly thereafter, Rodriguez deployed bear spray at Sergeant A.W. and other officers on the barricade line. [20] Sergeant A.W. was sprayed by Rodriguez in the face, mouth, and nose with bear spray. Sergeant A.W. was wearing his helmet but the visor did not completely cover his face and mouth, so Sergeant A.W. was greatly affected by the attack.

---

[20] A 302report documenting an interview with Sergeant A.W. is included as Exhibit S-1. Sergeant A.W.'s body worn camera video of Rodriguez's spray attack is included as Exhibit S-2.

Sergeant A.W. had never been sprayed with bear spray before. He thought it was bear spray because he heard other officers around him describing it as such and because it felt different than police pepper spray. Sergeant A.W. had previously experienced OC spray at the police academy, but the bear spray he experienced on January 6 was heavier and more painful. After being sprayed by Rodriguez, Sergeant A.W. could not see anything. Sergeant A.W. felt like he had sandpaper in his eyes. He was coughing, the spray took his breath away ("breathtaking"), and he felt a "burning" sensation covering his face. On a pain scale of one to ten, Sergeant A.W. quantified Rodriguez's bear spray attack as an eight or nine. According to Sergeant A.W., to perceive his experience after he was sprayed by Rodriguez, one could close their eyes and pretend there were a thousand people surrounding you and trying to kill you.

A fellow officer helped Sergeant A.W. up a flight of stairs to the terrace level and then inside the Capitol Building. Sergeant A.W. rinsed his eyes out with water in a bathroom where other officers were decontaminating. The bathroom was covered with residue from chemical irritants. Once Sergeant A.W. regained his sight, he observed officers around him who had been sprayed with chemical irritants laying on the ground. After Sergeant A.W. decontaminated, he borrowed a co-worker's cell phone and called his mother because Sergeant A.W. did not know whether he would survive the day. Sergeant A.W. had never seen rioters attack police so viciously.

### h.  Officer A.Z.

Officer A.Z. recalled Rodriguez's spray attack. It was the first time that he was sprayed with a chemical irritant on January 6. Officer A.Z. was sprayed by Rodriguez in the face, mouth,

and nose with bear spray.[21] However, Officer A.Z. was wearing his helmet with a visor, which largely deflected the spray. Officer A.Z. was also wearing a cloth face covering at the time.

Officer A.Z. immediately thought the spray Rodriguez used was bear spray or hornet spray because it felt different than police pepper spray. Officer A.Z.'s clothing was stained orange with spray residue. On a pain scale of one to ten, Officer A.Z. quantified Rodriguez's bear spray attack as a seven to eight. As result of Rodriguez's bear spray attack, Officer A.Z.'s vison became blurry and he removed his gloves and face covering because his eyes, face, and neck were burning. Officer A.Z. was worried about the loss of his vision and thought, "What if my vision was permanently affected?" Officer A.Z. temporarily left the police line but returned and fought through the pain. Officer A.Z. commented that his adrenaline was pumping so high on January 6 that he believed if someone had shot or stabbed him that day, he would have kept going.

After the crowd broke through the barricades and officers retreated, Officer A.Z. was sprayed on at least two or three more occasions with chemical irritants. As the day progressed, the effects of multiple spray attacks intensified and Officer A.Z. felt like his entire body was burning. Officer A.Z. returned home from duty approximately 12 to 16 hours after being initially sprayed by Rodriguez. When he showered, the chemical irritants reactivated and "felt like hell." Officer A.Z. remarked that his hands were burning for two to three days after January 6.[22]

---

[21] A 302 report documenting an interview with Officer A.Z. is included as Exhibit T.
[22] Additional officer testimony regarding the effects of OC spray is included in the government's sentencing memorandum in *Ramey*, 22-cr-184-DLF, ECF No. 60, at 13-15; s*ee also id.*, ECF No. 45, at 12-15 (post-trial briefing by the government in *Ramey* on the effects of OC spray).

**THE CHARGES AND PLEA**

On December 1, 2021, a federal grand jury in the District of Columbia superseding indictment charging Rodriguez with seven counts, including: Assaulting, Resisting, or Impeding Certain Officers, under 18 U.S.C. §§ 111(a)(1) and (b) (Count Two). On March 13, 2023, Rodriguez pled guilty to Count Two without a signed plea agreement or an agreed statement of offense. *See* Exhibit U, Transcript of Plea Hearing, at 8-9. After the government's factual proffer (Exhibit U, at 11-16), Rodriguez acknowledged that there was a factual basis for an assault committed with a chemical spray, which would meet all elements for his conviction under 18 U.S.C. §§ 111(a)(1) and (b). Exhibit U, at 19-23. Specifically, Rodriguez agreed that the factual basis for his guilty plea under 18 U.S.C. § 111(b) was based on the spray attack resulting in bodily injury, namely, the "immense pain" Officer N.D. experienced, rather than his use of a dangerous weapon. Exhibit U, at 19-23. After making findings of fact based on the government and defense proffers, the Court found those facts sufficient to prove the elements of 18 U.S.C. §§ 111(a)(1) and (b), and accepted Rodriguez's guilty plea. *Id*. The Court reserved for sentencing specific factual findings regarding whether the chemical spray used was bear spray, the number of officers impacted by the assault, the distance between Rodriguez and officers when he deployed the spray, and specific nature of injuries the officers suffered. Exhibit U, at 17-19, 23.

## III.   STATUTORY PENALTIES

Rodriguez now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers, Inflicting Bodily Injury, under 18 U.S.C. §§ 111(a)(1) and (b). He faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR by the U.S. Probation Office. The government submits that the correct adjusted offense level under the Sentencing Guidelines should be calculated as follows:

### Count Two: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level (Aggravated Assault) | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious bodily injury | +5 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a),(b) | Official victim | +6 |
| | **Total** | **31** |

| | |
|---|---|
| **Adjusted Offense Level** | **31** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **28** |

PSR ¶¶ 40-51.

Probation correctly calculated Rodriguez's criminal history score as category as I. PSR ¶ 54. Accordingly, calculating Rodriguez's total adjusted offense level after acceptance of responsibility, at 28, Rodriguez's Guidelines range is 78 to 97 months of imprisonment. PSR ¶ 94.

### a.  Cross-Reference Under U.S.S.G. § 2A2.2 For Aggravated Assault

Pursuant to U.S.S.G. § 2A2.4, the base offense level is 10. However, § 2A2.4(c) directs that a cross-reference to § 2A2.2 (and a base offense level of 14) applies "if the conduct constituted aggravated assault," which is defined as "a felonious assault that involved (A) a dangerous weapon

with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, comment. (n.1).

Here the cross-reference applies because Rodriguez acted with "intent to commit another felony," namely, obstructing, interfering, and impeding law enforcement officers engaged in the performance of their official duties during a civil disorder, under 18 U.S.C. § 231, as alleged in Count One of the Superseding Indictment, ECF No. 28. Alternatively, as further detailed below, the Court could appropriately find a basis for the aggravated assault cross-reference because Rodriguez used a dangerous weapon (bear spray) with intent to commit bodily injury, and because Rodriguez's attack resulted in serious bodily injury.

### b. Enhancement Under U.S.S.G. § 2A2.2(b)(2) For Dangerous Weapon

The bear spray that Rodriguez used to assault police officers constitutes a "dangerous weapon"; therefore, the Court should apply a 4-level enhancement under U.S.S.G. § 2A2.2(b)(2)(B).

"Dangerous weapon," as defined under U.S.S.G. § 2A2.2, Application Note 1, "has the meaning given that term in §1B1.1, Application Note 1," and "includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury." "Dangerous weapon," as defined under U.S.S.G. § 1B1.1, Application Note 1, constitutes "(i) an instrument capable of inflicting death or serious bodily injury." *Id.*, comment. (n.1(E)). "Serious bodily injury," under § 1B1.1, Application Note 1, "means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery,

hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, comment. (n.1(M)). Bear spray constitutes a dangerous weapon under both definitions offered in the Guidelines under U.S.S.G. §§ 2A2.2 and 1B1.1.

In *United States v. Ramey,* this Court addressed the question of whether a defendant's use of OC spray on January 6, 2021, when he sprayed it at officers from at least ten feet away, qualified as a dangerous weapon. The Court found that it did. The Court noted, "Application Note 3 [of U.S.S.G. § 2A2.2] makes clear that the Court shall apply the enhancement in a case involving a dangerous weapon with the intent to cause bodily injury." *Ramey,* July 7, 2023 Sent. Tr. at 6. Even though the Court had found that the government did not prove beyond a reasonable doubt that OC spray was capable of causing *serious* bodily injury in the manner it was used, the Court found by a preponderance that Ramey used the spray with the intent to commit bodily injury, primarily because Ramey intended to assault the officers and did in fact cause bodily injury. *Id.* at 6. The Court explained why it found that Ramey intended to cause injury:

> [H]e and others in the crowd were trying to break the line of officers on the northwest side of the Capitol. He acted intentionally. He acted forcefully. He used the pepper spray in a manner that it is intended. And he, in fact, hit the officers in the face with the spray. Both testified about the painful effects of being temporarily incapacitated as a result of the spray.

*Id.* That bodily injury included "burning eyes, stinging, and other painful effects." *Id.* The Court also cited *United States v. Quiver*, 805 F.3d 1269 at 1273 (10th Cir. 2015), which found that a taser qualified for the enhancement under the guidelines. *Ramey,* 7/7/23 Sent. Tr. at 7.

Under the reasoning in *Ramey,* Rodriguez's spray attack readily qualifies. In *Ramey,* the evidence showed only that the spray was a type of OC, not necessarily the bear spray at issue here, which is an even stronger and more dangerous product, since it is designed for use against bears,

not people.  Rodriguez has admitted, like Ramey, that he sprayed officers with the intent to assault. And Rodriguez has also admitted in his plea that he inflicted bodily injury. Moreover, many officers reported experiencing bodily injury. To take a few examples:

- Sergeant O.A. experienced a "burning" sensation on his face, eyes, and forehead from Rodriguez's spray attack. The chemical irritant felt like "little needles" pinching and entering his skin, and he had difficulty breathing. Sergeant O.A. was forced to leave the barricade line to decontaminate. Chemical irritants reactivated two to three hours after the attack, and again 12 hours later, which felt like "needles" entering his skin again.

- Officer N.D. experienced "immense pain" to his eyes and face after Rodriguez's spray attack. He was wearing contact lenses on January 6, which made chemical irritants cling to and cause further pain to his eyes. Officer N.D. was forced to leave the barricade line to decontaminate, and he had to be assisted in doing so by his superior officer because he could not see. Officer N.D. rated the pain as a 7.5 on a scale of one to ten. The Court previously found that Officer N.D. experienced bodily injury as the basis for Rodriguez's guilty plea. *See* Exhibit U, at 19-23.

- Officer P.N. described Rodriguez's spray attack as "burning" and "irritating." He was forced to step back from the barricade line.

- Officer A.Z. rated Rodriguez's spray attack as a seven or eight on a pain scale of one to ten. He experienced burning to his eyes, face, and neck, and his vision became blurry. He was forced to step back from the barricade line. Chemical irritants on Officer A.Z.'s skin reactivated 12 to 16 hours later, which "felt like hell."

And, as in *Ramey*, the Court can easily conclude Rodriguez intended to inflict bodily harm. Rodriguez deliberately sprayed a substance, which he knew was a chemical spray, directly at officers' faces from a distance of three to five feet. Rodriguez told several interviewers on January 6 that he felt the need to "fight back." After the attack, Rodriguez explained to one interviewer, "They [police officers] were pepper spraying people – but the police got it back," meaning he had followed through on earlier statements and physically fought police officers with bear spray. During his interview with the FBI, Rodriguez admitted that he intentionally sprayed uniformed police officers because he "needed to do something to stop it." As he expressed in his FBI interview, Rodrigeuz knew on January 6 and afterwards, "Spraying a police officer… [is] a crime." These facts show that Rodriguez intended to cause, at a minimum, "bodily injury"; the type of pain that would, and did, cause officers to retreat from the barricade line. Moreover, the Court can find that people intend the natural and probable consequences of their actions: here, the immense pain and debilitating physical effects that resulted from spraying a noxious brown chemical at officers' faces from just feet away.

Secondly, several types of evidence establish that the type of spray used by Rodriguez was capable of causing serious bodily injury, thereby meeting the "Dangerous weapon" standard in U.S.S.G. § 1B1.1, Application Note 1. Specifically, in addition to injuries meeting the standard for bodily injury described above, several of Rodriguez's victims actually experienced effects that qualify as serious bodily injury, both from the bear spray used by Rodriguez and sprays they recognized as similar that were deployed by others:

- Officer M.B. rated Rodriguez's bear spray attack as a 15 on a pain scale of one to ten. She said that the bear spray "burns worse" than OC sprays designed for use on humans,

and it felt twice as powerful. Officer M.B.'s hands burned from Rodriguez's spray, a level of pain that she compared to placing her hand directly on a hot stove top and to tearing an ACL. In the months following January 6, Officer M.B. sought medical attention for swollen eyes, which she attributed to exposure to chemical irritants on January 6 such as those deployed by Rodriguez. She also described the lingering psychological impact of her experience, replaying the events of January 6 in her head often and experiencing nightmares. She remarked that "the bear spray still haunts [her]."

- Officer B.R. was not immediately affected by the spray deployed by Rodriguez; however, when he removed his gas mask, he immediately felt the effects of the bear spray that covered his mask. Officer B.R. called the pain "extreme." He could not open his eyes at all and had to be assisted by another officer to make it from the crowded tunnel to a wash station to decontaminate. The chemical irritant affected Officer B.R. for several hours even after he returned home from duty.

- After being sprayed by Rodriguez Officer P.N. was sprayed again by a substance he recognized as bear spray.  On this occasion, Officer P.N. did not have a visor to deflect any of the spray. He described the spray as red in color and smelling like alcohol, like the spray Rodriguez used. This bear spray attack was much worse than other OC sprays that he had experienced before. He felt as though the skin on his face was "peeling off" or like acid had been thrown in his face. His vision became blurry, and he could barely see. On a pain scale of one to ten, Officer P.N. rated the direct attack with bear spray to his face as a 13. After being further assaulted in the Lower West Terrace tunnel, Officer P.N. experienced serious trouble breathing and had a seizure. Officer P.N. was transported by ambulance

from the Capitol to a hospital, where he received treatment. In the months following, Officer P.N. received ongoing medical treatments for his injuries, including physical therapy for vestibular balance, consultation with an eye specialist for blurred vision, and speech therapy for a stutter that he developed. Officer P.N. did not attribute his injuries to any one assaultive incident on January 6, but rather the cumulative effects of the events. Officer P.N. was unable to work as a police officer for 8 months after January 6 based on his physical and psychological injuries. Officer P.N. was diagnosed with PTSD from his experience on January 6, and he continues to receive mental health treatment and take prescribed medications.

- Former Officer J.R. was subjected to multiple assaults with chemical irritants on the West Plaza, including Rodriguez's spray attack, and again at the entrance to the tunnel. Describing the later attack, he remarked that the bear spray immediately "took [him] out." It felt as though he was "in a fire" or "on fire." Former Officer J.R. felt as though he could not breathe, "like [his] lungs weren't working," and "like [he] was suffocating." Former Officer J.R. had been sprayed with pepper spray before January 6 during training at the police academy, as well as during other crowd control incidents he encountered while on the job with the MPD, but there was a distinct difference between the effects of bear spray and pepper spray. Former Officer J.R. quantified a direct bear spray as a "ten out of ten" on a pain scale and he felt "extreme pain." In the days following, former Officer J.R.'s hands blistered and became swollen, which he attributed to the multiple spray attacks he endured. Former Officer J.R. described a "burning" sensation that lasted for days, and he compared the pain to placing one's hands on a hot stove and leaving them there. On

40

January 7, he was transported by ambulance to the hospital, diagnosed with chemical burns to his hands, and prescribed pain medication. On January 8, a second doctor diagnosed former Officer J.R. with chemical burns to his hands and prescribed additional pain medication. As a result of the overall impact of January 6, former Officer J.R. sought mental health counseling for six to eight months afterwards. He was hospitalized for panic attacks and prescribed anti-anxiety medication. Former Officer J.R. ultimately resigned from MPD due to the long-term psychological impact of January 6.

- Sergeant A.W. quantified Rodriguez's bear spray attack as an eight or nine on a pain scale of one to ten. After the attack, he felt a "burning" sensation all over his face, he felt like he had sandpaper in his eyes, he could not stop coughing, and his breath was taken away. Sergeant A.W. described bear spray as much more painful that the OC spray that he had previously experienced at the police academy. Sergeant A.W. could not see at all and he had to be assisted by other officers from the West Plaza, up a flight of stairs, and into the Capitol building to decontaminate.

Additionally, public information from SABRE, the manufacturer of the bear spray Rodriguez used, also demonstrates that bear spray is capable of causing serious bodily injury. As detailed above, Frontiersman Bear Attack Deterrent was designed to stop an attack on a human by an aggressive bear or other dangerous animal from 25 to 40 feet away. Stopping a bear attack requires a spray that deploys with great speed, density, and, above all, strength. Frontiersman bear spray contains 2.0 percent MC concentration, which is the maximum strength allowed for commercial sale in the United States. This formula is 50% stronger than that contained in the strongest available police pepper spray. A warning label on the cannister entitled "Hazards to

Humans & Domestic Animals" declares "DANGER" and specifies that the spray can cause irreversible eye damage if sprayed at close range. Additional warnings on the back of the cannister suggest calling poison control or a doctor or going in to see a doctor if exposed.

Expert testimony at trial in *United States v. Christopher Worrell, et al.*, 21-CR-292-RCL, showed how pepper gel – of a type intended for use against humans – is a deadly or dangerous weapon because it is capable of causing serious bodily injury, including corneal abrasions, an inability to breathe, rapid changes in blood pressure which may lead to loss of consciousness or heart failure, or death.[23] In *Worrell*, in addition to this expert testimony, Judge Lamberth heard testimony from a U.S. Capitol Police (USCP) training officer, and several USCP officers who recounted their experience with OC spray in training and with unknown chemical sprays on January 6. Judge Lamberth concluded, beyond a reasonable doubt, that the defendant's pepper gel was a deadly and dangerous weapon because "the evidence at trial show[ed] that being sprayed with the pepper gel in the manner that Mr. Worrell used the weapon is capable of causing extreme physical pain and protracted impairment of the eyes including corneal damage, and sometimes requires medical intervention." Notes for Oral Ruling, *Worrell*, 21-cr-292 (RCL), ECF No. 245 at 8 (D.D.C. May 12, 2023).

*Worrell* involved less aggravating circumstances than Rodriguez's case: Worrell was at least ten feet away from the police officers whom he attacked, as shown below in Image 19;

---

[23] Worrell's case involved pepper gel, which is less potent than bear spray, but the physiological impact the expert described was not specific to pepper gel. *See id.,* Exhibit L at 111 (describing effects "when [a person is] struck with something like pepper spray or pepper gel").

Worrell sprayed OC pepper gel, which less potent than the bear spray; and no victim officers testified to provide information regarding the effects of Worrell's attack.



*Image 19 – Worrell Trial Exhibit 166,*
*showing Worrell (left) spraying police line (right) with pepper gel*

Other courts in this district have also found that pepper spray constitutes a dangerous weapon. *See, e.g.*, *United States v. Peter Schwartz*, 21-cr-178 (APM), May 5, 2023 Sent. Tr. at 10 (finding, after defendant was convicted at trial of violating 18 U.S.C. § 111(b) based use of OC spray on January 6, that OC spray was a deadly and dangerous weapon).[24] Where agreed upon as part of pleas or in stipulated trials, several courts have found that bear spray, specifically, is a

---

[24] *See, also, United States v. Lazar*, 21-cr-00525 (ABJ) (guilty plea); *United States v. Worrell*, 21-cr-292 (BAH), Hrg. Tr. 3/19/2021 (detention decision/finding under the BRA); *United States v. Mault*, 21-cr-657 (BAH) (guilty plea); *United States v. Mattice*, 1:21-cr-0657 (BAH) (guilty plea); *United States v. Bilyard*, 22-cr-34 (RBW) (guilty plea); *United States v. Caldwell*, 21-cr-0181 (CKK) (guilty plea); *United States v. Khater*, 21-cr-0222 (TFH) (guilty plea); *United States v. Stallings*, 21-cr-178 (APM) (guilty plea); *United States v. Gardner*, 21-cr-0622 (APM) (guilty plea).

deadly or dangerous weapon and have been presented with evidence or admissions establishing it as such.[25] For example, in *United States v. Caldwell,* 21-cr-181 (CKK), an officer injured by Caldwell's bear-spray attack (who knew "the orange spray to be bear spray") noted that the "spray caused *severe pain*, anger, and temporary vision impairment. It took around 10 minutes for [her] to recover enough from the spray to return to the police line." Gov. Sent. Mem., *Caldwell,* 21-cr-181 (CKK), ECF No. 61 at 30 (emphasis added). Another officer impacted by Caldwell's attack "experienced severe skin irritation, severe pain, and eventual hospitalization as a result of the spray that was transferred onto his skin." *Id.* at 17 (emphasis added). These officers' descriptions of the pain caused by Caldwell's bear spray attack is consistent with serious bodily injury described by several officers affected by Rodriguez's attack and further speaks to the dangerous potential of bear spray.

Therefore, based on the above, the Court should find that bear spray constitutes a dangerous weapon because he used bear spray with the intent to cause bodily injury, and because bear spray is capable of causing (and actually did cause) serious bodily injury.

### c.   Enhancement Under U.S.S.G. §2A2.2(b)(3)(B) For Serious Bodily Injury

The five-point enhancement under U.S.S.G. § 2A2.2(b)(3)(B) applies because "[Rodriguez's] victim[s] sustained serious bodily injury." "Serious bodily injury," under n.1 to §1B1.1, "means injury involving extreme physical pain or the protracted impairment of a function

---

[25] *See, e.g.*, *Caldwell*, 21-cr-0181(CKK) (guilty plea); *Khater*, 21-cr-0222 (TFH) (guilty plea); *United States v. Christian Manley*, 23-cr-0691 (TSC) (guilty plea); *United States v. Sean McHugh*, 21-cr-0453 (JDB) (guilty verdict in stipulated bench trial).  In *Caldwell,* the government also presented evidence from bear-spray attack victims showing that bear spray is capable of causing serious bodily injury, specifically, severe pain, with one officer requiring hospitalization.

of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

As detailed above in Section IV(b) ("Enhancement Under U.S.S.G. § 2A2.2(b)(2) For Dangerous Weapon"), the government has identified at least eight MPD officers who were injured by Rodriguez's spray attack. At a minimum, each of these officers' descriptions of their injuries, which resulted from Rodriguez's attack, are consistent with the Guidelines definition of bodily injury (justifying a three-point enhancement under U.S.S.G. § 2A2.2(b)(3)(A)).[26] However, injuries described by several of the officers whom Rodriguez assaulted meet the definition of serious bodily injury, including Officer M.B. (experienced pain level of 15 on a scale of one to ten, compared pain to placing ones hands directly on a hot stove, compared pain to tearing an ACL, received medical treatment for swollen eyes due to chemical irritant exposure months afterwards), Officer B.R. (experienced "extreme" pain after touching his bear spray covered gas mask and then touching his face), Officer P.N. (cumulative effect of multiple physical and chemical irritant assaults resulted in a seizure, treated at hospital, received months long medical treatment for multiple conditions including blurred vision, unable to work as police officer for 8 months following events, diagnosed with PTSD, required long-term mental health treatment, prescribed psychiatric medication), former Officer J.R. (cumulative effect of multiple chemical irritant assaults resulted in his blistered and swollen hands, received treatment at hospital and clinic for

---

[26] "Bodily injury," under n.1 to §1B1.1, "means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." Notably, the Court has already found that Rodriguez's use of bear spray resulted in bodily injury to Officer N.D., namely, "immense pain" to the eyes and face. Exhibit U, at 19-23. Rodriguez has also agreed that the government could prove that his actions resulted in bodily injury to Officer N.D. Exhibit U, at 18-19.  Note that the Court can also impose a four-point enhancement under U.S.S.G. § 2A2.2(b)(3)(D) if "the degree of injury is between" bodily injury and serious bodily injury.

hands, diagnosed on two occasions with chemical burn, prescribed pain medication, treated at hospital for panic attacks, prescribed psychiatric medication, resigned from MPD due to traumatic experience on January 6), Sergeant A.W. (experienced pain level of eight or nine on a scale of one to ten, felt "burning" sensation on his face, compared pain with having sandpaper in his eyes, felt unable to breathe). The injuries that these current and former MPD officers described involve "extreme physical pain" and/or "the protracted impairment of a function of a bodily member, organ, or mental faculty, and/or "requir[ed] medical intervention," including "hospitalization…" under U.S.S.G. § 2A2.2(b)(3)(B).

### d.   Enhancement Under U.S.S.G. § 2A2.2(b)(7) For 111(b) Conviction

The enhancement under U.S.S.G. § 2A2.2(b)(7) applies because Rodriguez was "convicted under 18 U.S.C. § 111(b)…." *Id.* At the plea hearing, the government proffered and Rodriguez agreed that the factual basis for his guilty plea under 18 U.S.C. § 111(b) could be proven beyond a reasonable doubt because the spray attack resulted in bodily injury, namely "immense pain to the eyes and face of Officer N.D." Exhibit K, at 16, 21. The Court made findings of fact based on the government and defendant's proffers, found those facts sufficient to prove the elements of 18 U.S.C. §§ 111(a)(1) and (b), and accepted Rodriguez's guilty plea. Exhibit K, at 23. Therefore, the Court should apply the enhancement under U.S.S.G. § 2A2.2(b)(7).

### e.   Enhancement Under U.S.S.G. § 3A1.2 For Official Victim

As in all January 6 convictions for violations of 18 U.S.C. § 111(a), an additional six points apply under U.S.S.G. § 3A1.2(a)-(b) because the victims were government officers, the offense of conviction was motivated by their status as police officers, and the applicable guideline is from

46

Chapter Two, Part A (here, 2A2.2). *See, e.g.*, *United States v. Kevin Douglas Creek*, 21-cr-645 (DLF) (applying official victim enhancement in a Capitol riot case under U.S.C. § 111(a)(1)).

A sentencing enhancement under U.S.S.G. § 3A1.2(a) and (b) applies to Rodriguez because "(1) the victim (A) a government officer or employee… and (2) the offense of conviction was motivated by such status…." Officer N.D. and the other seven officers who were assaulted by Rodriguez are or were members of the Metropolitan Police Department (MPD) and were wearing their MPD uniforms and/or distinctive police riot gear. They were in formation on the West Plaza guarding the barricade line. It was clear that the officers were government officials, and Rodriguez attacked them precisely because they were doing their jobs as law enforcement officers. And at the plea hearing, Rodriguez agreed that the government could prove Officer N.D., the victim listed in the Superseding Indictment, was engaged in his official duties at the time Rodriguez assaulted him, which included assisting the Capitol Police enforcing federal law. *See* Exhibit U, at 18-19. The additional three points under U.S.S.G. § 3A1.2(b) applies because the applicable guideline for Rodriguez's assault is under Chapter Two, Part A (here, § 2A2.2).[27]

Moreover, the official victim enhancement (under § 3A1.2) also applies as directed by Application Note 4, which provides, "If subsection (b)(7) applies § 3A1.2 (Official Victim) also shall apply." Application Note 4 explains, "The enhancement in subsection (b)(7) is cumulative to the adjustment in §3A1.2 (Official Victim) in order to address adequately the directive in section 11008(e)(2)(D) of the [21st Century Department of Justice Appropriations Act], which provides

---

[27] If the Court were to take the unusual step of finding that the enhancements under 3A1.2(a) and (b) did not apply here, the government maintains that a six-point enhancement would separately apply under § 3A1.2(c), because Rodriguez "knew or had reason cause to believe" that his victims were officers and assaulted them "in a manner creating a substantial risk of serious bodily injury."

that the Commission shall consider "the extent to which sentencing enhancements within the Federal guidelines and the authority of the court to impose a sentence in excess of the applicable guideline range are adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by" 18 U.S.C. §§ 111…." U.S.S.G. § 2A2.2, Application Note 4. Therefore, because Rodriguez has been convicted of violating 18 U.S.C. § 111(b), U.S.S.G. § 2A2.2(b)(7) applies, and under Application Note 4, the enhancement for an official victim (which separately applies based simply on the text of the enhancement itself) also applies.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

Rodriguez's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Rodriguez sprayed a chemical intended to deter bears against an outnumbered group of officers at the police line while those officers were trying to fend off attacks from all sides.  He sprayed that potent chemical at the officers at close range. His spray attack injured at least eight MPD officers and caused officers to retreat from a police line trying to hold back a violent mob. Rodriguez's attack made these officers even more vulnerable to violence from other rioters. Some of the officers' injuries were immediate, including Sergeant A.W., who was blinded and had to be taken inside the Capitol by other officers to decontaminate. The attack contributed to the cumulative injuries other officers experienced from other assaults, including Officer P.N., who was

hospitalized on January 6. Others found their skin peeling off in the following days. In a day where officers were often under near-constant assault, Rodriguez's attack was so painful that it seared into officers' memories and continues to haunt many, over two years later. The government disagrees with Probation that a downward variance of 36 months' incarceration—42 months below the bottom of the Guideline's range—is warranted in this case. The nature and circumstances of Rodriguez's offense were of the utmost seriousness, and fully support the government's recommended sentence of 88 months' incarceration, three years of supervised release, $2,000 in restitution, and a $100 special assessment.

### B. Rodriguez's History and Characteristics

Rodriguez's history and characteristics do not appear to include mitigating factors and, in fact, reflect that Rodriguez has sought out conflict in the past.

Rodriguez is a 28-year old former real estate agent from Brooklyn, New York. PSR ¶¶ 61, 85. Rodriguez is a high school graduate with some college credit. PSR ¶ 82. Based on the PSR, it is unclear whether Rodriguez is currently employed.

Rodriguez was arrested in Florida in 2015 on three separate occasions: (1) for misdemeanor battery and petty theft; (2) for marijuana possession; and (3) for battery. But all charges were dismissed. PSR ¶¶ 57-59. Rodriguez was arrested in Tennessee in 2016 for violating a protective order and those charges were also dismissed. PSR ¶ 60. Rodriguez does not have any criminal convictions. PSR ¶ 53.

With regard to the protective order violation, in March 2016, Rodriguez's former roommate in Knoxville, Tennessee, filed an ex parte petition for a protective order, which was granted. PSR ¶ 55. The former roommate alleged that Rodriguez had sent him text messages

threatening bodily harm and that Rodriguez had damaged the former roommate's property. *Id.* In April 2016, Rodriguez allegedly traveled to the residence of his former roommate and refused to leave until the former roommate called the police. PSR ¶ 60. Rodriguez initially left the residence but then returned on a second occasion. *Id.* When police officers arrived, Rodriguez told the officers that he was aware of the protective order in place, but he "thought it was a joke." *Id.*

On or about March 4, 2021, before his arrest, Rodriguez confronted a gym manager in Brooklyn during a dispute that appears to have arisen from Rodriguez's refusal to wear a mask while at the gym.[28] The episode, which was captured on video and posted on social media, was later the subject of public reporting. *Id.* In the video, Rodriguez can be heard telling the gym manager, who appears to be of Asian descent, "You need to go back to China! That's what you need to do, okay? You need to go back to China!" According to public reporting, Rodriguez was terminated from his employment with a realty company as result of the incident. *Id.*

Though Rodriguez does not have any criminal convictions, he has been charged twice with battery in Florida and for violating a protective order in Tennessee. PSR ¶¶ 57, 59, and 60. These prior charges, the existence of a prior protective order and its alleged violation, as well as the viral incident at the gym, demonstrate Rodriguez's propensity for confrontation before and after the events of January 6. Rodriguez's disposition to "fight back," as he told interviewers on January 6, is consistent with his character rather than aberrant.

---

[28]   https://www.yahoo.com/video/back-china-real-estate-agent-182113115.html, *last visited* August 18, 2023.

The government has reviewed a mitigation package submitted by defense counsel on numerous occasions, which describes instances where Rodriguez was himself the victim of a crime. None of these experiences, however, explain—let alone excuse—Rodriguez's decision to use bear spray against police officers on January 6, and cannot offset the lasting trauma to which his actions have contributed.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rodriguez's criminal conduct on January 6 was the epitome of disrespect for the law and those who swore an oath to uphold it.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[29] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Rodriguez's actions on January 6 greatly exceed those of many other rioters who demonstrated on restricted areas of the Capitol grounds

---

[29] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

and/or who unlawfully entered the Capitol building. Near the West Plaza, Rodriguez encountered real and serious violence between rioters and police officers. Rodriguez was directly in front of deployments of tear gas and pepper spray. Yet he was not deterred by what he saw and pressed forward to the very front of the police barricade line. There, he used bear spray, the strongest chemical spray that is commercially available, to attack at least eight MPD officers. He used a spray designed to immobilize animals that weigh hundreds of pounds against officers. His decision to do so reflects a callousness toward human life. It demands deterrence.

Although Rodriguez has expressed remorse for his actions on January 6, on several occasions he justified his assault because police officers had sprayed him and other rioters with OC spray. When interviewed, Rodriguez rationalized his attack in this way several times. Rodriguez told FBI agents that he attacked police officers in retaliation because he and others in the crowd had been sprayed by the police. Rodriguez admitted that he was aiming for the police officer who had deployed OC spray at the crowd. During his plea hearing, Rodriguez repeatedly offered the same rationalization, stating, "I used a chemical spray I found on the ground to spray the Metropolitan Police officer *right after I was sprayed*… I agree that the government could prove that my actions resulted in [Officer N.D.'s] … bodily injury, *after I got sprayed of course*… Your Honor, *when I got sprayed, that's when I lost it*…." Exhibit U, at 18-19, 42 (emphasis added). This account omits the fact that Rodriguez tried to use the bear spray against officers before this ever happened, undermining his narrative that his use of the spray was an immediate, impulsive reaction to being sprayed himself. And Rodriguez has admitted he committed the charged crime, an admission that self-defense could not justify his actions. Rodriguez's attempt to blame the police also rings hollow. A badly outnumbered police force was defending the Capitol and the members

52

of Congress, the Vice President, and staff inside. Rodriguez chose to march up to the very front lines and saw other rioters attack officers. Rodriguez himself aimed but could not deploy a cannister of bear spray during an attempt to breach the barricade line, at which point the officers responded with the less-lethal OC spray. Rodriguez's response was to retaliate, and he did so with a more powerful weapon—bear spray. The idea that the police, who came under attack and whose response, if anything, showed restraint, were the aggressors here, is just false.

Given Rodriguez's actions that day outside the U.S. Capitol building, and his lack of remorse upon being arrested and interviewed by the FBI, it is important that he be deterred and supervised. An 88-months term of imprisonment, near the middle of the 78 to 97-month guideline range, and three years of supervised release will adequately serve that purpose.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *Ramey*, 22-cr-66 (DLF), the Court heard testimony that the defendant Ramey brought tactical gear and then sprayed two U.S. Capitol Police (USCP) officers in the face with pepper spray as those officers struggled to maintain a police line against a mob surging towards the Capitol building and convicted him of 18 U.S.C. § 111(a)(1) and other offenses. It acquitted him of a charge under 18 U.S.C. § 111(b), finding that the government had not proven that the pepper spray

was a deadly and dangerous weapon as used. The Court sentenced Ramey to 60 months' incarceration. While Rodriguez, unlike Ramey, will receive credit for acceptance of responsibility, his attack merits a longer sentence. Here, Rodriguez attacked at least eight MPD officers on the West Plaza barricade line with bear spray, which is more powerful than Ramey's pepper spray, and Rodriguez's attack took place at a closer distance. To use something intended for use against grizzly bears on humans requires an alarming level of callousness. His assault caused at least eight MPD officers to retreat from the barricade line on the West Plaza—a barricade line that collapsed less than 20 minutes after his attack and allowed the mob to advance towards the Capitol building; Ramey's attack injured two USCP officers. As detailed above, all eight of the identified victim officers who Rodriguez attacked with bear spray suffered bodily injury and/or serious bodily injury as a result.

The Court may also consider *Khater*, 21-cr-0222 (TFH). In that case, the defendant Khater's co-defendant George Tanios brought two cans of Frontiersman bear spray and two cans of pepper spray with him to Washington, D.C. Tanios provided Khater with a cannister of pepper spray, which Khater used to assault two USCP officers and one MPD officer near the Lower West Terrace. Khater's first attack occurred at a distance of less than eight feet and now-deceased USCP officer Brian Sicknick was hit directly in the face. Khater continued to deploy the pepper spray, hitting another USCP officer in the face from only a few feet away. Khater then sprayed an MPD officer directly in the face with his pepper spray. All three of the officers affected by Khater's attack were forced to retreat from the barricade line. Under the terms of a plea agreement, Khater acknowledged that pepper spray was a dangerous weapon and that his attack resulted in bodily injury to the officer victims in that the officers "were incapacitated and unable to perform their

duties for at least 20 minutes or longer while they recovered from the spray." In the instant case, Rodriguez used bear spray—the most powerful form of OC spray commercially available—rather than the pepper spray Khater used; Rodriguez attacked at least eight police officers, as opposed to three who Khater attacked; and many of the injuries the officers attacked by Rodriguez described are more consistent with serious bodily injury instead of bodily injury. Judge Hogan sentenced Khater to 80 months incarceration followed by two years of supervised release.

In *Caldwell*, 21-cr-0181-CKK, defendant Caldwell pled guilty to violating 18 U.S.C. § 111(a)(1) and (b). Like Rodriguez, Caldwell used bear spray to attack police officers on the Lower West Terrace on January 6. *Id.*, Government's Sentencing Memorandum, ECF No. 61, at 2, 14-17, 28-30. During an interview posted on social media, Caldwell estimated that he had attacked 15 police officers, but the government presented information of four officers whom Caldwell injured, noting that none of the injuries were permanent. In the instant case, the government has identified and confirmed eight officers were attacked by Rodriguez. Unlike the instant case, however, Caldwell pleaded guilty pursuant to a written plea agreement wherein the parties agreed to a 3-point enhancement for bodily injury, so neither party requested (and the Court did not need to address) whether a greater enhancement for serious bodily injury was in fact warranted. Differently, Caldwell asked officers if they were "scared" during his spray attack, and entered the Capitol building, where Rodriguez did not. Pursuant to his plea agreement, Caldwell agreed that the following sentencing enhancements applied: the chemical irritant spray that Caldwell used constitutes a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B); Caldwell's attack resulted in bodily injury under U.S.S.G. § 2A2.2(b)(3)(A); Caldwell was convicted under 111(b) under U.S.S.G. § 2A2.2(b)(7); and the victim was a government officer under U.S.S.G.

§ 3A1.2(a)-(b). *Id.*, ECF No. 56. Caldwell was remorseful and did not try to justify or rationalize his actions, as Rodriguez has done on several occasions. Judge Kollar-Kotelly sentenced Caldwell to 68 months' incarceration followed by 36 months' supervised release.

Recently, in *McHugh*, Judge Bates found McHugh guilty at stipulated trial of violations of 18 U.S.C. §§ 111(a)(1) and (b) and 1512(c)(2). 21-cr-0453 (JDB). As Rodriguez represented in multiple interviews on January 6, McHugh was prepared for violence, telling others he was going to Washington, D.C. to "fight." While McHugh brought bear spray with him to the Capitol; Rodriguez found a cannister of bear spray on the ground. During the riot, McHugh actively participated in at least four attempts to breach perimeters, including by assaulting officers with bear spray. Rodriguez participated in an effort to breach the barricade line and then attacked officers with bear spray. McHugh attacked "multiple officers, causing them pain," including one officer who described being temporarily blinded. *Id.*, ECF No. 113, Gov. Sentencing Memorandum, at 16-17. Many of the police officers attacked by Rodriguez described experiencing much greater levels of pain from the bear spray attack. McHugh used a megaphone to spew vitriol towards officers and to encourage other rioters to act against the officers. Rodriguez made his way to the front of the barricade line, held a "Stop the Steal" sign above his head, and led the crowd in a chant: "Fight for Trump!" After the riot, McHugh bragged on social media, where Rodriguez did not. Judge Bates sentenced McHugh to a period of 78 months incarceration followed by three years of supervised release. Despite McHugh's more aggressive language on January 6, the demonstrated number of officers harmed by Rodriguez, and the severity of the effects they experienced, warrants a longer sentence here.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), and the offense is a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v.*

*United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[30]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").

---

[30] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Rodriguez to pay $2,000 in restitution for his convictions on Count Two. This amount fairly reflects Rodriguez's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 88 months' incarceration, three years of supervised release, $2,000 in restitution, and a $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      s/ Will N. Widman
         WILL N. WIDMAN
         NC Bar No. 48158
         Trial Attorney, Detailee
         1301 New York Avenue NW, 8th Floor
         Washington, DC 20530
         (202) 353-8611
         Will.Widman@usdoj.gov