UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

  - v. -                                              :

EDWARD FRANCISCO RODRIGUEZ,        :        **21-CR-483 (DLF)**

    Defendant.                                   :

- - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - x

**MR. RODRIGUEZ'S SENTENCING
MEMORANDUM**

**Nora K. Hirozawa, Esq.**
Attorney for Mr. Rodriguez
One Pierrepont Plaza, 16th Fl.
Brooklyn, NY 11201
Tel.: (718) 330-1200

TO:   **Matthew Graves, Esq.**
      United States Attorney
      District of Columbia
      Attn:   Will Widman, Esq.
            Assistant United States Attorney

TABLE OF CONTENTS

I.   **Introduction** ...............................................................................................................1

II.  **Statement of Facts** ....................................................................................................2

   A.   Mr. Rodriguez's childhood in the Dominican Republic and Tampa..........................2

   B.   ███████████████████████████████████████████. ....................3

   C.   ██████████████████████████████████████████-19 ...........5

   D.   Mr. Rodriguez discovered polarizing, right-wing politics.........................................7

   E.   Mr. Rodriguez's rehabilitation since his arrest. ......................................................16

III.  **The Sentencing Guidelines support a probationary sentence**...........................19

   A.   The Court should calculate Mr. Rodriguez's Guidelines under U.S.S.G. § 2A2.4. ...................20

      1. The Court should require the government to establish "aggravated assault" by clear and convincing evidence. ...................................................................................21

      2. The offense did not involve use of a dangerous weapon..........................................23

         a. The government has failed to prove that bear spray was used. .........................23

         b. Even if the Court were to find the spray was bear spray.....................................26

         c. Bear spray, as used by Mr. Rodriguez, is not a "dangerous weapon." ...............29

      3. Mr. Rodriguez did not use the chemical spray with intent to cause bodily injury..............33

   B. The Court should decline to apply the dangerous weapon enhancement....................36

   C. If the Court were to apply U.S.S.G. § 2A2.2 notwithstanding Mr. Rodriguez's objections .....37

      1. The Court should decline to impose a three-level enhancement for bodily injury.............37

      2. The Court should decline to impose a four-level enhancement ...............................38

         a. Mr. Rodriguez did not use a "dangerous weapon."............................................38

         b. U.S.S.G. § 2A2.2(b)(2)(B) impermissibly double-counts dangerous weapon.................38

      3. The Court should decline to impose the official victim enhancement. ....................39

         a. Mr. Rodriguez was not motivated by the officers' status as government officers. ........39

         b. U.S.S.G. § 3A1.2 impermissibly double-counts the official victim element of § 111(b), which is already accounted for by § 2A2.2(b)(7)....................................................40

   D.   ████████████████████████████████████████████████.....................43

   E.   The Court should apply a downward departure under U.S.S.G. § 5H1.6 or a variance under 3553(a) for loss of caretaking...............................................................43

   F.   The policy considerations and empirical data supporting U.S.S.G. § 4C1.1 and § 5C1.1 weigh in favor of a probationary sentence. ....................................................43

IV. The 18 U.S.C. § 3553(a) factors support a probationary sentence................................45

A.   Mr. Rodriguez's personal history and characteristics weigh in favor of a probationary sentence..................................................................................................................45

B.   The nature and circumstances of the offense weigh in favor of a probationary sentence...46

C.   Any disparity between the sentence imposed for Mr. Rodriguez and other January 6th defendants is warranted and appropriate. ........................................................................46

V.   The Court should decline to impose restitution. ...........................................................47

VI.  Conclusion.................................................................................................................48

## I.      INTRODUCTION

Mr. Rodriguez's conduct on January 6th is inseparable from his complex personal history. ██
████████████████████████████ He has never been convicted of a crime. He is not an Oath Keeper, or Proud Boy; he was not involved in planning the Stop the Steal rally. He did not arrive in Washington, D.C. prepared to engage in any violence whatsoever. He had never even attended a political rally until he went to a Trump rally the week before the 2020 election.

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████

Mr. Rodriguez is deeply remorseful for his conduct on January 6th—a serious aberration from who he is and what he believes in. Reviewing the statements submitted by MPD officers has further enhanced Mr. Rodriguez's understanding of the personal and psychological toll his and others' actions had that day. This case has taken a significant toll on Mr. Rodriguez, as well.

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

██████████████████████████████████████████████ For the

reasons detailed below, Mr. Rodriguez respectfully asks that the Court impose a sentence of three

years on probation, with 300 hours of community service as a special condition.

I.    **STATEMENT OF FACTS**

   **A.  Mr. Rodriguez's childhood in the Dominican Republic and Tampa.**

Although Mr. Rodriguez was born in New York, where his mother is from, he was raised by

his parents in the Dominican Republic. His family was relatively well-off—his father was a pastor and

worked in real estate, while his mother was involved with their church. Mr. Rodriguez lived in a quiet

neighborhood, attended private school, and was also homeschooled by his mother. ███████████

██████████████████████████████████████████████ r.



███████████████████████████████████████████████

██████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

It was during this time that his father began to experience financial setbacks in his real estate business, ██████████████████████████████████████, Mr. Rodriguez moved with his mother and siblings to Tampa, Florida, while his father temporarily relocated to New York to seek work. Mr. Rodriguez completed two years at Gaither High School, a public school outside of Tampa, and graduated at age 16. Soon after, he enrolled at Hillsborough Community College.

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

**B.** █████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

_____

█████████████████████████████████████████████

██████████████████████████████████████████████

Michael was a middle-aged doctor at the local state hospital and an observant Baptist. He became both a friend and a father-like figure to Mr. Rodriguez. Growing up in the Dominican Republic, Mr. Rodriguez's parents were never involved in American politics. They did not identify as Democrats or Republicans. Although Mr. Rodriguez voted—in 2016, he voted for Hillary Clinton— like his parents, he was never actively engaged in politics. Growing up with a pastor as a father and very active in their church, religion was central to his life. Mr. Rodriguez's interest in religion provided common ground for his friendship with Michael, who brought Mr. Rodriguez to his local Baptist church and enjoyed discussing Christianity with him. Although Michael's Baptist church was different in many ways from the Pentecostal community Mr. Rodriguez was raised in, it felt familiar and grounding during a time when Mr. Rodriguez had little else to cling to. Upon learning that Mr. Rodriguez grew up in the Dominican Republic, Michael expressed interest in foreign languages and asked Mr. Rodriguez to teach him a little Spanish. They would engage in basic conversation in Spanish, which Michael spoke with a Southern twang. Michael would discuss employment opportunities with Mr. Rodriguez and drive him places if he needed to get somewhere. ██████████ ███████████████████████████████████████████████████████████████████ ███████████████

Michael also exposed Mr. Rodriguez to the conservative MAGA Republican values former-President Trump espoused for the first time. Michael would frequently share right-wing news articles, YouTube videos, and social media posts, even after Mr. Rodriguez moved out of Tennessee. ██████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████ As a result of Mr. Rodriguez's isolation in Tennessee and Michael's warmth and support, he quickly became one of the most influential people in Mr. Rodriguez's life.

████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

4



**C.** ███████████████████████████████████



**D. Mr. Rodriguez discovered polarizing, right-wing politics when he was at his most vulnerable.**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ That echo chamber was amplified by one of the people Mr. Rodriguez trusted most: Michael. Even after Mr. Rodriguez moved away from Tennessee, he stayed in touch with Michael, who continued to share articles and posts about politics. Mr. Rodriguez spoke with Michael by phone at least once per day, and sometimes up to twenty times a day.

In an interview with defense counsel, Michael reported that Mr. Rodriguez "picked up from us more of an idea of being in line with the Republican train of thought than the Democratic train of thought" and that he "got the impression that he didn't think that so much before getting there," or having people in his life who held right-wing beliefs.[5] He was right. Mr. Rodriguez's world was and remains narrowly circumscribed—he spent, and continues to spend, most of his time with his parents and Ms. Lisa. Working at his family's real estate office in ██████████████, the majority of customers he serves are working-class Latino families looking for affordable apartments.

████████████████████████████████████████████████████████████

██████████████████████████████████████. But the broad themes of freedom and success resonated with Mr. Rodriguez, conjuring the successful, happy life he had always dreamed of and the values his father had instilled in him. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████

---

[4] Defense counsel conducted a telephonic interview with Ms. Lisa on March 25, 2022.
[5] Defense counsel conducted a telephonic interview with Michael on March 28, 2022.

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████ Particularly during a time of forced self-isolation, the sense of community Mr. Rodriguez found online was exhilarating. The combination of regular, daily chats with Michael about politics, hours of consuming political content online, and near constant bombardment of emails and text messages created a potent cocktail of right-wing disinformation. ██████████ ███████████████████████████████████████

The week before the 2020 election, Mr. Rodriguez attended a Trump rally—his first ever political rally. The atmosphere was festive: Trump flew in on a plane and there was music booming, a happy crowd cheering. Mr. Rodriguez felt, for the first time in a while, like he had a purpose. In the weeks following the rally, the right-wing social media pages and posts Michael shared with him became more and more enthusiastic and urgent. Under the guise of defending "freedom," right-wing Republicans raised alarms and spread disinformation regarding the 2020 election results.

In one of their conversations, Michael told Mr. Rodriguez about the "Stop the Steal" rally happening in Washington, D.C. None of Mr. Rodriguez's family or friends were going—Michael could not make it up from Tennessee and Mr. Rodriguez's parents even begged him *not* to go, telling

him to stay out of politics. But Michael, someone Mr. Rodriguez trusted and respected, encouraged him to go. In the weeks and days leading up to January 6, 2021, Mr. Rodriguez was bombarded with social media and mass text message campaigns imploring him, personally, to come to "DEFEND OUR SENATE MAJORITY," "SAVE the Senate!"[6]



Team Trump (Text TRUMP to 88022) ✔
@TeamTrump

Vice President @Mike_Pence: "I promise you, come this Wednesday, we will have our day in Congress."

Edward,

The Vice President is right. TOMORROW will be a crucial milestone in our months-long effort to DEFEND Election integrity.

**Over 100 Members of Congress plan to object to the Election results, because they share the concerns of millions of Americans about voting irregularities. *This is our last line of defense, Edward.***

President Trump and Vice President Pence will never stop fighting to deliver you a FAIR and HONEST Election, and now they need to know they have your support.

*Figure 1. One of the many emails found on Mr. Rodriguez's cell phone, sent by the Trump campaign on January 5, 2021.*

During the 24 hours leading up to January 6th, alone, Mr. Rodriguez received more than two dozen personalized emails and text messages from President Trump and affiliated groups, imploring him, Edward, to help fight for a "fair" and "honest" election.[7] Mr. Rodriguez became convinced that he, personally, had an obligation to go. So although Michael was not attending and Mr. Rodriguez did

---

[6] The cell phone records produced in discovery reveal several such messages and emails during the three days leading up to January 6, 2021.

[7] Most people recognize such emails as mass email invitations, or even spam. Mr. Rodriguez, however, did not. Approximately a year after his arrest, Mr. Rodriguez contacted defense counsel to ask, "Ms. Nora, I know you and my parents said to avoid getting involved in anything political, but I just received a *personal* email invitation to do karaoke with Julia Salazar next week, can I go?" The event invitation was a similar mass email. Julia Salazar is a New York State Senator for Mr. Rodriguez's neighborhood in ████████████, who identifies as a democratic socialist and was endorsed by the Democratic Socialists of America (DSA).

not know any other family or friends who were attending, he spontaneously decided to make the trip, just 36 hours before.

###### E.        Mr. Rodriguez's participation in January 6, 2021.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████[8] Mr. Rodriguez attended the Stop the Steal rally on his own—he did not participate in any planning in advance of the rally, he did not bring any weapons or chemical spray with him to Washington, D.C., and he was not wearing or carrying any sort of tactical gear. He expected a rally, not an uprising. As the crowd moved from the National Mall to the Capitol, Mr. Rodriguez moved with it, and ultimately found himself on the Lower West Plaza, across a barricade from a line of Metropolitan Police Department (MPD) officers. He stood near the West Plaza steps, to the right of the Media Tower erected in the middle of the West Plaza steps.

Mr. Rodriguez did not, at any point, cross the police barricades separating the "Upper West Plaza" from the Lower West Plaza. He did not enter the "Upper West Plaza," climb the stairs leading



*Figure 2. Map of Capitol grounds showing Mr. Rodriguez's approximate location.*

████████████████████████████████████████████████████████████████████████

to the Lower West Terrace, enter the tunnel, or enter the Upper West Terrace. He did not enter the Capitol.

Mr. Rodriguez's offense conduct is limited to a single, isolated incident. At approximately 2:10 p.m. on January 6, 2021, Mr. Rodriguez picked up a chemical spray bottle he found on the ground and released spray towards the police standing on the other side of the West Plaza barricade. *See, e.g.,* Gov't Exh. O-2, N.D. BWC at 14:10:42 (showing chemical spray canister lying on ground near barricade). He indiscriminately waved the spray in the direction of the officers.

What led to this? Mr. Rodriguez has no prior criminal convictions. He is not a Proud Boy. He does not seek out or engage in violence. ████████████████████████████████████ ████████████████████████████████ He has great respect for authority figures, especially law enforcement. Which is why his experience on January 6th was so unsettling. Mr. Rodriguez has always trusted the police. ██████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

The rally on the National Mall began more or less as Mr. Rodriguez had expected. Thousands of people gathered on the Mall and Mr. Rodriguez spent much of this time walking around and chatting with strangers in the crowd. President Trump gave a speech, and Mr. Rodriguez expected the rally to wrap up soon after. But as Trump repeatedly called on his supporters to "Stop the Steal," the crowd began moving towards the Capitol and Mr. Rodriguez moved with them.

But as Mr. Rodriguez stood in the crowd along the Lower West Plaza, the police began using large tank-size canisters to spray chemical irritant at the crowd. He was so swept up in the moment and feeling a sense of community he had never experienced before that he failed to appreciate how out of control the members of the crowd had become. He also failed to appreciate that law enforcement was both outnumbered and unprepared, and attempting to push back the crowd with the only means they had. At approximately 1:53 p.m., Mr. Rodriguez asked one of the police officers, "Can you stop spraying people?" Gov't. Exh. C, BWC of Officer J.R. at 13:53:53-13:54:05. None of the officers responded. He looked to another officer and repeated, "Can you guys stop spraying

people? Why are you spraying people?" *Id.* Again, none of the officers responded. Mr. Rodriguez put his fabric partial-face mask back on, but it is clear he was in distress. Unlike many of the other members of the crowd, Mr. Rodriguez did not yell at the police, insult them, damage property, or attempt to breach the barricade. He stood in the crowd, mostly quiet, occasionally chanting "freedom!" with the crowd.



*Figure 3. Gov't Exh. C, BWC of Former MPD Officer J.R. showing Mr. Rodriguez approaching the officers and asking them to stop spraying the crowd.*

One of the police officers, MPD Sergeant A.W.,[9] was carrying a tank of MK-30 OC spray, which BWC footage shows he repeatedly sprayed at the crowd. Mr. Rodriguez was standing on the steps leading from the Lower West Plaza to the Upper West Plaza when Sergeant A.W. walked up to the barricade and began spraying OC spray at the crowd, at approximately 2:08 p.m.

---

[9] Defense counsel refers to the impacted MPD officers by their initials to protect their privacy, at the government's request.



*Figure 4. Sgt. A.W.'s BWC shows him spraying the crowd at approximately 2:08 p.m.*



*Figure 5. Former MPD Officer J.R.'s BWC shows Mr. Rodriguez reaching out, in an effort to prevent the spraying by MPD.*

Mr. Rodriguez was standing on the other side of a banister from the crowd sprayed by Sergeant A.W. But when he saw A.W. spraying the crowd, he cried out "No! Stop! Don't!" reaching his left hand out in the direction of the spray. He is holding a sign in his right hand and does not have any weapon in his left hand. *See* Figures 4-5; Gov't Exh. C, Former MPD Officer J.R. BWC at 14:08:27.

At approximately 2:09, Sergeant A.W. returned to the area where Mr. Rodriguez was standing, now farther back in the crowd, and pointed his MK-30 OC spray gun at the crowd, spraying Mr. Rodriguez and others. *See* Gov't Exh. D, Sgt. A.W. BWC at 14:09:30-34. Sergeant A.W. continued to hold the spray gun pointed down at Mr. Rodriguez and the rest of the crowd, many of whom were entirely unprotected from the spray, cowering, crying, and coughing. *See id.* at 14:09:44.

As Mr. Rodriguez explained to agents post-arrest, he was confused and overwhelmed by the chaos that was unfolding at the Capitol. Why were the police spraying people, people who not only lacked protective helmets and shields, but had no protection at all? It was inconsistent with everything Mr. Rodriguez knew about the police. Around him, rumors swirled through the crowd about antifa agitators infiltrating the protest, and because Mr. Rodriguez knew no one at the rally, he began to feel



*Figure 6. Sgt. A.W. points his MK-30 OC spray gun down at the crowd; Mr. Rodriguez is on the right wearing a red baseball cap.*



*Figure 7. Mr. Rodriguez spraying in the direction of the officers.*

paranoid. Was the man with the spray gun even a real police officer, or an agitator sent to turn the police and protestors against each other? ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

About sixty seconds after Sergeant A.W. sprayed him and the others in the crowd, Mr. Rodriguez extended one arm holding a chemical spray in the direction of A.W., and blindly waved his arm, releasing a spray for approximately five seconds. Mr. Rodriguez was standing on the fourth step

from the top of the staircase leading to the Upper West Plaza when he released the chemical spray, approximately 10 feet away from the line of officers at the metal barricade.

After releasing the spray at 2:10 p.m., Mr. Rodriguez left the crowd. He did not spray, attack, or insult any other MPD officers, or anyone else. He did not return to the crowd. He did not at any point cross the barricade, and he did not enter the Capitol. He did not damage any property.

As he was leaving the Capitol that day, Mr. Rodriguez was stopped by two strangers who conducted "interviews" with him. Mr. Rodriguez repeated essentially the same talking points to each: "we the people will never surrender," "we will fight back," etc.—the same generic right-wing talking points he had been bombarded with for two months leading up to January 6th.

### E.  Mr. Rodriguez's rehabilitation since his arrest.

Mr. Rodriguez was arrested on July 9, 2021. Following his arrest, Mr. Rodriguez accepted responsibility for his actions and spoke voluntarily with law enforcement. On July 16, 2021, a United States Magistrate Judge for the District of Columbia released him on a personal recognizance bond, under the supervision of Pretrial Services. Since his arrest, Mr. Rodriguez has diligently complied with all the conditions of his release. Mr. Rodriguez pled guilty to Count Two of the Superseding Indictment, without a plea agreement, to avoid wasting the Court and the government's resources on pretrial motion practice or litigation at trial.

The impact of this case on Mr. Rodriguez's life has already been swift and significant. Prior to his arrest, Mr. Rodriguez worked as a licensed real estate agent. However, as a result of his arrest, his license was suspended and the instant conviction will prevent him from regaining a real estate license in New York State in the future. This has been a significant setback for Mr. Rodriguez, who chose not to complete his college education and instead pursued a career in real estate, like his father.

In light of his real estate license suspension, Mr. Rodriguez has continued his studies, taking an online course with Hillsborough Community College, the college he previously attended in Florida, in 2021 and several courses at Borough of Manhattan Community College in 2022. Mr. Rodriguez has also developed an interest in programming and software development and completed a Java

programming course for beginners in March 2023. He is hopeful that continuing to advance his programming knowledge will lead to new professional opportunities.

In addition to his studies, Mr. Rodriguez has been volunteering at his parents' real estate business regularly, helping with customer service and administrative tasks at the office, and managing an Airbnb for a property owner.

Mr. Rodriguez has always found meaning in helping others. Unlike many 28-year-olds, Mr. Rodriguez's roommate is not a friend his age, but a 92-year-old woman, who he thinks of as a grandmother and affectionately calls "Ms. Lisa." Ms. Lisa similarly views Mr. Rodriguez as the son she never got to raise:

> I lost my only son when he was 12 years old due to cancer and that was the most difficult time of my life. Although I am not related to Edward, I consider Edward as more than my tenant, he is like a family member, like my right hand. For the past ten years that I know him, he has treated me with respect and love. Edward goes above and beyond to ensure that I am doing okay every day because I have no family that lives close by me. Edward helps me run all of my errands and helps me get by on my daily routines. Edward takes me to my doctors' appointments, to the pharmacies, to the supermarket to buy groceries every month, he takes me to the stores, he takes my clothes to the laundromat and cleaners, he takes me to get my physical therapy twice a week, Edward helps me make important phone calls, he helps me prepare my bills to send them via mail and takes it to the post office, he takes me to the bank when I need to go, Edward buy milk for my coffee every time I run out, he helps me fill out important documents in regards to my pension, property, taxes… etc.

Exh. E, Letter from Basilisa ▮▮▮▮. Ms. Lisa writes, "I am aware Edward made a regretful mistake, but I know for a fact that he is not a criminal, he is a very decent and caring human being who truly care about the people around him. If everybody were like Edward, the world would have been a better place." *Id.*

Since August 2022, Mr. Rodriguez has also devoted significant time to helping care for his 54-year-old uncle, ▮▮▮▮▮▮▮▮▮▮. *See* Exh. F, Letter from Jacqueline ▮▮▮▮. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ As his mother writes,

> There is a certain light and kindness about my son; the way he interacts with his uncle is truly remarkable. He accompanies him to all his medical appointments, ensures he's clean, and makes certain he's fed. Edward is always there, taking care of him. He is the most important person in his uncle's life. We wouldn't know how to manage without Edward's support and understanding.

Exh. D, Letter from Coreen ████. Mr. Rodriguez's aunt similarly reports,

> Because of Edward, there has been tremendous improvement in my homeless brother's life and we are getting closer and closer to help[ing] him find an apartment and help[ing] him get out of the streets… I [] feel very proud of Edward because after a failed 12 years of everyone trying to help my brother from being homeless and wandering around in the streets, Edward took the initiative and together we began this incredible journey of helping him start a new life.

Exh. F, Letter from Jacqueline ████.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**II.      The Sentencing Guidelines support a probationary sentence.**

Mr. Rodriguez previously submitted objections to the presentence report ("PSR") prepared by the Office of Probation. The crux of Mr. Rodriguez's primary objection to the PSR—that his Guidelines should be calculated under U.S.S.G. § 2A2.4—rests upon his lack of intent to cause bodily injury to police, or anyone else, on January 6th.

███████████████████████████████████████████████

██████████████████████████████.

### A.  The Court should calculate Mr. Rodriguez's Guidelines under U.S.S.G. § 2A2.4.

As discussed in Mr. Rodriguez's objections to the presentence report, the Court should calculate the sentencing Guidelines in this case under U.S.S.G. § 2A2.4, as set forth below:

BOL:   10 (U.S.S.G. § 2A2.4(a))

                +2 – Victim sustained bodily injury (U.S.S.G. § 2A2.4(b)(2))

                -2 – Acceptance of responsibility (U.S.S.G. § 3E1.1)

   TOL:   10

   GLs:   6-12 months

U.S.S.G. § 2A2.4.

As the Court is aware, 18 U.S.C. §§ 111(a) and (b) do not require that a defendant specifically *intend* to cause bodily injury, only that bodily injury result from the defendant's conduct. *See United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994) (citing *United States v. Feola,* 420 U.S. 671 (1975)). Application of the heightened base offense level under U.S.S.G. § 2A2.2 requires more. The government bears the burden of proving not just that bodily injury resulted, but that Mr. Rodriguez's conduct constituted an "aggravated assault." U.S.S.G. § 2A2.2, cmt. n.1.

The government indicated at the plea hearing that they intend to argue "aggravated assault" is met based on Mr. Rodriguez's use of a dangerous weapon. But under the commentary to U.S.S.G. § 2A2.2, the government must show that Mr. Rodriguez used "a dangerous weapon *with intent to cause bodily injury with that weapon*."[10] In order to establish that the chemical spray used by Mr. Rodriguez was

---

[10] U.S.S.G. § 2A2.2 is applied where the government can establish that a defendant's conduct constituted "aggravated assault." U.S.S.G. § 2A2.4(c). "Aggravated assault" is in turn defined as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, app. n. 1. The government does not argue for the application of § 2A2.2 based on any ground other than use of a dangerous weapon with intent to cause bodily injury.

a "dangerous weapon," the government must prove (1) that the spray was capable of causing serious bodily injury or death to another person, *and* (2) that Mr. Rodriguez used it in that manner. Additionally, even if the Court were to determine the chemical spray to be a dangerous weapon, the government must prove that Mr. Rodriguez *intended* to cause bodily injury with the dangerous weapon.

The government will likely cite *United States v. Ramey*, 22-CR-184 (DLF), as an example of this Court applying U.S.S.G. § 2A2.2 and the four-level dangerous weapon enhancement, despite finding at a bench trial that the defendant's use of pepper spray did not constitute use of a dangerous weapon. But as the Court is aware, the application of § 2A2.2 requires highly individualized, fact-specific findings by the Court. Notably, in *Ramey*, the defense did not object to the application of § 2A2.2. Additionally, the Court had the opportunity to receive evidence, including live testimony, at trial and made a factual finding of the defendant's *intent* to cause bodily injury.[11]

Because Mr. Rodriguez did not possess the intent to cause bodily injury, unlike Ramey, the Court should grant Mr. Rodriguez's objections to the PSR and calculate his Guidelines under § 2A2.4.

### 1. The Court should require the government to establish "aggravated assault" by clear and convincing evidence.

Although a preponderance of the evidence standard generally applies to sentencing enhancements, in extraordinary circumstances, where the disputed sentencing factors become "a tail which wags the dog of the substantive offense," *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986), due process requires proof by clear and convincing evidence. *See United States v. Staten*, 466 F.3d 708, 718 (9th Cir. 2006); *United States v. Paster,* 173 F.3d 206, 219–21 (3d Cir.1999). It appears that although the D.C. Circuit has noted a Circuit split on this issue, it has not expressly taken a position on the application of a heightened standard in extreme cases where relevant conduct would dramatically

---

[11] Although it appears the Court did not specifically address its rationale for applying § 2A2.2, rather than § 2A2.4, the Court's finding regarding intent to cause bodily injury supports not just the Court's application of the dangerous weapon enhancement, but also a finding that Ramey's conduct constituted "aggravated assault," under § 2A2.2. Further, Ramey was convicted of another felony, 18 U.S.C. § 231, which would provide a separate basis for the application of § 2A2.2.

increase the sentence to an extreme degree. *See United States v. Watts*, 519 U.S. 148 (1997); *United States v. Graham*, 317 F.3d 262 (D.C. Cir. 2003); *United States v. Jackson*, 161 F.3d 24 (D.C. Cir. 1998).

Here, because the determination of whether Mr. Rodriguez's conduct meets the definition of "aggravated assault," and the consequent application of § 2A2.2 in lieu of § 2A2.4, would result in a monumental, 65- to 75-month difference in Mr. Rodriguez's Guidelines range, the Court should require the government to establish "aggravated assault" by clear and convincing evidence. *Staten*, 466 F.3d at 718.

In *United States v. Hymas*, the Ninth Circuit identified six factors relevant to determining whether a disputed sentencing factor has a disproportionate impact at sentencing. 780 F.3d 1285, 1290 (9th Cir. 2015). Two of the six factors identified in *Hymas* are particularly relevant here:

(1) whether an increase in the number of offense levels is less than or equal to four; and

(2) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Id.* Because the determination of whether Mr. Rodriguez's conduct amounted to an "aggravated assault" means the difference between a 6-12 month range and the 70-87 month range calculated in the PSR,[12] this determination must be established by clear and convincing evidence.

As discussed above, the sole charge to which Mr. Rodriguez pled guilty does not require proof of specific intent to cause bodily injury. Permitting the government to impute intent to Mr. Rodriguez without proving such a consequential fact—a fact that would inflate his Guidelines to more than ten times the alternate Guidelines calculation under § 2A2.4—by clear and convincing evidence would violate due process.

---

[12] The Office of Probation disclosed a revised PSR today, October 30, 2023, which reflects an amended Guidelines range of 78-97 months, based on incorporation of the government's request that an enhancement be added for serious bodily injury. *See* ECF No. 59 at ¶ 94. This re-calculation, which Mr. Rodriguez disputes, only emphasizes the dramatically disproportionate result of applying § 2A2.2 to his offense conduct and the need to require proof by clear and convincing evidence.

As detailed below, the government has failed to meet this burden, even if the Court were to apply a preponderance of the evidence standard. Accordingly, the Court should decline to calculate the Guidelines under § 2A2.2 and instead apply § 2A2.4.

### 2. The offense did not involve use of a dangerous weapon.

The government has failed to prove by a preponderance of the evidence, let alone by clear and convincing evidence, that Mr. Rodriguez used a "dangerous weapon," as defined by the Guidelines. As a preliminary matter, the government has not established the type of chemical spray used by Mr. Rodriguez. Yet even if the Court were to determine the spray was bear spray, as alleged by the government, bear spray is not an inherently deadly or dangerous weapon and the government has not shown that Mr. Rodriguez used the spray in a manner capable of causing serious bodily injury.

### a. The government has failed to prove that bear spray was used.

The Government has not proved that the chemical spray used by Mr. Rodriguez was, specifically, bear spray and not another type of capsaicin spray, like pepper spray or OC spray. Mr. Rodriguez did not purchase the spray himself, and the government does not allege that Mr. Rodriguez purchased or brought bear spray with him to Washington, D.C. Instead, he found the spray on the ground, in the middle of the chaotic crowd in front of the Capitol.[13] There is no evidence that Mr. Rodriguez knew what type of spray it was or had any prior experience using any kind of chemical spray. The government did not recover the canister actually used by Mr. Rodriguez on January 6th.

---

[13] BWC footage shows multiple canisters of chemical spray lying on the ground near the West Plaza steps. It is unclear whether these canisters are full or empty and whether they were discarded by MPD or protestors.

Instead, the government relies on a magnified photograph discovered on Twitter, in which it appears the label of the item in Mr. Rodriguez's hand can be partially read. The government then compares the magnified photograph to an advertisement for Frontiersman bear attack deterrent to argue that the substance was bear spray, specifically. The largest word is partially covered, but the letters "E-R-S-M-A-N" can be seen. Below, it appears to say "Bear Attack Deterrent." This is, indeed, likely a SABRE



Frontiersman product, a brand that sells various sprays and other related products, including reusable holders for their sprays online and in retail stores. But the label the in Mr. Rodriguez's hand that the government relies upon is not a Frontiersman bear spray canister, itself, but a Frontiersman holster that is sold separately from actual spray canisters and is readily available online and in retail stores.[14] The holster is designed to allow those carrying spray to clip the spray to their belt loop, a chest strap, or some other readily accessible location. The spray canister sits fully inside the sleeve, with only the top of the canister visible. The holster is designed to hold roughly 7.9 oz. and 9.2 oz. cans of spray. Other sprays this size, including ordinary pepper sprays, are readily available online and in retail stores.[15]

---

[14] Bear Spray Holster, The Home Depot, https://www.homedepot.com/p/Bear-Spray-Holster-454-NH/311380054?source=shoppingads&locale=en-US&&mtc=SHOPPING-BF-CDP-GGL-D27-027_031_HOM_MOB_ELEC-NA-NA-NA-SMART-NA-NA-NA-NA-NBR-NA-NA-NEW-SecuritySurveillance&cm_mmc=SHOPPING-BF-CDP-GGL-D27-027_031_HOM_MOB_ELEC-NA-NA-NA-SMART-NA-NA-NA-NA-NBR-NA-NA-NEW-SecuritySurveillance-71700000090572476-58700007665901167-92700069342217943&gclid=CjwKCAjwov6hBhBsEiwAvrvN6Boht5831D9nM-lKBTPYs4g6niscKoROejGARA02JwSrpc-AuSa_aBoCPpYQAvD_BwE&gclsrc=aw.ds.

[15] *See, e.g.,* Lab Certified Streetwise 18 Pepper Spray, 9 oz Fire Master, Amazon, https://www.amazon.com/Certified-Streetwise-Pepper-Spray-Master/dp/B00FJVASAC; WildFire 1.4%MC 9oz pepper spray fire master, Amazon, https://www.amazon.com/Wildfire-1-4-Pepper-Spray-Master/dp/B07S3Z4898; Guard Dog Security 9 oz Fire Master Pepper Spray, https://www.lowes.com/pd/Guard-Dog-Security-9-oz-Fire-Master-Pepper-Spray/5001879113.

The government conducted searches of Mr. Rodriguez's home and electronic devices, for any evidence of the instant conduct. They did not find any evidence that Mr. Rodriguez purchased bear spray, or any other chemical spray, nor that he had planned to engage in any sort of violence on January 6th. The government may claim that Mr. Rodriguez's online searches, "what bear spray does," "damages of bear spray," "damages of bear spray on humans," on January 16, 2021, suggest the spray was, in fact, bear spray and that Mr. Rodriguez knew it. But, if anything, Mr. Rodriguez's post-hoc online queries reflects a *lack* of familiarity with bear spray and knowledge of its effects at the time of the offense conduct.

The government may also claim that officers reported that the spray they experienced on January 6th felt stronger than regular pepper spray or OC spray. But Mr. Rodriguez was hardly the only person to use a chemical spray on January 6th—police and protestors alike released many different types of chemicals into the air outside the Capitol that day. Notably, MPD Officer N.D. was one of the few officers who remembered being sprayed by Mr. Rodriguez, specifically.[16] Officer N.D. reported in July 2021 that the pain from the spray was "similar to the pain he felt when he was pepper sprayed in the police academy."[17] An FBI interview report documenting the July 2021 interview further noted that "[a]fter viewing the [body camera] videos, Officer N.D. stated that the size and shape of the canister were similar to that of MPD individually issued Oleoresin Casicum (OC) spray and was possible that the spray the individual used was MPD issued spray."[18] Officer N.D. also reported, in his victim impact statement, being both "bear maced" and "OC sprayed." Thus, contrary to the government's photo comparison, an officer familiar with the effects of both bear mace and OC spray, Officer N.D. believed the spray used by Mr. Rodriguez *felt* similar to the pepper spray used in police training and *appeared* similar to the OC spray used by MPD.

---

[16] Former MPD Officer J.R. reported remembering a "man wearing a red hat who doused [him] in bear spray." Notably, however, this incident took place in the inaugural tunnel and the parties agree that Mr. Rodriguez never entered the inaugural tunnel.

[17] This information is drawn from an FBI report produced by the government in discovery, documenting an interview conducted with Officer N.D. on July 14, 2021.

[18] *Id.*

Officer N.D.'s statements significantly undermine the government's factual assertion that the canister contained bear spray. Even if the Court were to conclude that the government has established that the spray used by Mr. Rodriguez was bear spray, Officer N.D.'s report highlights the fact that pepper spray, OC spray, and bear spray are all composed of the same capsaicinoid ingredients and the impact of these sprays—regardless of the concentration—is not as different as the government claims. As detailed below, none of these sprays, as used by Mr. Rodriguez, qualify as a deadly or dangerous weapon under § 1B1.1.

### b. Even if the Court were to find the spray was bear spray, bear spray is not an inherently dangerous weapon.

Even if the Court were to find that the canister contained bear spray, that does not establish use of a "dangerous weapon." Section 1B1.1 defines "dangerous weapon" as: "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument, or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of gun)." USSG § 1B1.1, cmt. n.1(E). "Serious bodily injury" is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1(M).

The government has not produced evidence that any officer suffered serious bodily injury as a result of Mr. Rodriguez's conduct.[19] And Mr. Rodriguez did not use an object that "closely resembles a more dangerous weapon or attempt to create such an impression." *See* USSG § 1B1.1, cmt. n.1(E).

---

[19] Notably, the plea agreement previously extended to Mr. Rodriguez by the government did not include an enhancement for serious bodily injury. In the original pre-sentence investigation and report, the Office of Probation did not find that any of the officers suffered serious bodily injury as a result of Mr. Rodriguez's conduct. On October 24, 2023, the government notified the Office of Probation—for the first time—that it disagreed with this finding and is now seeking an enhancement for serious bodily injury under § 2A2.2(b)(3)(B). On October 30, 2023, the Office of

Bear spray, like OC and pepper spray, is not an inherently deadly weapon, particularly when sprayed outdoors from a significant distance. Bear spray, OC spray, and pepper spray all share a similar capsaicin-based chemical composition. And they all share another similar characteristic: they are sprays developed to act as deterrents and for self-defense, *not* as weapons.

Police departments use similar chemical sprays as alternatives to more dangerous uses of force that could cause permanent damage or serious injury. The District of Columbia Metropolitan Police Department ("MPD") uses "OC spray" as a "compliance technique," and its Use of Force General Order informs officers that it "may induce pain or cause discomfort…but will not generally cause an injury when used in accordance with Department training and standards."[20] *See* Exh. G, MPD Use of Force General Order. OC spray is considered a categorically lower level of force than baton strikes and electronic control devices, colloquially known as Tasers, at the next level up, which are still "not likely to cause death or serious physical injury." *Id.* at 4. MPD's Use of Force Order also cites "OC spray" as an example of a "less lethal weapon," defined as a "weapon deployed with the intent or purpose of nullifying a threat without causing death"—a category distinct from "deadly force," defined as "any force that is likely to intended to cause *serious bodily injury* or death." *Id.* at 22 (emphasis added).

An early National Institute of Justice ("NIJ") report on OC sprays highlighted that the sprays "seem to leave few if any residual effects," and scientists studying the sprays "did not see any long-term health risks associated with the use of OC.".[21] The same report noted several circumstances that would make OC sprays less effective: (1) being too close or too far from the suspect, (2) eyeglasses, sunglasses, or other protective eyewear and clothing, (3) a suspect throwing "up his hands in a defensive manner to block the spray." *Id.* The report also noted that being sprayed "normally requires only fresh air and soap and water" for decontamination. *Id.* The widespread use of similar capsaicinoid

---

Probation issued an amended PSR that adopts the government's request, which Mr. Rodriguez will address in a separate filing.

[20] *Use of Force*, MPD GO-RAR-901.07 at 4 (Apr. 27, 2023), https://go.mpdconline.com/GO/GO_901_07.pdf.

[21] *Oleoresin Capsicum: Pepper Spray as Force Alternative*, Nat'l. Inst. of Justice Tech. Assess. Prog. (March 1994), *available at*: https://www.ojp.gov/pdffiles1/nij/grants/181655.pdf.

sprays by law enforcement, including MPD on January 6th, supports the finding that bear spray is not inherently deadly or dangerous.

The government may point to this Court's finding in *Ramey* that the defendant's use of pepper spray supported a dangerous weapon enhancement under § 2A2.2, citing *United States v. Quiver,* 805 F.3d 1269, 1273 (10th Cir. 2015). The court in *Quiver* found that a Taser is an inherently dangerous weapon, based in part on the defendant's concession that "[i]t is impossible to think of a purpose for a Taser other than as a weapon." Accordingly, the court concluded, "a Taser (unlike the objects not ordinarily used as weapons referenced in his cited cases) need not depend on a manner of use to achieve the designation of a "dangerous weapon" under § 2A2.2(b)(2)(B)." *Quiver*, 805 F.3d at 1273.

The court's approach in *Quiver* made sense for the particular weapon at issue: a Taser. But capsaicinoid sprays differ from Tasers both in terms of their ability to cause serious bodily injury and, consequently, the way in which state governments regulate them because of that risk. Tasers, like firearms, are currently banned from civilian ownership in Washington, D.C., New York, New Jersey, Massachusetts, Hawaii, and Rhode Island.[22] Illinois, Maryland, and Minnesota require background checks be completed prior to sale.[23] Connecticut, Delaware, Illinois, New Mexico, and North Carolina impose restrictions on TASER use and possession, such as restricting possession to one's own home.[24] No such restrictions apply to pepper spray, OC spray, or bear spray—instead, these are readily available over the counter and online.

Applying a huge Guidelines swing for use of an object that is capable of causing serious bodily injury only when used in very specific, unusual circumstances not present here undermines the entire point of imposing a *mens rea* requirement for applying the heightened "aggravated assault" Guideline in the first place. The Court should instead consider both Mr. Rodriguez's lack of intent to cause

---

[22] *Stun Gun State Laws*, Sabre, https://www.sabrered.com/stun-gun-state-laws/ (last visited Oct. 27, 2023); Taser Restrictions by State, Dep't of Self Defense, https://www.departmentofselfdefense.com/pages/taser-laws-and-restrictions#:~:text=TASER%20RESTRICTIONS&text=They%20are%20currently%20banned%20from,purchasers%20under%2019%20years%20old (last visited Oct. 27, 2023).

[23] *Id.*

[24] *Id.*

bodily injury and the manner in which he used the spray, which was not capable of causing serious bodily injury—and did not, in fact, cause serious bodily injury—and apply § 2A2.4.

### c.   Bear spray, as used by Mr. Rodriguez, is not a "dangerous weapon."

Under § 2A2.2, the term "dangerous weapon" includes "any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury." U.S.S.G. § 2A2.2, cmt. n.1. When an object, like a gun, is inherently deadly, the government need only prove (1) intentional (2) use of the weapon (3) in the commission of the offense. *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002). When an object is not inherently deadly, however, an "additional element is required: (4) the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner." *Id.* at 45 (emphasis original).

Because bear spray is not inherently deadly or dangerous, the Government must prove that bear spray is capable of causing serious bodily injury *and* that Mr. Rodriguez used the spray in that manner. The Guidelines envision a high bar for "serious bodily injury," defining the term as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." USSG § 1B1.1, comment. n.1(M).

As previously noted, the study of the effects of capsaicinoid sprays undertaken by the DOJ confirms that such sprays *cannot*, absent extraordinary circumstances not present here, cause serious bodily injury.[25] The government seeks to present two pieces of evidence in support of its argument that the chemical spray used by Mr. Rodriguez was an inherently dangerous weapon: (1) expert testimony from a different case regarding a specific type of capsaicinoid product not present here, pepper gel, Gov't Exh. L, Trial Transcript from *United States v. Worrell*, 21-CR-292 (RCL); and (2) information from the Environmental Protection Agency regarding the formula for Frontiersman bear spray. *See* Gov't Exh. K, EPA Letter re: Frontiersman Bear Spray.

---

[25] *Id.*

As a preliminary matter, the EPA letter addresses the Confidential Statement of Formula dated February 28, 2023 for Frontiersman Bear Attack Deterrent. The label enclosed is marked "accepted" on April 11, 2023 and a notation in the upper right corner indicates that the label reflects "09/29/2022 amendment + 10/18/2022 Additions." Gov't. Exh. O at 3. The instant offense, obviously, took place on January 6, 2021; Government Exhibit O offers no information about the formula or label for the product distributed by Frontiersman in 2020 or 2021, nor does it indicate whether the formula was the same in 2020 or 2021.

Further, the "precautionary statements" on the label state that the product "may cause irreversible eye damage if sprayed in the eyes at close range." *Id.* The label does not define "close range." The label notes that "[c]ontact through touching or rubbing eyes may result in substantial *but temporary* eye injury." *Id.* (emphasis added). Moreover, the serious harm warnings listed on bear spray are due in part to the pressure of the can, rather than solely the spray's chemical makeup. The Interagency Grizzly Bear Committee, comprised of representatives from the U.S. Fish and Wildlife Service, the U.S. Forest Service, the National Park Service, the Bureau of Land Management, the U.S. Geological Survey, state wildlife agency representatives and Native American tribes that manage grizzly bear habitat,[26] indicates that it is the pressure that may lead to lasting injury, stating, "*At very close range*, the *pressure* can cause permanent eye damage."[27] (emphasis added). As an aerosol spray, bear spray exits the canister at a high velocity. *Any* substance sprayed with this amount of pressure directly into the eye at very close range would undoubtedly be capable of doing permanent damage to the eye.

---

[26] Interagency Grizzly Bear Committee, About Us, available at: https://igbconline.org/about-us/#1634593061643-05f3cdaf-9bcb
[27] Interagency Grizzly Bear Committee (IGBC) Bear Spray Guidelines (2017)**,** available at: https://igbconline.org/be-bear-aware/bear-spray/

Mr. Rodriguez did not spray the officers (1) in the eyes or (2) at close range. As shown in the picture below, all of the officers had protective visors in front of their eyes, such that none would have been sprayed directly in the eyes.



Further, Mr. Rodriguez did not spray the officers at close range. He was on the fourth step from the top of the West Plaza Stairs at the time of the spraying. The government itself could not confirm that he was any closer than within 10 feet, a distance corroborated by photo and video evidence. *See* ECF No. 55, Mar. 13, 2023 Plea Hr'g Tr. at 16. The DOJ's own reports warn that OC spray, the compositionally similar tool used by police, loses effectiveness when used at a distance.[28] Additionally, the open-air environment, in contrast to areas of the Capitol grounds like the inaugural tunnel, would have diluted the spray further. *Id.*

These sprays are created with the understanding that animals "have much more sensitive senses of sight and smell, so it takes much less [of the active ingredient in bear spray] to affect them."[29] Bear spray, like pepper spray, causes only temporary irritation to the eyes that can be remedied with

---

[28] *Oleoresin Capsicum: Pepper Spray as Force Alternative*, Nat'l. Inst. of Justice Tech. Assess. Prog. (March 1994), *available at*: https://www.ojp.gov/pdffiles1/nij/grants/181655.pdf.

[29] Pepper Spray Store, Differences Between Animal (Dog or Bear) Spray and Human Pepper Spray, available at: https://www.pepper-spray-store.com/pages/animal-vs-human-spray#:~:text=Dogs%20and%20other%20animals%20have,them%20and%20keep%20you%20safe; Bryan Buckner, Guardian Self Defense, *Difference Between Dog and Human Pepper Spray* (Aug. 19, 2009), https://www.guardian-self-defense.com/blogs/security/difference-between-dog-and-human-pepper-spray (noting dog spray is not as strong as human spray because "a dog's senses (sight, smell) are much more sensitive than ours are").

simple washing—nowhere near akin to the extreme pain, protracted impairment, or hospitalization described in the serious bodily injury definition. Other courts have stated unequivocally that "[t]he fact that someone may have to wash an affected area for 15 minutes or seek medical attention does not establish that the spray could cause 'extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental facility; or requir[e] medical intervention such as surgery, hospitalization, or physical rehabilitation.'" *United States v. Perez*, 519 F. App'x 525, 528 (11th Cir. 2013).

Here, the officers' injuries required about 60-90 seconds to rinse out their eyes, and the Government has alleged no long-term effects that would qualify as "protracted impairment." Gov't Exh. O-1, MPD Officer N.D. FBI 302 (documenting July 8, 2021 interview). While several officers reported immense pain, they did not have to seek medical attention for the chemical spray injuries, and MPD Officer N.D. compared the feeling to the use of pepper spray during regular police training. *Id.* The officers were able to flush out their eyes and immediately return to work. The only officers who sought medical attention did so due to injury caused by *other* spraying incidents, not Mr. Rodriguez's conduct.

Notably, although the officers were not wearing gas masks, they were wearing some protective gear, including Plexiglass face shields. This is significant because a DOJ study notes that even a suspect raising his hands above his face can inhibit the use of OC spray.[30] Similarly, the report warns that "[e]yeglasses, sunglasses, and other protective eyewear and clothing may greatly reduce the effectiveness of OC sprays." *Id.* If sunglasses, or even hands, provide significant enough protection to reduce the potency of the spray, then Plexiglass face shields must also.

Moreover, the officers themselves were using chemical spray on the crowd as a countermeasure. Chemical spray was already present in the air without permanently harming the officers or participants in the rally. While Mr. Rodriguez acknowledges and deeply regrets that he

---

[30] *Oleoresin Capsicum: Pepper Spray as Force Alternative*, Nat'l. Inst. of Justice Tech. Assess. Prog. (March 1994), *available at*: https://www.ojp.gov/pdffiles1/nij/grants/181655.pdf.

caused the officers pain and bodily injury, he did not cause "serious bodily injury." Nor did he intend to.

The government has indicated that they do not intend to present any live testimony at sentencing. Instead, the government relies upon video footage from body-worn cameras and open-source videos, several victim impact statements that do not attribute any serious bodily injury to Mr. Rodriguez's use of chemical spray, specifically, and expert testimony presented in *United States v. Worrell*, 21-CR-292 (RCL), a January 6th case involving the use of pepper gel. Reading through the statements, it is clear that each and every MPD officer who reported for duty at the Capitol that day experienced both physical injury and psychological trauma as a result of the events that transpired. For some, like former MPD Officer J.R., that trauma was so severe that they left law enforcement entirely or even contemplated self-harm—a heartbreaking impact that cannot be understated. But the key question for the Court to resolve is whether Mr. Rodriguez, specifically, used the chemical spray in a manner capable of causing *serious* bodily injury to the officers.

None of the evidence before the Court is sufficient to establish that Mr. Rodriguez's five-second use of a chemical spray, outdoors, at a substantial distance from officers wearing face shields and riot gear was capable of causing serious bodily injury to the officers. Accordingly, the Court should decline to find that Mr. Rodriguez used a dangerous weapon, as defined by § 1B1.1, or else hold an evidentiary hearing before proceeding with sentencing.

### 3.  Mr. Rodriguez did not use the chemical spray with intent to cause bodily injury.

As detailed in the statement of facts above, by 2:10 p.m. on January 6, 2021, Mr. Rodriguez had been sprayed by police with chemical irritants multiple times. At approximately 1:53 p.m., Mr. Rodriguez implored two of the officers standing at the top of the West Plaza stairs, "Can you stop spraying people?… Can you guys stop spraying people? Why are you spraying people?" Govt. Exh. C, BWC of Former MPD Officer J.R. at 13:53:53-13:54:05. None of the officers responded. At approximately 2:08 p.m., MPD Sergeant A.W. walked up to the barricade and began spraying OC spray at the crowd. Mr. Rodriguez extended his left arm and cried out, "No! Stop! Don't!" *See id.* at

14:08:27. About a minute later, at 2:09, Sergeant A.W. approached the area where Mr. Rodriguez was standing and pointed his MK-30 OC spray gun, again, at the crowd. He sprayed Mr. Rodriguez and the people surrounding him. Just over sixty seconds later, as Sergeant A.W. continued to point his spray gun at the crowd, Mr. Rodriguez released the chemical spray towards him. Mr. Rodriguez waved the canister blindly, covering his face with his sign and looking backwards.



Exh. A, Expert Report at 2-3.

The government may attempt to argue that Mr. Rodriguez's statements in open-source videos support a finding of intent. *See* Gov't Exh. A, H, I. But Mr. Rodriguez's broad proclamations of fighting socialism and antifa or refrain of "Here in America, we fight back," do not reflect an intent to cause bodily injury. ▮▮▮▮▮▮▮▮▮▮▮▮



…

███████████████████████████████████████████████

████████████████████████████████

Mr. Rodriguez deeply regrets the statements he made while caught up in the chaos of the day and reiterates his remorse for his actions. But it is clear that these statements do not meet the government's burden of proving intent to cause bodily injury, as required to establish "aggravated assault" and apply § 2A2.2.

If anything, Mr. Rodriguez's reaction is more analogous to the defendant's conduct in *United States v. Leffingwell*, where the court considered the aggravated assault enhancement but placed weight on factors that made intent to harm less likely. *United States v. Leffingwell*, No. 21-cr-005 (D.D.C. Apr. 5, 2022). In *Leffingwell*, the court placed special weight on the fact that the defendant did not make threats towards the officers and only punched an officer as a reaction after he was pushed. *United States v. Leffingwell*, No. 21-cr-005 (D.D.C. Apr. 5, 2022), Sent. Tr. at 42-43.[31] The court also considered the defendant's traumatic brain injuries and decided to sentence the defendant to 6 months incarceration instead of the government's request for 27 months. *Id.* at 28, 48-49, 55.

**B. The Court should decline to apply the dangerous weapon enhancement under U.S.S.G. § 2A2.4.**

For the reasons set forth above, the chemical spray, as used by Mr. Rodriguez, does not constitute a dangerous weapon. The Court should accordingly decline to impose the dangerous weapon enhancement under § 2A2.4(b)(1).

As set forth in his proposed Guideline calculations, Mr. Rodriguez acknowledges that his actions resulted in bodily injury and he does not object to the application of the two-level enhancement for bodily injury under § 2A2.4(b)(2).

---

[31] Regarding Leffingwell's conduct before he punched an MPD officer inside the Capitol, Judge Amy Berman Jackson commented, "But what were you doing? Mostly, you're standing there. And this surprised me when I viewed the videos, given the passion and the anger in the prosecution's sentencing memo." *Id.* The same observations could be made of Mr. Rodriguez's conduct before the five-second spraying incident.

**C. If the Court were to apply U.S.S.G. § 2A2.2 notwithstanding Mr. Rodriguez's objections, the Court should decline to apply enhancements for certain specific offense characteristics.**

If the Court were to disagree with Mr. Rodriguez's objections and determine that § 2A2.2 is the appropriate base offense level, Mr. Rodriguez separately objects to the PSR's application of certain specific offense characteristics under that Guideline, as detailed further below. *See* PSR at ¶¶ 42-45.

Specifically, he objects to the application of a four-level upward departure for use of a "dangerous weapon" because the manner in which he used a chemical spray did not render it a "dangerous weapon," as defined by the Sentencing Guidelines. *See* PSR at ¶ 42; U.S.S.G. §2A2.4(b)(2).

Mr. Rodriguez also objects to the dangerous weapon, bodily injury, 111(b), and official victim enhancements because they constitute impermissible double-counting. PSR at ¶¶ 42-45. The very same factors relied upon to determine that a heighted base offense level applies under § 2A2.2—in particular, that a dangerous weapon was used—would have already been accounted for by selecting § 2A2.2 over § 2A2.4. Applying further enhancements based on the same conduct would disproportionately and dramatically increase Mr. Rodriguez's Guidelines range.

**4. The Court should decline to impose a three-level enhancement for bodily injury under § 2A2.2.**

Consistent with his plea allocution, Mr. Rodriguez does not dispute that bodily injury resulted from his actions. The Guidelines application notes direct the user to § 1B1.1 for the definition of injuries. USSG § 2A2.2, comment. (n.1). "Bodily injury" is defined as "any significant injury; *e.g.,* an injury that is painful and obvious, or is a type for which medical attention ordinarily would be sought." USSG § 1B1.1, comment. (n.1(B)).

However, should the Court decide to calculate the Guidelines under § 2A2.2, he objects to the application of enhancements pursuant to § 2A2.2(b)(3)(A) and § 2A2.2(b)(7) because they impermissibly double-count the bodily injury element of 18 U.S.C. § 111(b). Double counting is impermissible when enhancement provisions necessarily overlap, are indistinct, and serve identical purposes. *United States v. Coldren*, 359 F.3d 1253, 1256 (10th Cir. 2004). Because bodily injury is an

element of § 111(b)—indeed, the element that elevates Mr. Rodriguez's offense conduct from a §
111(a) to a § 111(b)—and an enhancement is already applied for his conviction under § 111(b),
imposing a separate enhancement for bodily injury would impermissible double count.

Mr. Rodriguez also objects to the recommended three-level enhancement for bodily injury.
The definition of "bodily injury" is exactly the same for U.S.S.G. § 2A2.4 and § 2A2.2. *See* U.S.S.G. §
2A2.4, app. n. 1 (citing U.S.S.G. § 1B1.1, app. n. 1); § 2A2.2, app. n. 1(same). Yet § 2A2.4(b)(2) applies
only a *two*-level enhancement "if the victim sustained bodily injury," while § 2A2.2(b)(3) applies a *three*-
level enhancement "if the victim sustained bodily injury." The only logical explanation for the higher
enhancement under § 2A2.2 is that the Sentencing Commission intended to punish defendants who
*intentionally cause* bodily injury with a deadly or dangerous weapon more severely than those, like Mr.
Rodriguez, who do not specifically intend that result. This presents yet another reason why the Court
should apply § 2A2.4, as the most appropriate Guideline to capture Mr. Rodriguez's offense conduct.

   5. **The Court should decline to impose a four-level enhancement for use of a
      "dangerous weapon" under § 2A2.2(b)(2).**

         a. **Mr. Rodriguez did not use a "dangerous weapon."**

As discussed in depth above, Mr. Rodriguez's use of a chemical spray did not constitute use of a
"dangerous weapon" because the government has failed to prove that Mr. Rodriguez used an
inherently dangerous weapon and, in any event, he did not use the chemical spray in a manner capable
of causing death or serious bodily injury. Accordingly, should the Court apply § 2A2.2, Mr. Rodriguez
objects to the four-level enhancement for use of a dangerous weapon.

         b. **U.S.S.G. § 2A2.2(b)(2)(B) impermissibly double-counts dangerous weapon,
            an element of 18 U.S.C. § 111(b).**

As discussed above, if the Court were both apply § 2A2.2 and determine that the chemical
spray constituted a "dangerous weapon," over Mr. Rodriguez's objections, he separately objects to the
application of a four-level upward departure for use of a dangerous weapon under § 2A2.2(b)(2)(B)

because it impermissibly double-counts an element of 18 U.S.C. § 111(b), which is already counted under § 2A2.2(b)(7).

**6. The Court should decline to impose the official victim enhancement.**

    **a. Mr. Rodriguez was not motivated by the officers' status as government officers.**

Section 3A1.2(b) increases the offense level by six levels if "the victim was…a government officer or employee" and "the offense of conviction was motivated by such status," and the defendant was convicted of an "Offense Against the Person." While many courts have held that the "victim's official status need not be the sole motivation for the offense," the victim's official status must still be a factor in the defendant's decision-making. *See United States v. Sulik*, 929 F.3d 335, 337 (6th Cir. 2019); *United States v. Abbott*, 221 F. App'x. 186, 189 (4th Cir. 2007).

For example, in *United States v. Talley*, the Sixth Circuit upheld the § 3A1.2 enhancement, rejecting the defendant's claim that he sought to kill an FBI agent because he sought to "eliminate witnesses in general" where the defendant had known the agent for several years, referred to him as a "fed," and " the very reason that Young was a witness was *because* of his official status as an FBI agent investigating Talley's case." 164 F.3d 989, 1003-04 (6th Cir. 1999) (emphasis in original). In contrast, in *United States v. Kohut*, the New Mexico District Court found that the victim enhancement was inappropriate where the victim happened to be a government official, but the defendant was not influenced by this fact, explaining "there is no evidence in the record to suggest that Kohut's actions were motivated by anything other than symptoms of his mental illness and a desire for a cigarette." 553 F.Supp.3d 964, 971 (D.N.M. 2021).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ Mr. Rodriguez did not spray the officers to achieve some higher goal. Unlike many other defendants charged under 111(b) for their conduct on January 6th, Mr. Rodriguez did not spray officers

as a means to breach the police barricade, enter the Capitol, or with animus against the officers. Unlike some defendants, Mr. Rodriguez did not bring a cannister of spray with him to the Capitol, nor did was he wearing or carrying any tactical gear. *See, e.g.*, *United States v. Ramey*, 22-CR-184 (DLF) (defendant wearing tactical vest and knee pads). He found the spray on the ground, and only sprayed after Sergeant A.W. pointed MK-30 OC spray gun at Mr. Rodriguez and the other protestors multiple times.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Mr. Rodriguez did not push the barricades, damage property, or otherwise act disruptive leading up to the spraying incident. Mr. Rodriguez did not taunt or harass the officers before using the spray; he politely asked them to stop spraying, joined generic protest chants of "Freedom," and stood silently in the crowd. *Id.* On camera, Mr. Rodriguez can be heard repeatedly asking the officers why they are spraying people, and asking the officers to stop. Gov't. Exh. C, Former MPD Officer J.R. BWC at 13:53:52. The chaos surrounding Mr. Rodriguez prevented him from appreciating the mounting threat police saw building, from their vantage, as a larger and more raucous crowd amassed in front of the Capitol.

███████████████████████████████████████████████████████████████

████████████████████████████████████████████

### b. U.S.S.G. § 3A1.2 impermissibly double-counts the official victim element of § 111(b), which is already accounted for by § 2A2.2(b)(7).

Similar double counting concerns exist for the official victim enhancement under § 3A1.2 (a) because the underlying conviction under § 111(b) already accounts for the official victim, as does the optional § 111(b) two-point enhancement. Although courts have recognized that the Guidelines allow for double counting, some courts have required a heightened level of intent for the official victim enhancement in § 111(b) cases to avoid the double counting concern. In one such case, the Sixth Circuit has noted that "knowledge alone cannot trigger the enhancement." *United States v. Sulik,* 929 F.3d 335, 338 (6th Cir. 2019). Instead, as the Guidelines make clear, the assault must be "motivated by such status." U.S.S.G. § 3A1.2; *United States v. Rivera-Alonzo,* 584 F. 3d 829, 836 (9th Cir. 2009).

Mr. Rodriguez was not motivated by the officers' official status. Mr. Rodriguez's actions were the product of a desperate, split-second decision, made in response to being repeatedly OC sprayed by police (and other protestors), observing others in the crowd react to being sprayed with OC spray and tear gas, and the influence of the chaos around him. The indiscriminate and untargeted nature of Mr. Rodriguez's conduct is illustrated by the fact that he actually sprayed other protestors, too. On these facts, the Court should decline to impose the official victim enhancement.

Even if the Court were to find a legal basis to apply § 3A1.2, as the Supreme Court has consistently recognized, "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *United States v. Kimbrough*, 552 U.S. 85, 101 (2007) (internal citations omitted). The Court should decline to impose the official victim enhancement here, where it would disproportionately increase Mr. Rodriguez's Guidelines by six levels.

**D.** ████████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

**E. The Court should apply a downward departure under U.S.S.G. § 5H1.6 or a variance under 3553(a) for loss of caretaking.**

Section 5H1.6 of the Sentencing Guidelines provides for departures "based on the loss of caretaking or financial support of the defendant's family." In applying such a departure, the Guidelines direct courts to consider the presence of the following circumstances:

(i)     The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking or essential financial support, to the defendant's family;

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant;

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonable are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family;

(iv)    The departure effectively will address the loss of caretaking or financial support.

*See* U.S.S.G. § 5H1.6, cmt. 1(B).

Mr. Rodriguez provides indispensable caretaking and support for both his 92-year-old roommate/landlord/in loco grandmother, Ms. Lisa, and his uncle, █████████████████████ ████. *See* Exh. D-F, Letters of Support. The Court should consider the impact a custodial sentence would have on Ms. Lisa and Mr. Rodriguez's uncle, in addition to Mr. Rodriguez, in determining an appropriate sentence.

**F. The policy considerations and empirical data supporting U.S.S.G. § 4C1.1 and § 5C1.1 weigh in favor of a probationary sentence.**

Mr. Rodriguez has no prior criminal convictions, giving him a criminal history score of zero. Under a recent amendment to the Sentencing Guidelines, "Zero Point Offenders" like Mr. Rodriguez receive an additional two-level reduction. *See* U.S.S.G. § 4C1.1 (proposed 4/5/23).[32] The two-level

---

[32] A complete copy of the 2023 Proposed Amendments can be found at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf

reduction under does not apply if a defendant "uses violence" in connection with the offense, among other carveouts.

However, the policy behind § 4C1.1 remains relevant. The Sentencing Commission's rationale for providing an additional two-level reduction is grounded in the Commission's analysis of recidivism data, which shows that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010. ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

Another recently adopted provision, § 5C1.1, states that "[a] departure, *including a departure to a sentence other than a sentence of imprisonment*, may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." *See* U.S.S.G. § 5C1.1, n. 10(B) (proposed 4/5/23) (citing 28 U.S.C. § 994(j)). Certainly, Mr. Rodriguez recognizes that the instant offense is a serious one and he does not seek to minimize the gravity of his conduct. ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████.

Even without a reduction under § 4C1.1, the 6 to 12-month Guideline range calculated under § 2A2.4 places Mr. Rodriguez in Zone B of the Sentencing Table. The Guidelines authorize a sentence of probation with a condition of community confinement or home detention, a split sentence, and a sentence of imprisonment in Zone B. The court should consider the Sentencing Commission's guidance in § 5C1.1 in imposing a non-custodial sentence, as authorized by the Guidelines.

III.   **The 18 U.S.C. § 3553(a) factors support a probationary sentence.**

   A. **Mr. Rodriguez's personal history and characteristics weigh in favor of a probationary sentence.**

**B. The nature and circumstances of the offense weigh in favor of a probationary sentence.**

As detailed above, Mr. Rodriguez's offense conduct was limited to a single, five-second act of spraying. He did not engage in any other violence, he did not enter the Capitol, he did not cause any property damage, and he did not plan or conspire with anyone in advance of January 6th. It is candidly unlucky that Mr. Rodriguez, who had no prior experience using a chemical spray and waved it indiscriminately towards the police line, actually hit any of the officers. But fortunately, for both Mr. Rodriguez and the officers, none of them suffered serious bodily injury as a result of his conduct. Taken in context, the limited scope of Mr. Rodriguez's conduct, although very serious, weighs in favor of a probationary sentence.

**C. Any disparity between the sentence imposed for Mr. Rodriguez and other January 6th defendants is warranted and appropriate.**

The government may argue that although Mr. Rodriguez's history and characteristics are unique and sympathetic, the imposition of a probationary sentence would result in a disparity compared to other January 6th defendants. But that argument must be viewed in the context of the specific actions of those defendants, their history and characteristics, and, critically, the procedural posture of those cases. The nature and circumstances of Mr. Rodriguez's conduct, the procedural posture, and his personal history and characteristics place this case outside the heartland of other January 6th assault convictions.

As the Court is aware, the government has persistently anchored the Guidelines range in many January 6th cases by insisting upon a one-size-fits-all plea agreement and refusing to bargain with defense counsel to arrive at a Guidelines calculation that reflects the particular circumstances of each individual case. As a result, many defendants charged under 18 U.S.C. § 111(a) or (b) related to their conduct on January 6, 2021, have either stipulated via plea agreement to the calculation of the Guidelines under § 2A2.2 or gone to trial. That is not the case for Mr. Rodriguez.

Immediately upon arrest, Mr. Rodriguez accepted responsibility for his conduct on January 6th. He has expressed great remorse and elected to plead guilty to Count Two of the indictment,

without a plea agreement. He did not stipulate to any Guidelines calculation and specifically noted that he intended to dispute the government's calculation, based on the unique facts of this case.

The Court should give little weight to this 3553(a) factor, as compared to defendants sentenced under U.S.S.G. § 2A2.2. If anything, the Court should compare Mr. Rodriguez to the 149 defendants sentenced between 2017 and 2021, whose primary guideline was §2A2.4, with a Final Offense Level of 11 and a Criminal History Category of I." *See* PSR at ¶ 112. 43 of those defendants did not receive a sentence of imprisonment, and for the 106 defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 7 months and the median length of imprisonment imposed was 8 months. *Id.*

Further, § 3553(a)(6) directs the Court to consider "the need to avoid *unwarranted* sentence disparities." ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████.

IV.     **The Court should decline to impose restitution.**

The Court should decline to order restitution. Restitution is governed by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, which was adopted by Congress in 1996 to make restitution a mandatory part of sentences imposed for certain categories of offenses. Such offenses include "crime[s] of violence" or any offense "in which an identifiable victim or victims [have] suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). To qualify as a victim, one must have been "directly and proximately harmed by the offense of conviction." 18 U.S.C. § 3663A(a)(2). In these cases, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A). However, the terms of payment may take into account the financial needs of the defendant and his or her family. *See* 18 U.S.C. § 3664(f)(2). The burden falls on the government to "demonstrate the amount of the loss sustained by the victim as a result of the offense." 18 U.S.C. § 3664(e).

The government has not met its burden here. Both the PSR prepared on June 13, 2023 and the final PSR issued on October 30, 2023 state, "Pursuant to 18 U.S.C. § 3663A, restitution may be ordered. Restitution information was not received from the government." PSR at ¶ 107. Because there is no evidence to support a restitution order, the Court should decline to impose restitution.

**V.      Conclusion**

For the foregoing reasons, Mr. Rodriguez respectfully asks that the Court impose a sentence of three years of probation, with 300 hours of community service as a special condition.

Respectfully submitted,

/s/ *Nora K. Hirozawa*
**NORA K. HIROZAWA**
Attorney for Mr. Rodriguez
Federal Defenders of New York, Inc.

Cc:      Will Widman (AUSA)
         Robert Cywinski (PO)