## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-483-DLF** |
| **EDWARD FRANCISCO RODRIGUEZ,** | |
| **Defendant.** | |

### GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this reply to Defendant's sentencing memorandum, ECF No. 64.

First, Rodriguez's descriptions of certain events on January 6, 2021, are inconsistent with video evidence, officer interviews, and Rodriguez's own statements to the FBI.

Second, with respect to the Sentencing Guidelines analysis, Rodriguez incorrectly calculates his base level offense under U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers," rather than § 2A2.2, "Aggravated Assault," as correctly calculated by Probation. *See* PSR ¶ 41. Likewise, Probation correctly determined certain sentencing enhancements apply in this case, including U.S.S.G. § 2A2.2(b)(2) (Dangerous weapon used), U.S.S.G. § 2A2.2(b)(3)(B) (Serious bodily injury), U.S.S.G. § 2A2.2(b)(7) (Convicted under § 111(b)), U.S.S.G. § 3A1.2(a),(b) (Official victim). *See* PSR ¶¶ 42-45. Rodriguez's arguments against their application fall short.

Third, the government disagrees with Defendant and Probation that a downward variance under U.S.S.G. § 3553(a) factors is justified in this case.

I.     **Rodriguez's Presentation of Certain Facts is Inaccurate**

    a.  **Rodriguez intentionally assaulted police officers.**

Rodriguez inaccurately describes his actions as "indiscriminate and untargeted." ECF No. 64, at 41; *see also, id.* at 11 ("He indiscriminately waved the spray in the direction of the officers."); *id.* at 15 ("Rodriguez extended one arm holding a chemical spray in the direction of [Sergeant] A.W., and blindly waved his arm, releasing a spray …."); *id.* at 34 ("Rodriguez waved the canister blindly…."); *id.* at 46 ("Rodriguez … waved it [chemical spray] indiscriminately towards the police line …."). Undoubtedly, this phrasing is designed to undercut the intentionality with which Rodriguez attacked police officers.

However, Rodriguez has admitted on several occasions that he acted intentionally, targeting police officers with his attack. On January 6, Rodriguez spoke with pride about fighting back against police officers. Rodriguez stated, "We fight back! … They [police officers] were pepper spraying people – but the police got it back…" ECF No. 62, Exhibit H, Timecode 00:00. At his plea hearing, Rodriguez admitted that he acted "voluntarily," "intentionally[,]" and "forcefully in that moment[,]" when he deployed chemical irritant spray at Officer N.D., who was the victim officer named in the Superseding Indictment. *See* ECF No. 62, Exhibit U, Transcript of Plea Hearing, at 23. During his interview with the FBI, Rodriguez further admitted that he intended to hit a uniformed officer with his spray attack, presumably Sergeant A.W., as detailed in Defendant's memorandum. *See* ECF No. 64, 14-15. Rodriguez told FBI agents, "I sprayed the police . . . I was trying to aim at that person who was spraying people . . . He was in a police uniform." Agents asked Rodriguez why he decided to spray police officers, and he replied, "I felt like I needed to do something to stop it."

Rodriguez's description of a "indiscriminate and untargeted" attack conflicts with his prior statements and the position taken elsewhere in his memorandum that he sprayed the police because police were spraying the crowd, *see, e.g.*, ECF No. 40 ("[Rodriguez] only sprayed after Sergeant A.W. pointed MK-30 OC spray gun at Mr. Rodriguez and the other protestors multiple times"). Based on the above, an accurate recitation of the facts should reflect that Rodriguez acted intentionally, rather than "indiscrimately" or "blindly." ECF No. 64 at 15, 34.

The video evidence in this case also shows that Rodriguez did not spray wildly at "indiscriminate" targets. He aimed at the police line. ECF No. 62, Exhibits C, D, E, F, and G.

**b. Rodriquez's assault took place at close range and lasted almost 8 seconds.**

On several occasions, Rodriguez described his spray attack occurring at a distance of approximately ten feet (without explaining how this distance was determined). *Id.* at 16, 31. Additionally, Rodriguez states that the attack took approximately five seconds. *Id.* at 15, 33, 36, 44, 46. Both measurements are inaccurate based on officer interviews and video evidence.

Officer M.B. estimated that Rodriguez was approximately three to five feet away when he sprayed her. ECF No. 62, Exhibit N-1. Officer B.R. estimated that Rodriguez was three feet away. *Id.*, Exhibit Q. Three to five feet is more accurate than ten feet, as proposed by the defense, since it is corroborated by the video evidence in this case. *See id.* at 6-9, Exhibit D, Timecode 03:44; Exhibit E, Timecode 08:40; Exhibit F, Timecode 00:08; Exhibit G, Timecode 00:24.

Likewise, the duration of the attack can be measured by reviewing video exhibits, which show Rodriguez spray attack lasted between seven and eight seconds. *See, e.g.*, *id.*, Exhibit F, Timecode 00:08-00:15. While these distinctions (three to five versus ten feet, and five versus seven to eight seconds) are not necessarily determinative of a particular Guidelines issue, the Court saved

such determinations for sentencing, and the defense's characterizations improperly downplay the severity of the attack.

### c. Rodriguez's conduct included a prior attempt to spray officers.

Rodriguez characterizes his offense conduct on multiple occasions as "limited to a single, isolated incident." *Id.* at 11; *see also, id.* at 44 ("Rodriguez's conduct was limited to a single, five-second act…"); and *id.* at 46 ("Rodriguez's offense conduct was limited to a single, five-second act of spraying…."). Rodriguez further describes his conduct, stating, "Rodriguez did not yell at the police, insult them, damage property, or attempt to breach the barricade. He stood in the crowd, mostly quiet, occasionally chanting "freedom!" with the crowd." *Id.* at 12. This description significantly understates Rodriguez's actions leading up to his spray attack.

Rodriguez made his way through thousands in the crowd on the West Lawn to the very front of the barricade line. ECF No. 62 at 4. There, Rodriguez stood against the metal fencing, holding a "Stop the Steal" sign. *Id.* at 5. Rodriguez was far from "mostly quiet." ECF No. 64 at 12. As shown in ECF No. 62, Exhibit C, Timecode 00:00-15:30, Rodriguez yelled and chanted with the crowd for over 15 minutes, including leading the crowd in a "Fight for Trump" chant. ECF No. 62 at 5. During that time, body worn camera video shows Rodriguez witnessed multiple attempts by rioters to breach the barricades and multiple attacks by rioters against police officers, but, nonetheless, Rodriguez chose to stay at the front and keep up the noise.

At approximately 2:08 p.m., as shown in ECF No. 62, Exhibit C, Timecode 14:24, Rodriguez stood close to a chemical spray attack by another rioter against police officers on the barricade line. *See also* Exhibit D, Timecode 01:20. Ten seconds later, police deployed OC spray in the direction of the rioter responsible for the attack. Rodriguez reached out his hand and yelled, "Stop! No!" at the officer deploying OC spray. Approximately 20 seconds later, as shown in

Image 1, Rodriguez reached into his overcoat and pulled out a cannister of spray, which appears to be the same Frontiersman bear spray he later deployed at police officers.



*Image 1, Exhibit C, Timecode 14:57 – Rodriguez holding bear spray*

At approximately 2:09 p.m., a group of rioters managed to break from its foundation and topple a large wrought iron lamppost onto police officers in an effort to breach the barricade line. At that time, as shown in Image 2, Rodriguez stood directly next to the rioters pushing the lamppost onto police officers, concealing a cannister of bear spray behind his "Stop the Steal" sign.



*Image 1, Exhibit C, Timecode 15:14 – Rodriguez holding bear spray*

Next, Rodriguez positioned himself directly next to the rioters pushing the lamppost and aimed his cannister of bear spray at police officers on the barricade line. ECF No. 62 at 5-6. Rodriguez tried, unsuccessfully, to deploy his bear spray at police officers during the attempted breach. *Id.*, *see also* ECF No. 62, Exhibit D, Timecode 02:25. In response to Rodriguez's attempted spray attack, as well as the rioters toppling the lamppost, Sergeant A.W. deployed OC spray at Rodriguez and others in the group. *Id.* Rodriguez retreated briefly and then returned to the front barricade line less than one minute later. On this occasion, Rodriguez successfully sprayed at least eight police officers with bear spray. *Id.* at 6-9.

All of the above conduct by Rodriguez, which proceeded his spray attack, should be considered when assessing facts this case, and certainly surpasses the "single incident" framing posed by the defense. They undercut Rodriguez's arguments that his conduct was a momentary impulse, that he did not intend to attack the police (as opposed to just spraying the crowd "indiscriminately"), and that he did not understand the weapon he was using.

### d.   Police officers deployed OC spray after they were attacked.

Finally, on several occasions, Rodriguez wrongly presents several instances of police officers spraying rioters as through their use of OC spray was unprovoked—as if the police themselves were the aggressors on January 6. *See, e.g.*, ECF No. 64 at 11 (…as Mr. Rodriguez stood in the crowd along the Lower West Plaza, the police began using large tank-size canisters to spray chemical irritant at the crowd); *id.* at 12 ("…Sergeant A.W. walked up to the barricade and began spraying OC spray at the crowd."); *id.* at 14 ("Sergeant A.W. continued to hold the spray gun pointed down at Mr. Rodriguez and the rest of the crowd, many of whom were entirely unprotected from the spray, cowering, crying, and coughing.") This framing of the facts is demonstrably false.

As this Court knows, thousands of rioters descended on the West Plaza, overwhelming and attacking police from all angles, using makeshift objects as weapons. For example, Sergeant A.W. recalled observing a rioter in the crowd throwing full cans of soda at police officer on the barricade line. ECF No. 62, Exhibit S-1. He also saw rioters attempting to push "into the restricted area over the line." *Id.* Based on this activity, Sergeant A.W. deployed his OC spray as a lawful crowd control measure and told the crowd to move back. *Id.*

At approximately 2:08 p.m., as detailed above, body worn camera video shows a chemical spray attack by another rioter in the crowd against police officers on the barricade line, which was followed by an officer deploying OC spray at the attacker. ECF No. 62, Exhibit C, Timecode 14:24. Rodriguez yelled at the officer to stop spraying, even though he had just witnessed a spray attack come from a rioter in the crowd. Throughout his time at the barricade line, the government does not have information that Rodriguez told other rioters in the crowd to stop using their chemical sprays—just the police.

Rodriguez inaccurately portrays police officers as the party responsible for violence or escalation with OC spray; omitting or remaining silent on the multiple attacks by rioters against police officers, including with chemical sprays, which precipitated the police's use of OC spray on January 6 as a lawful crowd control measure. Rodriguez's attempt to justify his use of bear spray against officers does not negate his intent to attack officers or cause bodily injury when he did so, and nor should it garner the Court's sympathy.

II.    **The Cross-Reference to U.S.S.G. § 2A2.2 for Aggravated Assault Applies, and Sentencing Enhancements Under U.S.S.G. §§ 2A2.2(b)(2), 2A2.2(b)(3)(B), 2A2.2(b)(7), and 3A1.2(a),(b) Apply**

Rodriguez urges the Court to calculate a Base Offense Level under U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers," rather than § 2A2.2, "Aggravated Assault," as calculated by

the government and Probation. *See* ECF No. 62 at 34; PSR ¶ 41.  As it did in *Ramey,* the Court should apply the cross-reference here.

Rodriguez's conduct satisfies three of the four possible reasons for the application of the cross-reference to Section 2A2.2: Rodriguez's felonious assault involved a dangerous weapon with intent to cause bodily injury; Rodriguez's assault resulted in serious bodily injury; and Rodriguez's assault was committed with the intent to commit another felony. Therefore, Defendant's reasoning for not applying a cross-reference to § 2A2.2 is unpersuasive and incongruous with the facts of the case.

### a. The Court should apply the preponderance of the evidence standard when applying the cross-reference for aggravated assault.

Rodriguez argues that this case qualifies as an "extraordinary circumstance[]" where "due process requires proof by clear and convincing evidence." ECF No. 64 at 21, *citing United States v. Staten,* 466 F.3d 708, 718 (9th Cir. 2006) (internal citations omitted). He is wrong.

Under the law of this Circuit, the preponderance of the evidence standard applies to sentencing determinations. *United States v. Long*, 328 F.3d 655, 670 (D.C. Cir. 2003). The D.C. Circuit has explicitly acknowledged the existence of a circuit split on the issue of dramatic increases in sentencing guidelines, but it has declined to establish a higher standard. *Id.* ("This court, for its part, has noted the split among the circuits on this issue but has declined to require more than the preponderance standard at sentencing."). Furthermore, in *Long*, the D.C. Circuit explicitly endorsed the imposition of an eight-level increase to the Sentencing Guidelines using the preponderance standard, and it noted with approval that other circuits had similarly endorsed "probably even a ten-level" increase. *Id.*[1]

---

[1] While the preponderance standard applies regardless, a four-level difference is at issue here (the base offense level of 10 under U.S.S.G. § 2A2.4 versus the base offense level of 14 under

Rodriguez's attempt to distinguish *Ramey,* where this Court applied the cross-reference in a case involving the use of OC spray, fails. Rodriguez notes that Ramey involved "live testimony." But live testimony is not required. Here, the government has presented video of the attack, statements by Rodriguez admitting that he intended to target the police to retaliate against their use of spray, and accounts from eight victims, as well as information regarding the product used from the manufacturer. And here, Rodriguez—unlike Ramey—admitted under oath that he inflicted bodily injury. Moreover, there really can be no question that Rodriguez acted with the intent to commit another felony, a violation of 18 U.S.C. § 231(a)(3): by spraying at the police line, he also intended to interfere with the police during a civil disorder. This fact alone is a sufficient basis for application of the cross reference. U.S.S.G. § 2A2.2, comment. (n.1). Rodriguez does not dispute this basis for application of the cross-reference in his sentencing memorandum.

### a. Rodriguez used a dangerous weapon, so § 2A2.2(b)(2) applies

Rodriguez disputes that the government has proven the chemical spray he used was bear spray, and not some other type of capsaicin spray. ECF No. 64 at 23. For the reasons set out below, the Court should find that Rodriguez used bear spray. But even if the Court found that Rodriguez "merely" used some unspecified type of OC spray, it should still impose the dangerous weapon enhancement, just as it did in *Ramey,* because the victims' statements establish that Rodriguez's spray (whatever it was) was capable of causing serious bodily injury or, alternatively, that Rodriguez used the spray with the intent to cause bodily injury (as the Court found in *Ramey*).

The government has shown that Rodriguez assaulted officers with bear spray. Rodriguez's own internet search history queried the effects of bear spray on humans. His statements to the FBI

---

U.S.S.G § 2A2.2).

show that he suspected the spray he used could have been bear spray. Video and image evidence further demonstrate that it is more likely than not that the OC spray used by Rodriguez was Frontiersman bear spray. The black belt holster identified the spray as "Frontiersman Bear Attack Deterrent," ECF No. 62, at 13; the government is unaware of evidence supporting the defense's speculative claim that someone replaced the canister in the holder with another type of spray. As shown below in Images 3, the bottom of white can is shown underneath the belt holster and the hole in the handle for a user's forefinger is clearly visible, which are consistent with the appearance of Frontiersman bear spray without its black belt holster, shown in Image 4.

 

*Image 3 (left) – Close-up of bear spray deployed by Rodriguez,
with forefinger hole (yellow) and white base of can (orange)*

*Image 4 (right) – Frontiersman Bear Attack Deterrent Spray without black belt holster,[2]
with forefinger hole (yellow) and white base of can (orange)*

The defense notes that Officer N.D. told investigators in an early interview that he believed he had been assaulted by Rodriguez with pepper spray, which felt similar to what he had

---

[2] Image source: https://www.sabrered.com/bear-spray/frontiersman-9-2-ounce-bear-spray, *last visited* November 1, 2023.

experienced in training at the academy. ECF No. 64, at 25. OC spray affects individuals differently; the importance of this statement is that Officer N.D. recognized the spray as an OC spray – which bear spray is. Is does not appear that he was asked to differentiate between OC spray intended for use on humans and bear spray during the interview. Moreover, individuals respond differently to OC sprays; N.D. labeled the spray a seven out of ten on a pain scale; other officers rated it much higher. Officer N.D. later referenced being "bear maced" on January 6 in his victim impact statement. ECF No. 62, Exhibit O-3. The point is that Officer N.D.'s account, while certainly not pinpointing bear spray as the type of OC spray used by Rodriguez, does not rule bear spray out. And other officers perceived the substance to be bear spray:

- Sergeant O.A. described the spray as more painful and more powerful than OC spray he had previously experienced in training.

- Officer M.B. was sprayed with bear spray prior to Rodriguez's attack, so she knew what bear spray felt like. She explained that she knew that she had been assaulted with bear spray by Rodriguez because it "burns worse" (than OC spray intended for use on humans). She also thought Rodriguez's spray was bear spray because it was orange in color and left a residue on her clothing that was more difficult to decontaminate. To Officer M.B., bear spray felt twice as powerful as regular pepper spray. On a pain scale of one to ten, Officer M.B. quantified Rodriguez's attack as a 15.

- Officer P.N. recalled that the cannister of spray used by Rodriguez appeared larger than OC spray cannisters with which he was familiar.

- Officer B.R. also recalled Rodriguez's assault based on the large size cannister of OC spray that was used.

- Sergeant A.W. believed Rodriguez assaulted him with bear spray because he heard other officers around him describing the spray as such and because the spray felt different than police pepper spray. Sergeant A.W. had previously experienced OC spray at the police academy, but the bear spray he experienced on January 6 felt heavier and more painful. Contrary to defense arguments, Sargeant A.W. was hit in the eyes with Rodriguez's spray and he was blinded until he could be helped inside and decontaminated.

- Officer A.Z. immediately thought the spray Rodriguez used was bear spray or hornet spray because it felt different than OC spray. On a pain scale of one to ten, Officer A.Z. quantified police pepper spray that he had experienced in training as a four. Officer A.Z. quantified Rodriguez's attack as a seven to eight. Officer A.Z.'s clothing was stained orange with spray residue.

The above officers' observations of Rodriguez's assault are consistent with video evidence in this and other January 6 sprayer cases involving bear spray, including *Caldwell*. Put simply, bear spray often looks different. Bear spray is brown, orange, or reddish-orange in color. Other pepper sprays or pepper gels appear more white or clear in color, as does the MK-30 OC spray used by MPD. *See, e.g.*, Exhibit D, Timecode 01:20-03:00. Bear spray deploys in a thick, dense fog. Pepper spray appears as a jet or stream, as described in *Ramey*. Pepper gel deploys in a thin rope, which appears denser than pepper spray, as described in *Worrell.*

Irrespective of whether officers attacked by Rodriguez remembered him or believed he used bear spray in his assault, the Court has body worn camera video from seven officers: MPD Officer I.D. (Exhibit E), MPD Sergeant O.A. (Exhibit M-2), MPD Officer M.B. (Exhibit N-2), MPD Officer N.D. (Exhibit O-2), MPD Officer P.N. (Exhibit P-2), former MPD Officer J.R.

(Exhibits C and R-2), and MPD Sargeant A.W. (Exhibits D and S-2), which show the spray deployed by Rodriguez is most consistent with the appearance and trajectory of bear spray.[3]

As detailed in the government's sentencing memorandum, bear spray's chemical properties and forceful deployment are capable of inflicting serious bodily injury, which makes it a dangerous weapon. Rodriguez incorrectly claims that the strength of the OC spray at issue is irrelevant, stating "pepper spray, OC spray, and bear spray are all composed of the same capsaicinoid ingredients and the impact of these sprays—regardless of the concentration—is not as different…." ECF No. 64, at 26. The officers above recognized his spray as bear spray or something different, many because it was more painful. As detailed in the government's sentencing memorandum, the manufacturer of OC sprays, SABRE has established a spectrum of OC spray strength, based on major capsaicinoid (MC) concentration. An expert witness testified in *United States v. Worrell,* 21-cr-292 (RCL), regarding that same spectrum of MC concentration. When MC concentration goes up, so does the level of pain experienced when exposed, and bear spray contains the highest concentration of MC in commercially available OC sprays. That said, as the government showed in *Worrell,* even pepper gel intended for use on humans is a dangerous weapon, capable of causing serious bodily injury.

Rodriguez improperly cites MPD use of force guidance and other law enforcement guidance regarding the police use of OC spray. MPD internal rules and academic writing on the use of pepper spray by law enforcement concern OC sprays with lower MC concentrations, not

---

[3] Even if the Court were to agree with Rodriguez and find that the government had not proven the Defendant used bear spray, identification of the specific variety of OC spray is not necessary in this case in light of officers' reactions to the spray. Rodriguez has conceded that the spray he deployed is OC-based. Thus, the Court can consider all evidence from this and other cases regarding the capabilities of OC, including *Ramey*.

bear spray. The government is unaware of any law enforcement agency, including MPD, that uses bear spray on humans. Further, "widespread use" of OC sprays by police officers and the fact that serious reactions may not be common, does not mean that OC sprays, including bear spray, are not capable of causing serious bodily injury. The Court agreed in *Ramey* that pepper spray had such a capability; bear spray, which is more powerful than that pepper spray used in that case, should qualify as well.

Rodriguez suggests that the Court erred in *Ramey* by citing *United States v. Quiver*, 805 F.3d 1269 (10th Cir. 2015), which involved a taser. The defense argues that tasers are regulated at the state level more so than OC sprays, and no such similar restrictions apply to OC spray. The fact that a weapon is more or less regulated, or banned from a locality, alone, does not make that object more or less of a weapon. Nonetheless, if the Court were inclined to equate heightened regulation with dangerousness, bear spray is regulated under a different scheme in Canada, which allows a maximum MC concentration of 1.84 percent, rather than 2.0 percent in the United States, due to the dangerousness of higher MC concentrations.[4] Additionally, the National Park Service classifies pepper spray and bear spray as weapons[5] and does not allow the use of either product within Yosemite National Park.[6]

Rodriguez cites *United States v. Arrington*, 309 F.3d 40 (D.C. Cir. 2002), when defining the term "dangerous weapon." However, the definition of "dangerous weapon" cited by the defense from *Arrington* is actually the standard for conviction under 18 U.S.C. § 111(b). While

---

[4] https://www.sabrered.com/outdoor-safety/bear-safety/canadian-bear-spray/sabre-frontiersman-xtra-225-gram-bear-spray-with-glow-in-the-dark-safety/, *last visited* November 1, 2023.

[5] https://www.nps.gov/yose/planyourvisit/weapons.htm, *last visited* November 1, 2023.

[6] https://www.nps.gov/yose/planyourvisit/scarebears.htm, *last visited* November 1, 2023.

Rodriguez's spray meets the *Arrington* standard, as the Court noted in *Ramey,* different definitions at sentencing apply under the Guidelines.

Based on the officer victim's descriptions of Rodriguez's assault, video evidence of the assault and its effects on officers detailed above, as well as other information provided by SABRE and expert testimony referenced in the government's sentencing memorandum, there is ample evidence to conclude that the spray used by Rodriguez was a "Dangerous weapon" under either definition offered in the Guidelines under U.S.S.G. §§ 2A2.2 and 1B1.1.

**b.   Rodriguez's assault resulted in serious bodily injury, so § 2A2.2(b)(3)(B) applies**

Rodriguez incorrectly asserts that "the government has not produced evidence that any officer suffered serious bodily injury as result of Mr. Rodriguez's conduct." ECF 62, at 26.

The government has produced 302 reports from officers who were attacked by Rodriguez, which detail painful reactions to the assault. Additionally, the government has produced medical records for former Officer J.R., which show he was diagnosed with chemical burns. A summary of the injuries constituted serious bodily injury to Rodriguez's officer victims is included in the government's sentencing memorandum, ECF No. 62, at 38-41, and which include examples of extreme physical pain and protected impairment.

The examples provided in the government's sentencing memorandum includes both officers who attribute the injuries directly to Rodriguez and also certain injuries that appear to be the cumulative result of spray attacks. Even considering only the injuries (including the pain) suffered by officers that they have attributed directly to Rodriguez's attack, the government has demonstrated serious bodily injury. But it is also appropriate for the Court to consider serious bodily injuries sustained by officers that appear to have been the cumulative effect of many assaults over the course of the day. If the government must show that a defendant was the sole (or even

leading) cause of an officer's injuries, it would not be possible to hold defendants accountable in a situation like this – a riot where officers are repeatedly attacked throughout the day.[7]

The same logic requires the Court to reject the argument that the possibility of lingering spray in the air means that Rodriguez's offense did not result in serious bodily injury. For the enhancements at issue in this case, the Guidelines are silent on whether the Defendant must be the sole cause of injury. Moreover, the argument that officer's injuries were instead caused by lingering OC spray from other sources is contrary to officer's specific attribution of pain felt as result of Rodriguez's attack

### c. Rodriguez intended to inflict bodily injury

Rodriguez characterizes his assault on police officers as a "defensive reaction to repeatedly being sprayed with OC spray… a desperate attempt to get the police to simply stop spraying." ECF No. 64, at 35. This characterization is familiar because Rodriguez similarly sought to rationalize or justify his actions in this way with the FBI when interviewed, and with the Court at his plea hearing. Stopping the officer who was deploying OC spray, presumably Sargeant A.W. who utilized an MK-30 cannister of OC spray at that time, certainly supports Rodriguez's motive to

---

[7] Courts have applied bodily injury enhancements where a defendant participated in a riot, and in doing so, contributed to resulting bodily injury. *See United States v. Bassil*, 932 F.2d 342, 346 (4th Cir. 1991) (applying bodily injury enhancement where group of individuals hurled chairs at officers—"while it may be uncertain whether the chair thrown by [defendant] caused a specific injury, it is undisputed that [he] participated and aided a riot in which assaults occurred that caused bodily injuries"); *United States v. LeCompte*, 108 F.3d 948, 951 (8th Cir. 1997) (explaining that, in applying the bodily injury enhancement to injuries resulting from a continuous assault, "[t]he district court was not required to assign the use of a specific dangerous weapon to a particular resulting injury"). This principle applies equally here. Indeed, in the context of the January 6 riot, courts have applied the bodily injury enhancement where the actions of a group of rioters resulted in bodily injury to an officer. *See United States v. Albuquerque Head*, No. 21-cr-291 (Jackson, J.) (applying serious-bodily-injury enhancement where defendant was part of the group of rioters who assaulted Officer Michael Fanone); *United States v. Kyle Young*, No. 21-cr-291 (Jackson, J.) (same).

commit a violent assault. However, the Court should reject the notion that Rodriguez acted with the *sole* intent of stopping the police from spraying. Rodriguez also acted with the intent to physically hurt police officers.

As in *Ramey*, the Court can easily conclude Rodriguez intended to inflict bodily harm—irrespective of whether Rodriguez was using bear spray or some other form of OC spray. Rodriguez has admitted on several occasions that he acted intentionally, targeting a police officer with his spray attack, as discussed above in Section I(a). Rodriguez deliberately sprayed a substance, which he knew was either "pepper spray or bear spray," directly at officers' faces from a distance of three to five feet. Rodriguez told several interviewers on January 6 that he felt the need to "fight back." After the attack, Rodriguez explained to one interviewer, "They [police officers] were pepper spraying people – but the police got it back," meaning he had followed through on earlier statements and physically fought police officers with chemical spray. During his interview with the FBI, Rodriguez described observing others around him in pain, suffering the effects of OC spray. Rodriguez admitted to agents that he knew what effect his spray would have on police officers because he had been sprayed by police officers with OC spray and had been "blinded." *See* ECF No. 62, Exhibit J. Seeing all of this suffering around him, and experiencing pain from being sprayed himself, Rodriguez's reaction was to retaliate and to inflict more pain, using a similar product to that which had caused him pain, and targeting the officer who was spraying.

Rodriguez's desire to stop police from spraying rioters—after having said nothing to deter the rioters around him who were assaulting police officers with fists, blunt objects, and OC sprays of their own—only buttresses Rodriguez's motive to inflict bodily injury. What better way to stop Sargeant A.W. from spraying than to cause him pain? As detailed in the government's sentencing

memorandum, ECF 62, at 30-31, Sargeant A.W. was one of the officers who was most greatly affected by Rodriguez's assault. On a pain scale of one to ten, Sergeant A.W. quantified Rodriguez's bear spray attack as an eight or nine, which constitutes extreme physical pain and serious bodily injury. After being sprayed by Rodriguez, Sergeant A.W. could not see anything. Sargeant A.W. was blinded, just like Rodriguez had been. Sergeant A.W. felt like he had sandpaper in his eyes. He was coughing, the spray took his breath away ("breathtaking"), and he felt a "burning" sensation covering his face. During the Court's plea colloquy with Rodriguez, Rodriguez admitted that he acted "willfully," "intentionally," and "forcefully" when inflicted bodily injury on Officer N.D., namely, "immense pain." ECF No. 62, Exhibit U, at 21-23. Rodriguez intended to hurt other officers as well, particularly Sargeant A.W. who was using a cannister of OC spray at that time. These facts show that Rodriguez intended to cause, at a minimum, "bodily injury"; the type of pain that would, and did, cause officers like Officer N.D. and Sargeant A.W. to retreat from the barricade line.

Rodriguez's reliance on *United States v. Leffingwell* is unfounded. No. 21- cr-005-ABJ (D.D.C. Apr. 5, 2022). January 6 defendant Lefingwell plead guilty to assault under 18 U.S.C. § 111(a)(1), not under § 111(b) as in the instant case. Leffingwell did not use of a dangerous weapon; instead, he used his fist to punch two officers. In *Leffingwell*, Judge Jackson applied the cross-reference for aggravated assault under Section 2A2.2 and the official victim enhancement under Section 3A1.2.

### d. Rodriguez was motivated by police officers' status as government officers, so § 3A1.2 applies

This case is unlike *United States v. Kohut*, where the victim "happened to be a government official" and "the defendant was not influenced by this fact." ECF No. 64, at 39, *citing Kohut*, 553 F.Supp.3d 964 (D.N.M. 2021). In that case, the defendant Kohut came out of his house with steak

knife and yelled at a U.S. Postal Service mail carrier, demanding a cigarette. The mail carrier, observing a dangerous weapon—a steak knife—instructed Kohut to get back, or the mail carrier would respond in kind with his own dangerous weapon—pepper spray. Kohut threw the steak knife at the mail carrier, which, thankfully, bounced off the mail carriers' shoulder and landed in a gutter, causing the mail carrier no injuries. After the assault, Kohut went back inside his house. Based on the Court's recitation of facts in *Kohut*, the entire incident could not have taken more than five minutes. The District Court in New Mexico determined that Kohut was not motivated by the mail carrier's status as a government official, rather, Kohut was "motivated by… symptoms of his mental illness and a desire for a cigarette." *Id.* at 971. Unlike Kohut, Rodriguez has admitted on numerous occasions that he intentionally assaulted police officers on January 6 to stop them from doing their jobs.

Rodriguez did not fall out of the sky and land on the West Plaza of the U.S. Capitol on January 6, randomly assaulting police officers in state of manic rage or nicotine withdrawal. He took a train from New York City to bus in Pennsylvania, which took him to Washington, D.C. He attended a rally dubbed "Stop the Steal," where law enforcement officers were present. He unlawfully entered the restricted area of the West Lawn, where he would have passed over downed metal fencing. He arrived on the West Plaza at a time when real violence was occurring between rioters and police officers. Rodriguez made his way straight for the center of the action, navigating to the very front of the crowd. There he stood for over 15 minutes, yelling, chanting, and most importantly, watching other rioters violently and repeatedly attack police officers and attempt to breach the barricades. Rodriguez obtained a cannister of bear spray, which he unsuccessfully attempted to spray in the midst of a breach attempt by rioters who had toppled an enormous metal lamp post. *See* ECF No. 62, Exhibits C and D. Rodriguez came back a minute

later, having figured out how to use the bear spray, and he assaulted at least eight MPD officers with it. *See id.*

The officers assaulted by Rodriguez are or were members of MPD and were wearing their MPD uniforms and/or distinctive police riot gear. They were in formation on the West Plaza guarding the barricade line. It was clear that the officers were government officials. At the plea hearing, Rodriguez agreed that the government could prove Officer N.D., the victim listed in the Superseding Indictment, was engaged in his official duties at the time Rodriguez assaulted him, which included assisting the Capitol Police enforcing federal law. During his FBI interview, he admitted that he was targeting a specific uniformed officer, who had been deploying OC spray. The Court should disregard Rodriguez's arguments that he did not know what he was doing or that he was not motivated by these officers' status as government officials. Rodriguez attacked them precisely because they were doing their jobs as law enforcement officers.

    **e. Applying the sentencing enhancements at issue in this case does not constitute impermissible double counting.**

The Guidelines do not prohibit double counting, only impermissible double-counting. As noted by the Eleventh Circuit in *United States v. Grushko*, "'[i]mpermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.'" 50 F.4th 1, 15–16 (11th Cir. 2022), cert. denied, 143 S. Ct. 2594 (2023), and cert. denied, 143 S. Ct. 2680 (2023), *quoting United States v. Suarez*, 893 F.3d 1330, 1336 (11th Cir. 2018). The Eleventh Circuit held "double counting is permissible where: (1) the Sentencing Commission intended the result; and (2) each guideline section in question concerns a conceptually separate consideration related to sentencing . . . We presume that the Sentencing Commission intended to apply separate guideline sections cumulatively unless we are specifically directed

otherwise . . . Additionally, the application of multiple guidelines sections can be triggered by the same conduct." *Grushko*, 50 F.4th at 15-16, *citing Suarez*, 893 F.3d at 1336-1337; *see also*, *United States v. Seibert*, 971 F.3d 396, 400 (3d Cir. 2020), opinion clarified, 991 F.3d 1313 (3d Cir. 2021), *quoting United States v. Reynos*, 680 F.3d 283, 291 (3d Cir. 2012) (allowing double counting where the Guidelines do not explicitly prohibit application of provisions); *United States v. Johnstone*, 107 F.3d 200, 212 (3d Cir. 1997) (concluding that double counting of weapons enhancements "is permissible because it is explicitly mandated by the clear and unambiguous language" of the relevant Guidelines section) and *United States v. Wong*, 3 F.3d 667, 671 (3d Cir. 1993) (noting that "an adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines exclude its applicability").

Consistent with the above opinions finding the Guidelines specifically do not prohibit, mandate, or simply allow double counting, Application Note 4(B) to Section 1B1.1 specifically states that there may be multiple adjustments under the guidelines triggered by the same conduct, and provides the example of "shooting a police officer during the commission of a robbery may warrant an injury enhancement under § 2B3.1(b)(3) and an official victim adjustment under § 3A1.2, even though the enhancement and the adjustment both are triggered by the shooting of the officer." U.S.S.G. § 1B1.1, App. N. 4.

The Court based its conviction under § 111(b) on bodily injury to Officer N.D., not the fact that a dangerous weapon was used. The Guidelines in this case should apply the enhancement for use of a dangerous weapon under U.S.S.G. § 2A2.2(b)(2); that enhancement would not constitute impermissible double counting of an element of the offense for which Rodriguez was convicted.

Serious bodily injury resulted from Rodriguez's assault, which is greater than bodily injury as previously found by the Court. Thus, the enhancement under U.S.S.G. § 2A2.2(b)(3)(B) would

not count as double counting for the same conduct that was the basis for the § 111(b) conviction. Additionally, as detailed above, the Guidelines specially provide the example of an assault on a police officer where both injury and official victim enhancements would apply.

U.S.S.G. § 2A2.2(b)(7) directs the Court to apply a 2-level increase since Rodriguez was convicted under § 111(b), and Rodriguez does not dispute its application.

Application Note 4 to Section 2A2.2 specifies, "If subsection (b)(7) applies, §3A1.2 (Official Victim) also shall apply… Subsection (b)(7) implements the directive to the Commission in subsection 11008(e) of the 21st Century Department of Justice Appropriations Act (the "Act"), Public Law 107-273. The enhancement in subsection (b)(7) is cumulative to the adjustment in §3A1.2 (Official Victim) in order to address adequately the directive in section 11008(e)(2)(D) of the Act, which provides that the Commission shall consider "the extent to which sentencing enhancements within the Federal guidelines and the authority of the court to impose a sentence in excess of the applicable guideline range are adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by 18 U.S.C. §§ 111 and 115." Thus, §3A1.2(a),(b) also does not constitute double counting under the Guidelines.

## III.    A Downward Variance is Not Warranted

The government disagrees with the defense and Probation that a downward variance is warranted in this case. In analyzing Rodriguez's personal history and characteristics, the defense does not address his prior arrests for battery, the prior protective order in place against him, and the alleged violation of that order. Rodriguez's assaultive actions on January 6 make sense when considering these and other incidents, including Rodriguez's confrontation with a gym manager. His actions before, during, and after January 6 show his propensity to "fight back" and engage in confrontation. Most significantly, perhaps, a downward variance is unwarranted given the injuries

sustain by eight MPD police officers. These injuries include persistent psychological trauma, which is not dissimilar from or less serious than the Defendant's own. The nature and circumstances of Rodriguez's offense were of the utmost seriousness, and fully support the government's recommended sentence.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      s/ Will N. Widman
         WILL N. WIDMAN
         NC Bar No. 48158
         Trial Attorney, Detailee
         1301 New York Avenue NW, 8th Floor
         Washington, DC 20530
         (202) 353-8611
         Will.Widman@usdoj.gov