UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - -- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

- v. - :

EDWARD FRANCISCO RODRIGUEZ, : **21-CR-483 (DLF)**

Defendant. :

- - - - - - - - - - - - -- - - - - - - - - - - - - - - - - - x

**MR. RODRIGUEZ'S RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

**Nora K. Hirozawa, Esq.**
Attorney for Mr. Rodriguez
One Pierrepont Plaza, 16th Fl.
Brooklyn, NY 11201
Tel.: (718) 330-1200

TO: **Matthew Graves, Esq.**
United States Attorney
District of Columbia
Attn: Will Widman, Esq.
Assistant United States Attorney

## I. Introduction

Mr. Rodriguez submits the instant supplemental objections to the final pre-sentence report ("PSR"), disclosed on October 30, 2023, *see* ECF No. 59, and responds to the government's sentencing memorandum. *See* ECF No. 62. For the reasons set forth below, Mr. Rodriguez respectfully reiterates his request that the Court grant his objections to the PSR and impose a probationary sentence. [redacted]

## II. Supplemental Objections to the Pre-Sentence Report

Mr. Rodriguez reiterates his prior objections to the pre-sentence report and asks that the Court resolve each. He also submits the below supplemental objections, pursuant to Federal Rule of Criminal Procedure 32(f). Pursuant to Federal Rule of Criminal Procedure 32(i)(3)(B), the Court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Unlike undisputed portions of the presentence report, the Court cannot simply accept the disputed portion as true.

### a. Serious bodily injury

Mr. Rodriguez objects to the application of a five-level enhancement for serious bodily injury pursuant to § 2A2.2(b)(3)(B), requested by the government and recommended in the final PSR, for the reasons discussed in greater detail below. *See* Section III(c).

### b. Restitution

Federal courts may order restitution only when statutes authorize restitution. *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). "The loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." *Hughey v. United States*, 495 U.S. 411, 420 (1990). Restitution as authorized by statute is intended to compensate victims only for the losses

caused by the conduct underlying the *offense of conviction*. *Id.* at 417 (emphasis added). The Supreme Court held that statutes "authorize an award of restitution only for the loss caused by the *specific conduct* that is the basis of the *offense of conviction*." *Id.* at 413; *see also United States v. Dorcely*, 454 F.3d 366, 377 (D.C. Cir. 2006).

Mr. Rodriguez objects to the Office of Probation's recommendation of $2,000 in restitution. He pled guilty to one count of assault on a federal officer, in violation of 18 U.S.C. § 111(a) and (b). He did not enter the Capitol, damage any property, or act in concert with anyone who did so. No records have been provided by the government related to any other loss amount and the PSR offers no explanation for how it arrived at the calculation of $2,000. The Court should accordingly decline to impose restitution.

## III. Responses to the Government's Sentencing Memorandum

### a. The Court should apply § 2A2.4 because Mr. Rodriguez's conduct does not constitute an "aggravated assault," as defined in the commentary to § 2A2.2.

As discussed in Mr. Rodriguez's sentencing memorandum, *see* Def. Sent. Memorandum, ECF No. 65 at 20-33, the cross-reference to § 2A2.2 applies only if a defendant's conduct constituted "aggravated assault." U.S.S.G. § 2A2.4(c)(1). "Aggravated assault" is defined as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, cmt. n.1.

In its sentencing memorandum, the government asserts for the first time that Mr. Rodriguez's conduct meets the definition of "aggravated assault" under § 2A2.2 because he acted with "intent to commit another felony," specifically a violation of 18 USC § 231. *See* Gov't Sent. Memo. ECF No. 62 at 34-35. Alternatively, the government argues, § 2A2.2 applies because Mr. Rodriguez used a dangerous weapon with intent to commit bodily injury and because his actions resulted in serious bodily injury. *Id.*

But the government has failed to establish by a preponderance of the evidence, let alone by clear and convincing evidence,[1] that Mr. Rodriguez's conduct meets any of these definitions of "aggravated assault." Because Mr. Rodriguez previously addressed the inapplicability of § 2A2.2 under § 2A2.2 Application Note 1, Section (A) in his sentencing memorandum, *id.* at 20-36, he addresses the government's new arguments that Mr. Rodriguez's conduct qualifies as an aggravated assault under Sections (B) and/or (D).

**b. U.S.S.G. § 2A2.2 does not apply because Mr. Rodriguez did not intend to commit another felony.**

The government asserts, without elaboration, that "the cross-reference applies because Rodriguez acted with "intent to commit another felony," namely, obstructing, interfering, and impeding law enforcement officers engaged in the performance of their official duties during a civil disorder, under 18 U.S.C. § 231, as alleged in Count One of the Superseding Indictment, ECF No. 28." ECF No. 62 at 35.

The Court should reject this argument for two reasons. First, the government relies upon the same exact conduct underlying Mr. Rodriguez's § 111 plea to support his intent to commit § 231. The same exact conduct cannot support a finding that Mr. Rodriguez intended to commit "*another* felony." Second, the government has not established the requisite mens rea for a violation of § 231 by a preponderance of the evidence, let alone clear and convincing evidence.

As the Court is aware, Mr. Rodriguez pled guilty, without a plea agreement, to Count Two of the Superseding Indictment, which charges him with violation 18 U.S.C. § 111(a) and (b). He did not admit to, nor was he convicted of another felony. However, the government argues Mr. Rodriguez's conduct constituted "aggravated assault" because he acted "with intent to commit another felony." ECF No. 62 at 35. Unlike other January 6th defendants, Mr. Rodriguez's conduct is limited to a single,

[1] Mr. Rodriguez continues to encourage the Court hold the government to a clear and convincing standard, rather than preponderance of the evidence standard, when it comes to establishing that Mr. Rodriguez's conduct constituted an "aggravated assault." *See* Def. Sent. Memo., ECF No. 65 at 21-22. But because the government has not even established certain sentencing factors by a preponderance of the evidence, he references that standard throughout this filing.

discrete, five-second act. After releasing the chemical spray, Mr. Rodriguez left the Capitol grounds; he did not breach the police barricade, enter the Capitol, engage in further assaults, or commit any other felony conduct.

**1. The same exact conduct that supports Mr. Rodriguez's § 111(a) and (b) conviction cannot serve as the basis for his intent to commit "*another* felony."**

The Guidelines provide for the application of § 2A2.2 in circumstances where a defendant commits an assault with the intent to commit *another* felony. The Guidelines do not define "another felony" for purposes of the § 2A2.4 cross-reference. But both the plain language of the Guideline and ordinary interpretation support a finding that "another felony" must be based on separate felony conduct, distinct from the exact same facts underpinning the assault for which Mr. Rodriguez is being sentenced.

Section 2K2.1 also offers insight into the Sentencing Commission's understanding of what constitutes "another felony." Section 2K2.1(b)(6)(B) provides for an enhancement if a defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with *another felony offense*." U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). For purposes of that section, "another felony offense" is defined as "any federal, state, or local offense, *other than the explosive or firearms possession or trafficking offense*, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1, cmt. n.14(C) (emphasis added). In other words, "another" is defined to mean an offense distinct from the substantive firearms offense for which the person is being sentenced, consistent with its ordinary interpretation.

On the facts here, a violation of 18 U.S.C. § 231 is not "another felony." The government relies on the same facts that support Mr. Rodriguez's § 111(a) and (b) plea to support a § 231 offense. Judge Amy Berman Jackson rejected the government's argument that a violation of § 111(a)(1) based

on the same conduct underlying a defendant's § 231 conviction constituted "another felony," observing,

> [T]here's no reason to believe that this is meant to be based on just the hypertechnical alignment of elements. Because when the guideline, at least in the gun context, tells you, well, you'd use the guideline for that offense instead of the firearms offense, it seems clear that it means something other than another gun possession offense. And it seems that the government's approach strips the provision of any meaning.
>
> It strikes me that if the Commission is asking: Did you commit the assault with the intent to commit some other offense? it didn't mean with the intent to commit that exact same assault, just charged differently. They could have easily defined "another offense" as any offense with any different elements that's a different offense, but they didn't.
>
> It's also important to note that the cross reference says you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony. This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime.

Exh, J, *United States v. Hamner*, 21-CR-689 (ABJ), Sent. Tr. at 20-21.

Judge Jackson notes that "the reason this is important" is that application of "the guidelines specifically designated or an assault on officers, § 2A2.4," establishes a base offense level of 10 and even with a two-level enhancement for bodily injury and a (disputed) three-level dangerous weapon enhancement, the total offense level is only 15; 13 after accounting for acceptance of responsibility. *Id.* at 21. In contrast, applying § 2A2.2 sets a base offense level of 14, adds a *three*-level increase for the *same* bodily injury, a (disputed) *four*-level enhancement for use of the *same* dangerous weapon, and provides for both a two-level enhancement because Mr. Rodriguez pled to a violation of § 111(b) rather than § 111(a) and a six-level enhancement under § 3A1.2 for an official victim—a total offense level of 29; 26 after accounting for acceptance of responsibility. As Judge Jackson acknowledged,

"you've got two guideline calculations for the same set of facts" that result in dramatically different Guidelines ranges.[2] *Id.* at 23. Here, 6-12 months,[3] as compared to 63-78 months.[4]

Given the significant and dramatic difference in sentencing exposure, Judge Jackson found that "at best, the cross reference is ambiguous. And under such circumstances the Rule of Lenity requires the adoption of the definition that favors the defendant."[5] Tr. at 24. The Court should similarly find that the discrete, five-second spraying incident that underlies Mr. Rodriguez's § 111 conviction cannot be the basis for his intent to commit "another felony," under § 2A2.2.

**2. The government has not established that Mr. Rodriguez had the intent to violate 18 U.S.C. § 231 by a preponderance of the evidence.**

A violation of § 231 requires a showing that "the defendant knowingly committed an act or attempted to commit an act *with the intended purpose* of obstructing, impeding, or interfering with law enforcement officers." *See United States v. Celentano*, 22-CR-186 (TJK), Jury Instructions, Interference with Officers During a Civil Disorder, ECF No. 64 at 13. The government has not proved this element by a preponderance of the evidence.

---

[2] The dramatic difference in Guidelines ranges Judge Jackson observed result from application of 2A2.2 and 2A2.4 to the same exact facts supports Mr. Rodriguez's argument that the Court should require the government to establish an "aggravated assault" by clear and convincing evidence, not just a preponderance. *See United States v. Hymas*, 780 F.3d 1285, 1290 (9th Cir. 2015).

[3] If the Court were to apply the three-level dangerous weapon enhancement under § 2A2.4, the Guidelines range would be 12-18 months.

[4] If the Court were to apply the five-level enhancement for serious bodily injury requested by the government under § 2A2.2, the Guidelines range would be even higher—78-97 months.

[5] This language appears in the commentary to § 2A2.2, not the Guideline itself. As the Court is aware, the commentary to the Sentencing Guidelines is not accorded the full force of the guideline, but rather is considered as "an agency's interpretation of its own legislative rule." *Stinson v. United States*, 508 U.S. 36, 44 (1993). In this Circuit, it is well-established that the Sentencing Guideline's application notes do not qualify for deference under *Stinson* if they "expand[] rather than interpret[] the Guideline." *United States v. Winstead,* 890 F.3d 1082, 1091 (D.C. Cir. 2018). Further, as the Supreme Court made clear in a recent decision, there are important limits to the deference courts give to an agency's interpretation of its own rules. *See generally Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-2418 (2019). Under *Kisor*, the Court should exhaust all the "traditional tools" of construction, including consideration of the text, structure, history and purpose of the regulation where Guideline commentary is genuinely ambiguous.

[redacted]

In sum, because (1) the government has not—and cannot—established Mr. Rodriguez's intent to cause bodily injury, (2) the government's circular and over-technical logic does not support Mr. Rodriguez's intent to commit "another felony," and (3) the government has not established serious bodily injury, the Court should calculate his Guidelines under § 2A2.4 and reject the government's request to apply the § 2A2.4(c)(1) cross-reference.

**c. U.S.S.G. § 2A2.2 does not apply because there was no serious bodily injury.**

For the first time since Mr. Rodriguez's arrest on July 9, 2021, the government indicated in an October 24, 2023 letter to the Office of Probation that they believe Mr. Rodriguez's actions on January 6th caused "serious bodily injury," not just bodily injury. "Bodily injury" is defined as "any significant injury; *e.g.,* an injury that is painful and obvious, or is a type for which medical attention ordinarily would be sought." USSG § 1B1.1, comment. (n.1(B)). In contrast, "serious bodily injury" covers assaults that inflict "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." § 1B1.1(M).

Mr. Rodriguez acknowledges that his conduct resulted in bodily injury. But nothing the government has presented supports a finding of serious bodily injury. Notably, the government discusses many of the officers' injuries in general, collective terms. *See, e.g.*, ECF No. 62 at 21. Even more critically, the only three officers who sought any medical attention at all, Officers P.N., J.R., M.B.,[6] did so as a result of either injuries entirely unrelated to Mr. Rodriguez's conduct and/or injuries resulting from the cumulative violence they experienced on January 6th.

---

[6] It is unclear whether Officer M.B. actually sought any medical treatment related to injuries sustained on January 6th, as discussed below.

Of the eight officers identified and interviewed by the government, the government appears to argue that five of them suffered "serious bodily injury." *See* ECF No. 62 at 45-46 (citing Officer M.B., Officer B.R., Officer P.N., Officer J.R., and Sergeant A.W. as officers who suffered "serious bodily injury"). Mr. Rodriguez addresses the injuries sustained by each of these five officers in turn.

**1. Officer M.B.**

Officer M.B. is one of the three officers that the government reports sought medical attention, in support of their argument that her injuries rose to the level of "serious bodily injury," and not just "bodily injury." The government asserts that "Officer M.B. sought medical attention for her injuries, including consultation with various specialists for a concussion, back pain, knee pain, and swollen eyes, which she attributed to exposure to multiple chemical irritants." ECF No. 62 at 23-24. It is unclear where this information is drawn from, and the government does not offer a cite. Officer M.B. was interviewed five times between January 6, 2021 and June 30, 2023. During an April 29, 2021 interview with two FBI special agents--her fourth--M.B. reported that she "did not seek medical treatment." *See* Exh. K, Officer M.B. April 29, 2021 302.

Government Exhibit N-1, an FBI 302 documenting a June 30, 2023 interview with Officer M.B., states that Officer M.B. "sought medical attention after January 6 for the concussion as well as for knee pain and back pain. Her eyes were swollen and in pain for three days from the tear gas. As a result of the events that took place on January 6 and the injuries she endured, [M.B.] is still being treated regularly by a chiropractor for a pinched nerve." Gov't Exh. N-1 at 2. Contrary to the government's claim, nowhere in Exhibit N-1, or any other recorded statement by Officer M.B. provided to the defense, does she report seeking medical attention for swollen eyes; further, she reports her eyes were swollen due to tear gas, not "multiple chemical irritants." At best, this is an oversight or overgeneralization by the government; at worst, the government is affirmatively misrepresenting the evidence to seek a higher sentence.

It is possible that although Officer M.B. did not seek *any* medical treatment during the nearly four months after January 6, 2021, she subsequently sought treatment for lingering problems with her

knees, back, and pinched nerve. But none of those injuries have anything to do with Mr. Rodriguez's conduct and cannot be relied upon to impose an enhancement for serious bodily injury.

Additionally, Officer M.B. reports that she was approximately 3-5 feet away from Mr. Rodriguez at the time he released the chemical spray. But her own BWC footage, as well as other video footage, undermines that claim. It is clear that M.B. is not one of the officers standing directly in front of Mr. Rodriguez; none of them are wearing only a bicycle helmet. M.B.'s own body camera also shows Mr. Rodriguez's spray at least four people away from where Officer M.B. was standing, and originating from the steps below the Upper West Plaza, where she is standing.






In any event, even if the Court were to credit Officer M.B.'s estimate of the distance between her an Mr. Rodriguez, her own behavior following Mr. Rodriguez's spraying seriously undermines her sensationalized post-hoc report of pain to FBI investigators. At 1:47:50 p.m., a little over 20 minutes before Mr. Rodriguez released the spray, Officer M.B. was sprayed with a chemical irritant by an unknown person in the crowd—someone other than Mr. Rodriguez. She left the police line, coughing and yelling "ah, shit!" Gov't Exh. N-2 at 13:47:50-13:49:40. Another officer poured water on her head and rinsed her helmet off, as she continued to yell, "I can't see shit!" *Id.* at 13:50:05. The other officer escorted her upstairs, where a third officer poured more water on her. She coughed and spat out water and remained off the line until approximately 1:00 p.m. When she returned to the line, another female officer asked her "what did you get hit with," to which M.B. responds "I got hit with one of them [IA]… it's fine, normal day." *Id.* at 14:00:09. Officer M.B. leaves the line again for about ten minutes before returning at 2:10 p.m., just before Mr. Rodriguez sprays. She remains on the police line,

well to the left of Mr. Rodriguez, for approximately eight seconds after Mr. Rodriguez begins spraying. *Id.* at 14:10:47.

In contrast to the prior spraying event, Officer M.B. does not cough, yell, or react much, at all, to Mr. Rodriguez's spray. She is able to cogently direct a fellow officer to pour water into her right eye, and less than one minute after the spraying incident, she says "I'm good, I'm good." *Id.* at 14:11:15. By 2:12 p.m., she is running over to help another officer, *see id.* at 14:12:20, who she then leads inside and upstairs.

Officer M.B. reported being sprayed over 20 times on January 6th. It is certainly possible that given everything she experienced on January 6th, Officer M.B. misremembered the facts, circumstances, and pain she experienced as a result of Mr. Rodriguez's conduct. But the evidence simply does not support a finding of serious bodily injury to Officer M.B. as a result of Mr. Rodriguez's conduct.

### 2. Former Officer J.R.

Officers P.N. and J.R. both reported sustaining significant injuries on January 6th and seeking medical attention. But the injuries they sustained did not stem from Mr. Rodriguez's conduct.

Notably, former Officer J.R. was wearing "turtle gear," including a helmet, which "deflected some but not all the spray particles." ECF No. 62 at 28. Aside from stepping back from the line, former Officer J.R. reported no other effects of Mr. Rodriguez's spray. In contrast, J.R. reported a memorable and traumatic bear spraying event by the inaugural tunnel approximately 20 minutes later. Former Officer J.R. was sprayed directly with bear spray by an unidentified rioter at a distance of three to four feet. Although former Officer J.R. reported that the canister looked similar to the one used by Mr. Rodriguez,[7] the effect was completely different. On this occasion, the bear spray covered former

[7] In contrast, in a July 14, 2021 interview, Officer N.D. reported that the canister looked similar to the OC spray canisters used by MPD and that it was possible Mr. Rodriguez used an MPD issued spray.

Officer J.R.'s entire body. J.R. suffered severely blistered hands and sought medical treatment as a result of *that* spraying incident, but critically, *not* as a result of Mr. Rodriguez's conduct.

If anything, the dramatically more severe injuries former Officer J.R. suffered as a result of the subsequent bear spraying in the tunnel, but not as a result of Mr. Rodriguez's chemical spray, supports a finding that either (1) the chemical spray Mr. Rodriguez used was not, in fact, bear spray, or (2) that Mr. Rodriguez did not use the spray in a manner capable of causing serious bodily injury.

**3. Officer P.N.**

Like former Officer J.R., P.N. was wearing "turtle" gear, including a helmet, visor, protective padding, and a flame retardant suit. His helmet and visor deflected some of the spray, but he reported some spray particles got into his mouth, which he described as "burning" and "irritating." He reported thinking at the time at the spray was pepper spray. He did not suffer any other immediate reaction to Mr. Rodriguez's spray.

But approximately 20 minutes after Mr. Rodriguez released the spray, Officer P.N. was assaulted several more times. including by being struck in the head with a blunt object, having his visor ripped from his helmet, and being sprayed directly in the face with bear spray by another rioter, after his visor was removed. Officer P.N. suffered a severe and immediate reaction to this unrelated spraying incident, which led to a seizure. Officer P.N. was brought to the hospital and received medical treatment there.

Officer P.N. suffered the worst injuries of all the officers identified by the government. But because those injuries are not attributable to Mr. Rodriguez's conduct, an enhancement for serious bodily injury is inappropriate.

**4. Other officers**

None of the other officers suffered injuries that come near the definition of "serious bodily injury." No other officer identified by the government even sought medical attention. The officers were able to flush out their eyes and immediately return to work, so only the 3-point enhancement for bodily injury should apply. The spray's effects did not last long, and none of the officers involved required medical attention for the chemical spray injuries. For these reasons, while Mr. Rodriguez acknowledges that he caused the officers pain and bodily injury, he did not cause "serious bodily injury."

Indeed, Officer N.D., the only officer named in the documents charging Mr. Rodriguez with assault, writes in his victim impact statement, "That day had an impact on me **but not one that was detrimental to my health but one that helped it** because I knew then and I still know now. Without the rule of law there would be no democracy, no safe place, and no order." Gov't Exh. O-3 at 2.

In cases similar to Mr. Rodriguez's, courts have found comparable injuries to only rise to the level of bodily injury. For example, the Fourth Circuit found a cut lip, "which required a single stitch," insufficient to sustain an enhancement for serious bodily injury under § 2A2.2. *United States v. Bryant,* 540 Fed. Appx. 241, 250 n.2 (4th Cir. 2014). The Fifth Circuit vacated a sentence after determining that an officer's injuries of "lacerations and a mild deviated septum" from being kicked in the face "did not rise to the level of 'serious bodily injury.'" *United States v. Nunez-Granados,* 546 Fed. Appx. 483, 486 (5th Cir. 2013). The Fifth Circuit specifically noted that the defendant's behavior could not be equated with a case in which a defendant "stomp[ed] on his head repeatedly with boots on" or one in which a defendant "pulled a man out of his car and stomped on his head repeatedly as he lay on the ground motionless." *Id.* at 487.

In contrast, the Fourth Circuit found serious bodily injury where an officer's "left eye was swollen shut, and he received medical treatment…as well as x-rays and treatment at a local hospital emergency room." *United States v. Hicks,* 313 Fed. Appx. 674, 676 (4th Cir. 2009). In addition, that officer "was relieved of his duty and sent home, as he was unable to perform his job because of the

swelling and impaired vision." *Id.* That injury required the use of sick days and had lingering effects requiring medical treatment four months after the assault. The "nature and duration" of the injury in that case were critical to affirming the district court's finding of serious bodily injury. *Id.* The Eighth Circuit found serious bodily injury from a facial injury when the defendant punched the victim in the face "breaking her jaw and several facial bones, which required oral surgery." *United States v. Steele,* 550 F.3d 693, 698 (8th Cir. 2008). The case law clearly indicates that "serious bodily injury" contemplates more severe injuries than those suffered here.

In Mr. Rodriguez's case, the injury required 60-90 seconds to rinse out the officer's eyes, and the Government has alleged no long-term effects that would qualify as "protracted impairment." Gov't Exh. O-1, Officer N.D. 302. The officers were not wearing gas masks, but the vast majority—including the officers standing closest to Mr. Rodriguez—were wearing some protective gear, including Plexiglass face shields. This is significant because DOJ guidance notes that even a suspect raising his hands above his face can inhibit the use of OC spray.[8] Similarly, the report warns that "[e]yeglasses, sunglasses, and other protective eyewear and clothing may greatly reduce the effectiveness of OC sprays."[9] If sunglasses, or even hands, provide significant enough protection to reduce the potency of the spray, then Plexiglass face shields must also.

Moreover, the officers themselves were using chemical spray on the crowds as a countermeasure. Thus, chemical spray was already present in the air without harming officers or permanently harming the protestors themselves. In addition, while the officers did experience pain, it was comparable to pain experienced in training, *see* Gov't Exh. O-1 at 2, and was not debilitating or extensive enough to seek medical treatment. Even officers who reported experiencing pain greater

[8] *Oleoresin Capsicum: Pepper Spray as Force Alternative*, Nat'l. Inst. of Justice Tech. Assess. Prog. (March 1994), *available at*: https://www.ojp.gov/pdffiles1/nij/grants/181655.pdf.
[9] *Id.*

than that experienced in training, like Sergeant O.A.[10] or Officer A.Z.,[11] reported the pain was the result of the cumulative effect of many sprays, not Mr. Rodriguez's spray specifically.

Because none of the officers identified by the government suffered serious bodily injury, the Court should decline to apply the § 2A2.4(c)(1) cross-reference to § 2A2.2 because Mr. Rodriguez's conduct did not rise to the level of an "aggravated assault," as defined by the Guideline commentary.

**IV. The Court should decline to impose a five-level enhancement for serious bodily injury under § 2A2.2(b)(3)(B).**

For all the reasons discussed in Section III(c), the Court should decline to impose the five-level enhancement for serious bodily injury under § 2A2.2(b)(3)(B).

**V.**

[10] Sergeant O.A. reported that approximately five to six days after January 6, the skin on his hands and face began to peel off, and the skin underneath appeared red and dry. He did not seek medical attention. The description of these injuries, and the lack of medical treatment, sounds more akin to a bad sunburn than serious bodily injury.

[11] Officer A.Z. reported that Mr. Rodriguez's spray was the first time he was sprayed on January 6th. He also specifically described the first two times he was sprayed as not being too painful, but the third caused his entire body to hurt. His hands burned for 2-3 days, but he did not seek medical attention or take off work.

[redacted]

[12] *See, e.g.*, *Why Do Victims Stay*, National Coalition for Domestic Violence, https://ncadv.org/why-do-victims-stay.

[13] *See* Lynn A. Addington, Police response to same-sex intimate partner violence in the marriage equality era, Criminal Justice Studies, 33:3, 213-230 (2020).



## VI. General and Specific Deterrence

The government cites general deterrence as a basis for imposing an 88-month sentence. There is no shortage of cases where this Court and others have imposed significant custodial sentences for January 6th-related cases. Those sentences have been appropriate, particularly where defendants' participation involved actual breach of the Capitol, property damage, serious bodily injury, and evinced an *intent* to cause bodily injury, property damage, or disruption of governmental proceedings. Those cases have already made clear that anyone who engages in similar behavior in the future will be subject to stringent punishment, as well as a felony conviction. The significant custodial sentences imposed for hundreds of defendants already offer more than ample general deterrence.

The government also cites specific deterrence as a basis for incarcerating Mr. Rodriguez for 88 months. Yet everything before the Court supports a finding that *no* incarceration is necessary to deter Mr. Rodriguez—he has learned his lesson. Unlike some defendants, Mr. Rodriguez has maintained complete compliance with all conditions of his release since July 9, 2021. He has accepted responsibility for his actions and pled guilty to a felony. At 28 years old, Mr. Rodriguez will be branded a felon—a label that will follow him forever and has already impacted his professional

opportunities. [redacted]

Had Mr. Rodriguez planned to assault police officers on January 6th, specific deterrence might make more sense. But he did not plan to assault anyone that day. [redacted] The government suggests that Mr. Rodriguez repeatedly rationalized his actions by citing that the police sprayed first and claims that Mr. Rodriguez's account "omits the fact that Rodriguez tried to use the bear spray against officers before this ever happened." ECF No. 62 at 52. That is factually incorrect.

At 1:53 p.m., approximately 15 minutes before Mr. Rodriguez sprayed anyone, he is heard asking police to stop spraying people. Gov't. Exh. C, BWC of Officer J.R. at 13:53:53-13:54:05. Sergeant A.W.'s body-camera footage shows him spraying the crowd again at 2:08 p.m., before the government alleges Mr. Rodriguez first attempted to use the chemical spray. Gov't Exh. D, BWC of Sgt. A.W. at 14:08:26; *see also* Gov't. Exh. C, BWC of Officer J.R. at 14:08:27. Indeed, Sergeant A.W. sprays the crowd less than one minute before the government claims Mr. Rodriguez first attempted to spray, at 2:09:21 p.m. ECF No. 62 at 6 (citing Gov't Exh. D, BWC of Sgt. A.W. at 14:09:21). Sergeant A.W. sprays Mr. Rodriguez and the surrounding crowd *again* at 2:09:30. *See* Gov't Exh. D, Sgt. A.W. BWC at 14:09:30-34. It cannot seriously be disputed that police used OC spray against Mr. Rodriguez and the rest of the crowd before Mr. Rodriguez sprayed at 2:10 p.m. Nor does the difference of 60 seconds detract from the impulsive and spontaneous nature of Mr. Rodriguez's poor decision-making.

To be clear, Mr. Rodriguez understands that this context does not excuse his behavior. Contrary to the government's somewhat unexpected assertion that Mr. Rodriguez lacks remorse, he deeply regrets his actions and is quite remorseful—something he has expressed repeatedly to both the Court and the government. Further, he has not asserted a self-defense defense, but rather accepted responsibility and pled guilty. Instead, the fact that Mr. Rodriguez acted in reaction to police spraying him and others is relevant context.



**VII. Conclusion**

Mr. Rodriguez respectfully requests that the Court grant his objections to the PSR, calculate his Guidelines appropriately under § 2A2.4, and impose a probationary sentence, consistent with the § 3553(a) factors.

Respectfully submitted,

*/s/ Nora K. Hirozawa*
**NORA K. HIROZAWA**
Attorney for Mr. Rodriguez
Federal Defenders of New York, Inc.

Cc: Will Widman (AUSA)
Robert Cywinski (PO)